# EXHIBIT A

EXHIBIT A

20STCV28924
Electronically FILED by Superior Court of California, County of Los Angeles on 08/04/2020 12:39 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Tang,Deputy Clerk

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CLAREMEONT GRADUATE UNIVERSITY, a California Domestic Nonprofit, , the Estate of
MICHAEL UHLMANN, a deceased individual, (Additional Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

DR. JOSEPH J. JABLONSKI, JR., an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* LOS ANGELES SUPERIOR COURT<br>111 N. Hill Street<br>Los Angeles, 90012 | CASE NUMBER: *(Número del Caso):*<br>20STCV28924 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Brian M. Heit, Esq.: 340 South Lemon Avenue, Suite 8933, Walnut, CA 91789; (310) 744-5227

DATE: 08/04/2020      Sherri R. Carter Executive Officer / Clerk of Court      , Deputy
*(Fecha)*      Clerk, by    J. Tang      *(Adjunto)*
     *(Secretario)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courts.ca.gov |
|---|---|---|

EXHIBIT A

SUM-200(A)

| SHORT TITLE:<br>Dr. Joseph J. Jablonski Jr. v. Claremont Graduate University et al. | CASE NUMBER:<br>20STCV28924 |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

JEAN SCHROEDEL, an individual, HEATHER CAMPBELL, an individual, and, DOES 1-50, inclusive.

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 07/31/2020 10:45 AM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:20-cv-10695-FLA-RAO   Document 1-2   Filed 11/23/20   Page 4 of 220   Page ID #:243

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Barbara Meiers

1  Brian M. Heit, Esq., SBN 302474
HEIT LAW GROUP, P.C.
2  340 South Lemon Avenue, Suite 8933
Walnut, CA 91789
3  Telephone (310) 744-5227
 Facsimile (850) 254-1950
4  Email Brian@heitlawgroup.com
*Attorney for Plaintiff, Dr. JOSEPH J. JABLONSKI, JR.*

5

6

7  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

8

9  |  | Case Number: |

10  DR. JOSEPH J. JABLONSKI, JR., an individual | 20STCV28924 |

11      Plaintiff, | **(UNLIMITED CIVIL ACTION)** |

12      vs. |

13  CLAREMEONT GRADUATE UNIVERSITY, a
California Domestic Nonprofit, , the Estate of
14  MICHAEL UHLMANN, a deceased individual,
JEAN SCHROEDEL, an individual, HEATHER
15  CAMPBELL, an individual, DOES 1-50,
inclusive
16

17      Defendants.

1. **Sexual Orientation Discrimination & Harassment in Violation of Education Code (Cal. Ed. Code §§ 220 et seq.)**
2. **Sexual Orientation Discrimination in Violation of FEHA (Cal. Gov't Code §§ 12900 et seq.)**
3. **Failure to Prevent Discrimination in Violation of FEHA (Ca. Gov't Code §§12900)**
4. **Violation of Title VII of the Civil Rights Act of 1964**
5. **Violation of the Genetic Information Nondiscrimination Act of 2008**
6. **Violation of Unruh Act (Civil Code §51)**
7. **Fraudulent – Intentional Misrepresentation**
8. **Intentional Infliction of Emotional Distress**
9. **Negligent Infliction of Emotional Distress**
10. **Defamation Per Se**
11. **Intentional Interference of Prospective Business Relations**

18

19

20

21

22

23

24

25

26

27

28  **JURY TRIAL DEMANDED**

EXHIBIT A

1    Plaintiff DR. JOSEPH J. JABLONSKI, JR, an individual, (hereinafter, "Plaintiff") by and

2    through its attorneys, based on its own experience and investigation and the independent

3    investigation of counsel and information and belief, alleges against Defendants CLAREMEONT

4    GRADUATE UNIVERSITY, a California Domestic Nonprofit, MICHAEL UHLMANN, an

5    individual, JEAN SCHROEDEL, an individual, HEATHER CAMPBELL, an individual, and,

6    DOES 1-50, inclusive, inclusive, (hereinafter, "Defendants") as follows:

### I. INTRODUCTION

8    Plaintiff is a rare professor who is a dedicated and published academic with real world

9    experience. Plaintiff graduated from Claremont Graduate University (hereinafter, "CGU") in

10   December 2018 with a PhD and is currently a professor at California State University, San

11   Bernardino (hereinafter, "CSUSB"). Plaintiff is also a licensed attorney and a member in good

12   standing with the Massachusetts, Virginia, and Washington D.C. Legal Bar Associations;

13   Plaintiff's legal career spanned from 1987 through 2010 until he enrolled in Claremont Graduate

14   University's School of Politics and Economics to obtain his Master of Arts and Doctorate in

15   American Politics and Political Theory.

16   His legal accomplishments and academic record are quite extensive. His academic career,

17   generally, is as follows: Plaintiff maintains a i) Bachelor of Arts from the University of

18   Pennsylvania, double major in European History and Sociology; ii) a Visiting Graduate Student

19   at Harvard University; iii) a Masters of Arts from University of Pittsburg in Sociology; iv) a Juris

20   Doctorate from University of Pennsylvania Law School where he served as an editor for the

21   University of Pennsylvania Law Review, v) a Doctorate and Masters of Arts from Claremont

22   Graduate University in American Politics and Political Theory.

23   Plaintiff's legal career includes i) clerking for Retired Honorable Danny J. Boggs, Chief

24   Judge of the U.S. Court of Appeals, Sixth Circuit; ii) publishing two cutting edge law review

25   articles on federalism issues before the US Supreme Court in the DePaul and Richmond law

26   reviews, cited numerous times in the literature and recognized for their excellence by the late

27   Justice Lewis F. Powell, Jr.; iii) Staff Attorney for the Appellate Court Branch of the National

28   Labor Relations Board; iv) and private practice where he was involved in landmark cases, such

FIRST COMPLAINT FOR DAMAGES                          EXHIBIT A

1  as, *Czarkowski v. Merit Systems Protection Bd.*, (Fed. Cir. 2004) 390 F.3d 1347 (holding that the

2  Merit Systems Protection Board has jurisdiction over the Department of the Navy under the

3  Whistleblower Protection Act), and *Sutton v. Roth. L.L.C.*, (4th Cir. 2010) 361 Fed.Appx. 543, a

4  cutting-edge case in the fields of personal injury and products liability. Cited numerous times

5  and received press coverage, http://www.ca4.uscourts.gov/Opinions/Unpublished/081914.U.pdf.

6      Despite Plaintiff's academic and legal accomplishments, since 2011 Defendants have

7  perpetuated an underhanded, systematic, pervasive, and intentional pattern of discrimination and

8  harassment of Plaintiff after Defendant, Professor Michael Uhlmann (hereinafter, "Uhlmann")

9  surreptitiously became aware that Plaintiff was a bisexual man who has a positive status for

10 human immunodeficiency virus (hereinafter, "HIV") and that he supported a right to same-sex

11 marriage in the US Constitution. Uhlmann, now deceased, staunchly and publicly opposed

12 marriage equality, gay rights, and any non-heterosexual-monogamous relationship. This is

13 evident throughout his entire academic and professional life. Uhlmann was well connected in

14 conservative circles, a devout Catholic, a member of the Federalist society, a Republican

15 strategist and conservative, and a Federal employee, among many roles he served as the

16 Assistant General Counsel for the Federal Trade Commission and the Assistant Attorney General

17 for Legislative Affairs in the Department of Justice.

18     Once Uhlmann became aware that Plaintiff was bisexual and HIV positive and that

19 Plaintiff supported a right to same-sex marriage in the US Constitution, Uhlmann and the other

20 Defendants i) schemed to deny Plaintiff's application for the Johnston Fellowship Scholarship

21 despite promising he would be awarded it, ii) refused to provide career advisement and assigned

22 Plaintiff a new advisor without notifying Plaintiff, iii) brought baseless academic behavior

23 complaints in attempt to get Plaintiff expelled and/or reprimanded, iv) forced Plaintiff to change

24 his thesis from marriage equality to a topic Defendants deemed appropriate, v) forced Plaintiff to

25 create dissertation committee outside of CGU because Uhlmann was unwilling to advise Plaintiff

26 even after Plaintiff changed his dissertation topic aware from marriage equality, vi) tasked

27 conservative students with harassing Plaintiff while teaching and studying, vii) mocked Plaintiff

28 by referring to Plaintiff's cigarettes as "gay cigarettes," and made other demoralizing comments,

1   viii) often mimicked a feminized-male-voice in front of Plaintiff in condescension, ix) told
2   students in front of Plaintiff it was okay for Plaintiff to wear a dress to school, x) constituting a
3   pattern of unprofessional and discriminatory conduct on the part of CGU faculty, dating back to
4   February 2011 and continuing to the present, and (xi) after Defendants at CGU and CSUSB
5   became aware that Plaintiff had applied for a tenure-track position teaching Constitutional Law
6   and American Government at CSUSB on October 28, 2019, Defendants schemed to sabotage
7   Plaintiff's well-supported application leading to a substantial lost employment opportunity for
8   Plaintiff.

9         Plaintiff seeks redress from this court to remedy reputational and academic harm,
10   monetary losses sustained, and to prevent this type of behavior from occurring to other students
11   similarly situated. To allow this conduct would pervert the legislative intent of the Fair
12   Employment and Housing Act, Title VII of the Civil Rights Act of 1964, and the Genetic
13   Information Nondiscrimination Act of 2008, rendering these laws meaningless.

14         Moreover, if Defendants conduct were to be upheld, any discriminatory conduct could be
15   deemed defensible and allowed, creating new defenses not intended by the legislators. Despite
16   this pervasive unlawful conduct, Plaintiff was able to maintain straight As in his graduate school
17   course work at CGU; Plaintiff is beloved by his students, which is indicated by his near perfect
18   student reviews.  To allow Defendants conduct toward Plaintiff would be unfair and cause
19   significant harm to Plaintiff and all past, current and future students at CGU and current Cal
20   State students who are being and will be served by his instruction as well as all other graduate
21   students at both institutions suffering from the same or similar treatment.

22                                    **II. PARTIES**

23         1.      Plaintiff, DR. JOSEPH J. JABLONSKI, JR., an individual, is domiciled in and
24   was a citizen of the State of California during the relevant time periods from 2010 through
25   present.

26         2.      Defendant, CLAREMONT GRADUATE UNIVERSITY, is a domestic nonprofit
27   entity organized under the laws of the State of California, registered with the California
28   Secretary of State, and located in Los Angeles County, hereinafter referred to as "CGU".

EXHIBIT A

3.     Defendant, The Estate of MICHAEL UHLMANN, a deceased individual, who based on information and belief was domiciled in and was a citizen of the State of California during the relevant time periods from 2010 through death in 2019 hereinafter, referred to as "Uhlmann".

4.     Defendant, JEAN SCHROEDEL, an individual, based on information and belief, is domiciled in and was a citizen of the State of California during the relevant time periods from 2010 through present, hereinafter referred to as "Schroedel".

5.     Defendant, HEATHER CAMPBELL, an individual, based on information is domiciled in and was a citizen of the State of California during the relevant time periods from 2010 through present, hereinafter referred to as "Campbell".

6.     Plaintiff is ignorant of the true names and capacity of defendants sued herein as DOES 1 - 50 inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

7.     Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the injuries to the Plaintiff

as alleged herein, and that such injuries as herein alleged were proximately caused by and/or attributable to such Defendants.

8.     Plaintiff is informed and believes and based thereupon alleges that at all relevant times herein mentioned each of the Defendants and Does 1-50, inclusive, were the agents, servants and/or employees, partner, predecessor-in-interest, successor-in-interest, beneficiary, executor, fictitious business name, trustee, subsidiary, related/affiliated entity, assignee, assignor, legal representative, general administrator, member, co-conspirator, and/or joint venturer or occupied other relationships with each of the other named Defendants and at all times herein mentioned acted within the course and scope of said agency and/or employment and/or other relationship and each other Defendant has ratified, consented to, had actual and/or constructive knowledge of, was bound by, approved or, and/or failed to prevent the acts of their agents, employees, predecessor-in-interest, successor-in-interest, trustees, trustors, and/or representatives, and that each actively, passively, acquiesced, participated in, allowed, aided and

1  abetted, assisted, acted, or failed to act, with one another in the commission of the wrongdoing

2  alleged in this Complaint.

3      9.      Whenever in this Complaint an act or omission of a corporation or business entity

4  is alleged, said allegation shall be deemed to mean and include an allegation that the corporation

5  or business entity acted or omitted to act through its authorized officers, directors, agents,

6  servants, and/or employees, acting within the course and scope of their duties, that the act or

7  omission was authorized by corporate managerial officers or directors, and that the act or

8  omission was ratified by the officers and directors of the corporation.

9      10.      Plaintiff does not know the true names or legal capacities of the Defendants

10  designated herein as DOES 1 through 50, inclusive, and therefore sues said Defendants under the

11  fictitious name of "DOE."  Plaintiff is informed and believes and thereon allege that each of the

12  Defendants designated herein as a DOE is legally responsible in some manner for the matters

13  alleged in this complaint and is legally responsible in some manner for causing the injuries and

14  damages of which Plaintiff complain.  Plaintiff is informed and believes and thereon allege that

15  each of the Defendants designated herein as a DOE Defendant was, at all times relevant to the

16  matters alleged within this complaint, acting in conjunction with the named Defendant, whether

17  as a director, officer, employee, agent, affiliate, customer, participant, or co-conspirator. When

18  the identities of DOE Defendants 1 through 50 are discovered, or otherwise made available,

19  Plaintiff will seek to amend this Complaint to allege their identity and involvement with

20  particularity.

21      **III. JURISDICTION & VENUE**

22      11.      The Superior Court of the State of California in and for the County of Los

23  Angeles has jurisdiction over this action and venue is proper in this Court as the unlawful

24  conduct was principally and substantially committed within the confines and borders of Los

25  Angeles County, California and only secondarily and in an ancillary sense in San Bernardino

26  County.

27      12.      The amount in controversy is more than $25,000.

28

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

# IV. GENERAL ALLEGATIONS

## PLAINTIFF DECIDES TO ATTEND CGU

13.     Prior to applying to CGU, Plaintiff had studied at the following academic institutions: University of Pennsylvania, Harvard University, and University of Pittsburgh. (Exhibit A – Academic Transcripts).

14.     Plaintiff's extensive and successful academic and professional career at many of the country's premier institutions afforded Plaintiff the opportunity to present a strong case for admission into political science doctoral programs and was invited on January 17, 2009, by Director of Graduate Studies, Mary Nichols, to visit Baylor University on  a "short list of students whom we would like to consider for financial aid offers," as Baylor could "offer full funding for five years, including full tuition and a stipends starting at $12,000 per year." (Exhibit B-Email dated January 17, 2009, to Plaintiff from Mary Nichols).

15.     Plaintiff accepted the invitation and was flown to Baylor and was interviewed by Baylor faculty for a full tuition remission scholarship.

16.     Plaintiff was accepted on February 24,2009 into CGU's and on February 5 into Boston College's  graduate program in Political Science. (Exhibit C – Acceptance Letter).

17.     Plaintiff after having spoken on April 27, 2009, with Schroedel's assistant, Sandra Seymour, about scholarships available to CGU students, told Plaintiff that the Johnston Fellowship was a full tuition remission scholarship and urged him to apply based on her review of his credentials. (Exhibit D-Plaintiff's hand-written notes).

18.     Plaintiff applied for and was denied the Johnston Fellowship in and around June 26,  2009. (Exhibit E: Letter from Jennifer Merolla dated June 26, 2009).

19.      After receiving the letter, Plaintiff called  Seymour to express his disappointment over not getting the Johnston Fellowship and due to his financial situation and living circumstances asked her about possibility of deferring his date of matriculation

7

EXHIBIT A

1  into the program.  Seymour told him that he would need to request a deferral in his enrollment at

2  CGU for a year.

3      20.    Seymour told Plaintiff that a deferral for a year is granted usually as a

4  matter of course.

5      21.    Plaintiff filed the necessary paperwork with CGU.

6      22.    Plaintiff received a letter granting him the deferral on or about July 15, 2009.

7  (Exhibit F: Letter granting Plaintiff deferral to Fall 2010.)

8      23.    After receiving the letter of deferral, Plaintiff called Sandra Seymour on or about

9  July 17, 2009, and again expressed his disappointment over being denied the Johnston

10  Fellowship.

11      24.    Plaintiff then inquired into the possibility of re-applying for the Johnston

12  Fellowship.

13      25.    Seymour told Plaintiff on or about July 17, 2009, that he should re-apply for the

14  Johnston Fellowship in February 2011 after the grades came in for the Fall 2010 Semester.

15  (Exhibit D-Plaintiff's hand-written notes).

16      26.    In or around summer 2010, Plaintiff spoke with CGU and CMC professors,

17  including Uhlmann about the possibility of studying at CGU.

18      27.    After speaking at length with Uhlmann, Uhlmann notified Plaintiff that he could

19  re-apply for the Michael Johnston Fellowship in American Politics and notified Plaintiff that if

20  he chose to study at CGU that Uhlmann would ensure that Plaintiff, provided he did well

21  academically his first semester,   would receive Michael Johnston Fellowship in American

22  Politics, which would cover approximately $160,000 of Plaintiff's tuition for the duration of his

23  doctorate program.

24      28.     Uhlmann told Plaintiff that he would advise him during his doctorate program.

25      29.    Plaintiff chose   to study at CGU based on Uhlmann's and Seymour's

26  representations and other professors at CMC, Ward Elliott and Mark Blitz.

27      30.    Plaintiff prepared to sell real estate he owned in Arlington VA, based on

28  representations made by Uhlmann, Seymour and others.

FIRST COMPLAINT FOR DAMAGES                              EXHIBIT A

31.    In Fall 2010, Plaintiff began his doctorate program in American Politics and Political Science.

32.    Shortly after Plaintiff started attending classes at CGU in Fall 2010, Uhlmann gave Plaintiff a CGU administrative form for him to sign, indicating Plaintiff's agreement to have Uhlmann serve as his advisor.

33.    During the first semester, Uhlmann also asked Plaintiff to serve as his chauffeur, driving Uhlmann to LAX and Ontario airports and medical appointments.

34.    Uhlmann gave Plaintiff his personal cell phone number and told Plaintiff he should feel free to call him whenever he felt like it.

35.    Uhlmann and Plaintiff spoke daily and would enjoy smoking cigarettes together.

36.    Uhlmann, in comparing Plaintiff's own credentials and experience to his own credentials and experience, stated several times that Plaintiff was a "natural teacher," possessed a very similar academic and legal background to his own, and acknowledged how helpful Plaintiff's Ivy League education and extensive Washington D.C. legal experience would be in obtaining a tenured professorship at CGU..

37.    Uhlmann acknowledged that Plaintiff was the top student in each of his classes in Fall 2010 Semester on numerous occasions at CGU and in Plaintiff's automobile on trips to and from airports.

38.    Indeed, Uhlmann often asked Plaintiff how he assessed the academic promise of other graduate students in his cohort and also even of enrolled graduate students senior to Plaintiff.

39.    Uhlmann gave Plaintiff personal gifts: two winter coats in November 2010 because as Uhlmann stated, "I don't want to see you freeze your fanny off, for you might not know it gets cold here in Claremont during the winter."  (Exhibit G: Photos of coats Uhlmann gave Plaintiff).

40.    Uhlmann gave Plaintiff a set of Christmas manger figurines. (Exhibit H: Photo of Christmas manger).

EXHIBIT A

41.    Uhlmann gave Plaintiff several bottles of wine and fresh fruit, i.e., bananas, cherries, and grapes.

42.    During the early period of their close relationship, Uhlmann would inquire into Plaintiff's personal life, asking him about romantic partners, to which Plaintiff would answer generally but did not provide specifics.

43.    In totality, Plaintiff reasonably interpreted after Fall Semester 2010 that he would have received the Johnston Fellowship, an opportunity to obtain a tenured position at CGU, find success as a political scientist, and be provided equal treatment under the law.

**UHLMANN BECOMES AWARE THAT PLAINTIFF SUPPORTED SAME-SEX MARRIAGE AND BEGINS TO HARASS AND DISCRIMINATE AGAINST PLAINTIFF**

44.    Plaintiff told both Uhlmann and Schroedel that he intended to apply for the Johnston Fellowship during the Fall 2010 semester and in January 2011.

45.    Plaintiff applied for the Johnston Fellowship in February 2011 by submitting his completed application materials by his hand-delivering the application to Sandra Seymour.

46.    Seymour accepted Plaintiff's application for the Johnston Fellowship.

47.    However, shortly thereafter, in or around February 2011, Uhlmann urgently inquired into the subject matter of Plaintiff's work in a class Plaintiff had with Schroedel. Plaintiff told  Uhlmann that he was analyzing the constitutionality of same-sex marriage, a cutting-edge issue which at the time had not yet been adjudicated as a right under the US Constitution by the U.S. Supreme court.

48.    Uhlmann responded to Plaintiff's authorship on same-sex marriage by stating: "I am glad you told me" and immediately turned around and walked away.

49.    Uhlmann's reaction was strange and contrary to his previous behavior, which was to engage in lengthy and in-depth discussion with Plaintiff.

50.    Up to this point, Plaintiff and Uhlmann had a close personal and professional relationship.

EXHIBIT A

51.     Based on information and belief, Uhlmann's colleague Schroedel confirmed to Uhlmann that Plaintiff was writing on same-sex marriage and that she believed Plaintiff was not heterosexual.

52.     Plaintiff immediately noted this behavior of Uhlmann's and Uhlmann's changed demeanor toward him left him feeling uneasy and concerned.

53.     While walking with Schroedel to get some coffee in the Department of Politics' offices and making small-talk with her, Schroedel in a subdued tone told Plaintiff that she knew of someone who secretly cross-dressed but presented a heterosexual appearance in the workplace.

54.     Plaintiff answered her by saying that he was sure there were people who did that.

55.     During Spring 2011 semester, Uhlmann began to change his demeanor and tone towards to Plaintiff through constant verbal harassment.

56.     Uhlmann began to refer to Plaintiff's cigarettes as "gay cigarettes."

57.     Uhlmann began to refer to Plaintiff's shorts as "gay shorts."

58.     Uhlmann repeatedly called Plaintiff's car "filthy" despite continuing to request and accept rides from Plaintiff to and from southern California airports.

59.     When Plaintiff notified Uhlmann in or about April 2011 that providing rides was taking too much of his time and interfering with his academic obligations, Uhlmann stated that if the rides were too rough that he could "get out the Vaseline," which Plaintiff interpreted as a colloquialism, representing lube to be used during anal sex.

60.     Uhlmann also began to mimic a feminized voice to mock Plaintiff.

61.     Uhlmann continued to make invidious comments that served to mock Plaintiff because he was not heterosexual.

62.     One day in the computer lab on the 2nd floor of Harper, Uhlmann put his right hand on Plaintiff's left hand and rubbed it saying "HIV, HIV, HIV," and then walked away from Plaintiff in the direction of his office. On another day, Uhlmann told

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

1    Plaintiff that he was a sinner and needed to go to confession to a priest in the Catholic Church to

2    save his soul.

3         63.    The comments and gestures by Uhlmann toward Plaintiff became more frequent,

4    persistent, and underhanded.    The comments were made frequently in front of Plaintiff's

5    classmates.

6         64.    Based on information and belief, Uhlmann, a registered Republican and

7    conservative, a member of the Federalist Society, and a devout Catholic has professed his disdain

8    and disgust for homosexuality and non-traditional romantic relationships in his academic

9    authorship and in private with Defendants and other colleagues.

10        65.    In 2003, Uhlmann supported then Senator Rick Santorum's position that sodomy

11   laws should be upheld trying to analogize them to incest and the like and wrote in opinion

12   editorial titled Late Edition: The Real Offense in Crisis Magazine: A Voice for Faithful Catholic

13   Laity, writing:

14        "These are perfectly legitimate questions, and one ought to be able to ask them without

15   being labeled misanthropic, homophobic, or any of the other opprobrious terms hurled by gay-

16   rights advocates. People of conservative moral disposition can and do differ on the ***prudential***

17   ***desirability of criminalizing adult homosexual activity***, but that's a different issue." See,

18   Uhlmann, Late Edition: The Real Offense (June 2003) Crisis Magazine: A Voice for Faithful

19   Catholic Laity https://www.crisismagazine.com/2003/late-edition-the-real-offense (as of May 20,

20   2020). (emphasis added).

21        66.    Notably, prior to learning about Plaintiff's sexual orientation, his HIV status, and

22   his support for same-sex marriage equality in the US Constitution, Uhlmann offered to be

23   Plaintiff's supervisor, provided Plaintiff with his personal cell phone number to call "anytime",

24   welcomed Plaintiff serving as his personal chauffeur, informed Plaintiff that he was a "natural

25   teacher," relied on Plaintiff's academic-promise evaluation of other graduate students, was

26   impressed by Plaintiff's curriculum vitae so much so that Uhlmann told Plaintiff that he was

27   likely to become a permanent tenured professor at CGU, and that Uhlmann would both support

28

EXHIBIT A

1   him for the Johnston Fellowship, which Plaintiff was guaranteed to be awarded the

2   scholarship if Plaintiff agreed to study at CGU, and a tenure-track professorship at CGU.

3       67.    Moreover, on many occasions Uhlmann would pat Plaintiff's hand or place his

4   hand on Plaintiff's right thigh during their drives to and from the airport.  Although Uhlmann

5   never stated verbally that he was interested in Plaintiff sexually, Plaintiff interpreted

6   these overt gestures as meaning such.

7       68.    In their totality, Plaintiff's experiences with Uhlmann led Plaintiff to the

8   opinion that Uhlmann appeared to have repressed homosexual tendencies.

9   **MICHAEL JOHNSTON FELLOWSHIP AWARDED TO MELISSA MAHONEY**

10  **OVER PLAINTIFF DESPITE PLAINTIFF'S OBJECTIVELY STRONGER**

11  **APPLICATION FOR THE SCHOLARSHIP**

12      69.    In Spring Semester 2011, Campbell notes to Plaintiff in the hall that she

13  thought Uhlmann's relationship to the Plaintiff was too personally close and

14  inappropriate.

15      70.    Plaintiff submitted his Fellowship Renewal Request Form Academic year

16  2011-2012 on April 12, 2011, which indicated that he expected to receive the Johnston

17  Fellowship.  (Exhibit I: Plaintiff's Fellowship Renewal Request Form dated April 12,

18  2011).

19      71.    Melissa M. Mahoney was awarded the Michael Johnston Fellowship in

20  sometime in April 2011.

21      72.    Plaintiff immediately went to complain about this decision and later noted

22  in Fall 2011, after he learned months later who in fact had been awarded the scholarship,

23  that his credentials were objectively and demonstrably superior to those of Melissa

24  Mahoney.

25      73.    Plaintiff informed Uhlmann and Schroedel that the decision appeared

26  arbitrary and capricious

27

28

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

74.   Schroedel told Plaintiff for the first time in late April 2011 that as an enrolled student he was not eligible to apply for Johnston Fellowship and that only not-yet-enrolled students were eligible.

75.   Plaintiff responded to Schroedel by stating that both Uhlmann and Seymour had made representations to him in 2010 to the contrary.

76.   Plaintiff sent Schroedel a letter complaining about his not getting awarded the Johnston Fellowship.  (Exhibit J: Plaintiff to Schroedel letter June 27.2011 with cc: Uhlmann .)

77.   Schroedel never responded to the letter.

78.   Plaintiff never received a response from Uhlmann to his June 27 letter.

79.   When Plaintiff returned to CGU from a trip home to Massachusetts in mid-summer 2011, to talk to Uhlmann about the Johnston Fellowship said that he expected Plaintiff to serve him with a complaint, that in response to Plaintiff's arguments that the recipient of the award was "far more gifted intellectually" than Plaintiff, and that Plaintiff would realize that in time.

80.   In a meeting with Schroedel at Hagelbarger's restaurant in Fall 2011, Schroedel promised to increase Plaintiff's financial aid package,    verbally apologized for the "mental illness" of her assistant Sandra Seymour and any representations Uhlmann had made to Plaintiff about the Johnston Fellowship, refused to award the Johnston Fellowship to Plaintiff and notified Plaintiff  that Melissa Mahoney was the recipient of the Johnston Fellowship and that she had an M.A. in Government from Harvard University and that was the determining factor in awarding her the fellowship over Plaintiff.

81.   Based on information and belief, Plaintiff years later confirmed that Melissa Mahoney did not in-fact have an M.A. from Harvard University, and that this was a misrepresentation to him made by CGU's Schroedel and a pretext to justify CGU's discrimination against Plaintiff in not awarding him the fellowship. (Exhibit U: Melissa Mahoney's CV).

82.     Based on information and belief, Melissa Mahoney was an advisee of Professor Daniel J. Mahoney from Assumption College and Professor Daniel J. Mahoney knew Uhlmann previously and was a professional friend of Uhlmann's.

83.     Plaintiff submitted his paper on Same-Sex Marriage to Schroedel who graded it as an A and he received an A from Schroedel for the course. (Exhibit K: Plaintiff's paper on same-sex marriage).

## UHLMANN REFUSES TO RETURN PLAINTIFF'S HAND-WRITTEN FINAL EXAM SUBMITTED FOR HIS NATIONAL SECURITY COURSE

84.     At the end of the Spring 2011 semester, Plaintiff requested from Uhlmann the return of his in-class final exam paper for his National Security Course, which is required of professors pursuant to CGU's own written policies and procedures. (Exhibit L – CGU Policy and Procedure).  Despite numerous requests, Uhlmann refused to return it to Plaintiff.

85.     Plaintiff notified Schroedel and Uhlmann of the CGU's policy on the returning of final exams.  Schroedel was unable to get Uhlmann to return the exam and Uhlmann failed to return the exam.

86.     The hand-written exam was especially important and valuable to Plaintiff as it contained original ideas he had developed on national security and was important for preparing for the American qualifying exam.

87.     In July 2011, Plaintiff escalated the matter, to then Department Chair, Campbell, who agreed with Plaintiff's position and even went so far to call it intellectual theft by Uhlmann.

88.     Plaintiff requested a formal complaint be filed against Uhlmann for his continuing pattern of faculty misconduct.

89.     This is the first time Plaintiff requested that Campbell file a formal complaint against Uhlmann.

90.     However, despite Campbell's concern, she did nothing and Plaintiff never received his final exam in compliance with CGU's policies and procedures.

15

91.     When Plaintiff realized that Campbell intended to do nothing about Uhlmann's misconduct, Plaintiff indicated to Campbell that he intended to file a grievance over the denial of the Johnston Fellowship, Uhlmann's substantial and continuing misconduct toward him, including Uhlmann's failure to return his National Security Final Exam, Campbell insisted and then begged him not to file the grievance.   Because of Campbell's insistence and pressure that Plaintiff not file a grievance against Uhlmann, Plaintiff did not file a grievance.  (Exhibit M: Blank CGU Grievance Form).

## UHLMANN ASSIGNS HIS ADVISEE, ASHTON ELLIS TO INQUIRE INTO AND OBTAIN A COPY PLAINTIFF'S PAPER ON SAME-SEX MARRIAGE

92.     Based on information and belief, on or around June 2011, Uhlmann's advisee, Ashton Ellis, at the behest of Uhlmann, inquired into Plaintiff's dissertation on same-sex marriage and promised feedback to Plaintiff. Plaintiff sent the draft to Ashton Ellis but never ever received any feedback. (Exhibit N: Ellis's hand-written Post It note to Plaintiff and Email to Ashton Ellis with Same-Sex Draft Paper).

93.     Based on information and belief, Ashton Ellis forwarded Plaintiff's draft to Uhlmann for Uhlmann's unlawful purposes.

94.     Later, on or around Spring 2017, Uhlmann recommended to Campbell that Ashton Ellis be awarded the job of teaching legal writing to CGU graduate students, despite Plaintiff's numerous requests to Campbell as Department Chair and Plaintiff's Advisor at the time, to be hired for that position.

95.     Ashton Ellis's credentials do not include extensive practice of law at the appellate level and the Defendants' choice to hire Ellis over Plaintiff is indicative of the preferential treatment for students willing to do Uhlmann's bidding and as such constitutes discrimination towards Plaintiff.

## UHLMANN TARGETS AND RIDICULES PLAINTIFF'S FELLOW GRADUATE STUDENT KEVIN FELDMAN DURING CLASS DISCUSSION IN MODERN PRESIDENCY CLASS IN FALL SEMESTER 2011

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

96.     Uhlmann became visibly irate in Modern Presidency class after Plaintiff's fellow graduate student Kevin Feldman  stated that he  believed that certain Framers of the US Constitution were racist.

97.     Uhlmann knew that Plaintiff and Feldman held similar views on the racism of certain of the Framers.

98.     Uhlmann mistreated  Feldman in front of the whole class to chill open discussion of the racism of the Framers, despite the Framers' racism being an increasingly important area of cutting-edge study in the social sciences generally and political science in particular and a developing consensus view held by many noted academics in the fields of political science, law, sociology, and history.

99.     Plaintiff felt vicariously attacked by Uhlmann  because Plaintiff knew that Uhlmann knew that Plaintiff held the same view as Feldman's.

100.    Plaintiff did not share Uhlmann's extremist right-wing views that America was a country without a significant racist past.  Plaintiff  was deeply disappointed to see that Uhlmann felt entitled to admonish and belittle "liberal" graduate students like Feldman and Plaintiff in front of the whole class.  .

101.    Classmates of Plaintiff took note of this harassment and discrimination by Uhlmann toward liberal students like Feldman and Plaintiff and would inquire about it.

102.    Plaintiff suspected Uhlmann's attacks on him and Feldman were because they saw racism in the Framers and because they supported a right to same-sex marriage in the Constitution.  Plaintiff  did not want to draw any further attention to himself, so he would meekly state that he did not know why Uhlmann targeted liberal students.

103.    On information and belief, Uhlmann was not required to apologize to the whole class but was, however, required to send a note of apology to Feldman for his professional misconduct toward Feldman.

104.    Although the time to obtain a doctorate varies by program, generally a doctorate takes between four and six years to obtain, which is what Plaintiff planned for at the inception of his studies at CGU.

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

105.   Beginning in or around February 2011, Uhlmann, Schroedel, and with Campbell's knowing acquiescence, began to engage in a pattern of discrimination and harassment against Plaintiff because he was not a heterosexual male and supported a right to same-sex marriage in the US Constitution, making every attempt to get him to quit or extend his program, and causing him to develop enormous student debt.

**UHLMANN TARGETS PLAINTIFF FOR HIS POLISH ANCESTRY**

106.   During the Spring of 2011, Uhlmann began making statements to fellow graduate students regarding Plaintiff's Polish ancestry.

107.   Plaintiff was tutoring a fellow classmate in German, for which Plaintiff is fluent.

108.   Uhlmann was unaware that Plaintiff was speaking German, and mocked Plaintiff for teaching Polish, insinuating that he should be ashamed of his ancestry.

109.   Polish immigrants have suffered extensive discrimination since their immigration in the early 1900s, which Uhlmann was aware of and attempted to capitalize on.   He only did this because he believed Plaintiff was gay and supported a right to same-sex marriage in the US Constitution.

**UHLMANN SETS DIFFERENT STANDARDS FOR PLAINTIFF IN HIS MODERN PRESIDENCY COURSE IN ATTEMPT TO LOWER PLAINTIFF'S GRADE UNFAIRLY**

110.   Uhlmann informed Plaintiff in front of the entire class that Plaintiff did not need to make a class presentation, because of Plaintiff's active, informed, and extensive involvement in participatory discourse during each class.

111.   Despite Uhlmann's public statement, towards the end of the semester, Uhlmann notified Plaintiff that he would have to lower Plaintiff's grade because he did not make a class presentation.

112.   Plaintiff felt it was necessary to report his threat.

113.   This the second time Plaintiff reported Uhlmann's misconduct to CGU, this time to Schroedel who did not follow up with Plaintiff, or to Plaintiff's knowledge admonish Uhlmann for this conduct.

EXHIBIT A

114.    Schroedel told Plaintiff that Uhlmann told her that Plaintiff submitted the best exam for an unprecedented 4-hr in-class exam in the Modern Presidency class.

115.    Uhlmann never told Plaintiff about how well he had done in the unprecedented 4-hr in-class exam.

## UHLMANN SURREPTIOUSLY WITHDRAWS AS PLAINTIFF'S ADVISOR WITHOUT NOTICE

116.    Plaintiff became aware in late Fall Semester 2011 that Uhlmann had dropped Plaintiff as his advisor in Spring 2011 .

117.    Uhlmann never notified Plaintiff that he was no longer Plaintiff's advisor.

118.    It is either a typical or irregular for graduate school advisor in the instant circumstances to withdraw as an advisor without providing notice to the advisee.

119.    At the time Uhlmann withdrew from advising Plaintiff, Plaintiff was the top graduate student in Plaintiff's cohort and had achieved a 4.0 in Fall 2010 and was on his way to achieving a 4.0 in Spring 2011.

120.    Plaintiff only became aware that Uhlmann refused to serve as Plaintiff's his advisor when Plaintiff was notified by Schroedel in  late Fall 2011 semester that she was now his advisor.

121.    Plaintiff was shocked that Uhlmann never notified him and inquired with Schroedel when Uhlmann had withdrawn as his advisor.

122.    Schroedel refused to answer Plaintiff's question regarding when or why Uhlmann was no longer his advisor.

123.    When Plaintiff inquired into how Schroedel became his advisor, Schroedel would not answer him.

124.    It is not typical for a graduate student to just be assigned an advisor, it is usually through discussion and mutual agreement.

125.    Uhlmann's choice to drop Plaintiff was only after Uhlmann either assumed or became  aware that Plaintiff was other than heterosexual and supported a right to same-sex marriage in the US Constitution.

FIRST COMPLAINT FOR DAMAGES                        128

EXHIBIT A

126.   No explanation to date has ever been provided by Uhlmann, Schroedel, or Campbell or any other CGU Faculty as to why Uhlmann withdrew as Plaintiff's advisor.

127.   Nor has anyone explained how or who wrote Plaintiff's name on the official form designating Schroedel as Plaintiff's advisor.

128.   Plaintiff to the best of knowledge never signed an administrative form making Schroedel his advisor.

129.   Plaintiff told Uhlmann he could not provide any rides to him any longer in late November 2011.

## UHLMANN FORBIDS PLAINTIFF FROM PARTICPATING IN CONFERENCE ON THE ADMINISTRATIVE STATE IN SPRING 2012

130.   Despite the Conference on the Administrative State in Spring 2012 being one that was relevant to Plaintiff's American Qualification Exam Preparation, Uhlmann failed to make Plaintiff aware of the Conference.

131.   Uhlmann also told Plaintiff in this timeframe that if Plaintiff thought of asking Uhlmann to be on his dissertation committee that he Uhlmann had no interest in doing so and that Plaintiff ought not to ask him to be on his dissertation committee.

132.   Plaintiff found out about the Conference through a graduate student colleague and Plaintiff nonetheless attended, despite Uhlmann's attempt to keep Plaintiff from attending.

133.   At the Conference, Uhlmann informed Plaintiff that under no circumstances should Plaintiff participate, speak, or ask questions at the Conference.

134.   After the Conference, Plaintiff notified CGU Professor Jennifer Merolla in her office , that Uhlmann had forbidden him from making any public comments at the Conference and that Uhlmann had similarly forbidden him from making any comments at an earlier conference at Albrecht Auditorium on *Citizens United* which Plaintiff opposed as wrongly decided by the US Supreme Court.   Plaintiff also informed Merolla that he wanted to state his public agreement with Professor Erwin Chemerinsky's presentation at the conference but felt that had he done so Uhlmann would have retaliated against him in some way.   Merolla concurred

1   with Plaintiff that Uhlmann's conduct was extreme and outrageous and went as far as

2   stating that it violated Plaintiff's freedom of speech bestowed by the U.S. Constitution's

3   First Amendment.

4       135.   This was yet another time Plaintiff complained about Uhlmann's inappropriate

5   conduct chilling academic debate and the exercise of Amendment rights to CGU.

6   **UHLMANN ESCALATES HIS TARGETING OF PLAINTIFF, CONTINUES TO MAKE**

7   ***AD HOMINEM* ATTACKS AGAINST PLAINTIFF IN CLASS**

8       136.   Plaintiff audited Uhlmann's class in Summer 2012 on the $1_{st}$

9   Amendment's establishment and free exercise clauses as further preparation for his

10   upcoming Qualifying Examinations.

11       137.   Uhlmann called Plaintiff a "smart ass" in front of Uhlmann's class, after

12   Plaintiff raised the "harm principle" by John Stuart Mill (which later became a

13   philosophical foundation for the right to same-sex marriage in the US Constitution).

14       138.   Uhlmann also mocked Plaintiff by calling him "Chief Justice," in what

15   Plaintiff interpreted it as Uhlmann's likening of Plaintiff to Chief Justice Earl Warren,

16   whom Uhlmann had by then numerous times disparaged as a "judicial activist."

17   **UHLMANN AND SCHROEDEL REMOVE ALL QUESTIONS REGARDING THE**

18   **AMERICAN JUDICIARY FROM PLAINTIFF'S AMERICAN QUALIFYING EXAM**

19   **FALL SEMESTER 2013**

20       139.   Plaintiff came to CGU as an expert in the American Judiciary, through his

21   Juris Doctorate, and appellate legal practice, and published law review articles on

22   federalism, his having taken Uhlmann's course on the American judiciary, and

23   Defendants knew or should have known that  Plaintiff was indeed well-versed in the

24   subject.

25       140.   In the summer of 2013, Plaintiff inquired of fellow graduate student Trish

26   Miller, who had taken and passed the American qualifying exam the previous semester,

27   what she thought the Defendants might ask on the up and coming American qualifying

28   exam.   Miller told Plaintiff that she was aware that the Defendants were out to screw

FIRST COMPLAINT FOR DAMAGES

EXHIBIT A

1    Plaintiff and that since he was a lawyer, he should not expect to see any questions on the

2    American judiciary.

3         141.    Despite the judiciary being one-third of the three co-equal branches of the

4    American Government, and a major area of political science study at CGU and of the American

5    qualifying exam at CGU, Plaintiff's Qualification Exam was intentionally devoid of any major

6    explicit questions in either Section A. or B. on or about the American judiciary.

7         142.    After the exam, fellow graduate student and study partner, Andrew Carrico told

8    Plaintiff that he Carrico felt he had flunked the exam due to their not being a question on the

9    American judiciary.

10        143.    Based on information and belief, Uhlmann had complete control over the

11   qualifying exam questions deriving from  his own courses, and that Uhlmann had intentionally

12   removed and/ or withheld any question on the American judiciary in an attempt to set Plaintiff up

13   to fail.

14        144.    Schroedel also stated to Plaintiff in the Harper 2nd floor student computer lab in

15   the afternoon prior to the American Politics Qualifying Exam that Plaintiff would enjoy taking

16   the exam.

17        145.    After the results of the exam were announced in December, Uhlmann indicated

18   his manipulation by stating to Plaintiff "it looks like you over-prepared" and then walked away

19   from Plaintiff without further comment.

20        146.    In this same time period, Schroedel was also tellingly very stingy in her

21   comments to Plaintiff, despite Plaintiff having done exceedingly well on an exam in the range of

22   a "High Pass" that was supposed to be a failure for Plaintiff.

23   **PLAINTIFF PROPOSED A DISSERTATION ON SAME-SEX MARRIAGE TO HIS**

24   **THEN ADVISOR SCHROEDEL WHO INFORMS HIM TO CHANGE HIS**

25   **DISSERTATION TOPIC OR "THEY WILL DESTROY YOU"**

26        147.    Prior to the landmark decision in ████████████████

27   ████████████████████████████████████████████

28   ████████████████████████████████████████████

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

████████████████████████████████████████████████████████

██████████████████████████████████████████

148.   When Plaintiff informed his then advisor, Schroedel, Schroedel dissuaded him from writing it on the topic of same-sex marriage by stating that if Plaintiff chose to write on same-sex marriage: "they will destroy you."

149.   ████████████████████████████████████████████████████

██████████████████████████████████████████████████

150.   Plaintiff inquired into who the ominous "they" were, but Schroedel refused to answer and merely stared at him blankly. Plaintiff saw himself out of her office with feeling ill and scared.

151.   But, ultimately, Plaintiff knew and understood the "they" to mean Uhlmann, and the other conservative faculty members and conservative graduate students at CGU and conservative faculty members at Claremont McKenna College ("CMC"), who often taught graduate courses at CGU.

152.   ████████████████████████████████████████████████████

█████████████████████████████████████

153.   ████████████████████████████████████████████████████

████████████████████████████████

154.   █████████████████████████████████████████████

155.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

156.   ████████████████████████████████████████████████████

███████████████████████████████████

FIRST COMPLAINT FOR DAMAGES

EXHIBIT A



157. [redacted]

158. [redacted]

159. [redacted]

160. [redacted]

161. [redacted]

162. [redacted]

163. [redacted]

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon

164. ████████████████████████████████
████████████████████████████████████
████████████████████████

165. ████████████████████████████████
████████████████████████████████████
██████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████

166. ████████████████████████████████
██████████████████████████████████████

167. ████████████████████████████████
████████████████████████████████

168. ████████████████████████████████
████████████

169. ████████████████████████████████
████████████████████████████████████
████████████████

170. ████████████████████████████████████
██████████████████████████
████████████████████████████████████████
██████████████████████

171.    Plaintiff had expressed interest in an adjunct professorship at CGU, specifically to teach constitutional law and legal writing.  Plaintiff had expressed this desire consistently since as early as 2014 continuing through 2016 to Campbell.

FIRST COMPLAINT FOR DAMAGES

EXHIBIT A

172. So, when an adjunct professorship became available after Ken Blickenstaff retired from CGU, Campbell could have notified Plaintiff of the open position.

173. [redacted]

174. [redacted]

175. [redacted]

176. [redacted]

177. [redacted]

178. [redacted]

HEIT LAW GROUP PROFESSIONAL CORPORATION 340 South Lemon



HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon

179. [redacted]

180. [redacted]

181. [redacted]

182. [redacted]

183. [redacted]

184. [redacted]

185. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

186. On or around November 21, 2017, Plaintiff's life was threatened by text message by CGU Ph.D. student Kelan Farell-Smith, with the words "your welcome blood," preceded by other minatory text messages.

187. Based on information and belief, Kelan Farrell-Smith had been banned from CGU for threatening the Defendants and other CGU professors, including the chairman of Plaintiff's dissertation committee, Mark Blitz.

188. On or around early December 2017, Joseph Lake, a Uhlmann advisee, approached Plaintiff in the ACB student computer lab, said stated generally that we have noticed that you (Plaintiff) have not been participating in the job candidate talks and it would be nice to have you (Plaintiff) participate in the job talks.

189. In a manner reminiscent of how Uhlmann would occasionally approach Plaintiff in Harper's 2nd floor student computer lab, Joseph Lake then came very close to Plaintiff's body in Plaintiff's workspace so that he could see what was on Plaintiff's computer screen.

190. Joseph Lake then asked Plaintiff again to attend an event to meet the job candidate and to talk with the candidate and other graduate students. Plaintiff agreed to attend in attempt to get Joseph Lake away from his personal space.

191. At the event the next day, Plaintiff entered into discourse with the job candidate about his dissertation on Woodrow Wilson and defended his thesis of Woodrow Wilson's race-historicism professionally, against the job candidates insisted-on contention that Plaintiff's thesis on Wilson's racism was untenable.

192. Joseph Lake then filed a formal grievance against Plaintiff with Campbell for academic misconduct and/or unprofessional behavior.

**PLAINTIFF, AGAIN, IN DECEMBER 2017 AND IN JANUARY 2018 NOTIFIES CAMPBELL OF THE ON-GOING PATTERN OF HARRASSMENT AND**

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

**DISCRIMINATION THAT HE HAD ENDURED SINCE 2011; CAMPBELL**

**DOES NOTHING**

193.    In or around January 2018, Plaintiff's lays out these complaint against the Defendant and Lake via email to Campbell. ███████████████████████████

████████████

194.    Campbell failed to respond.

195.    Plaintiff by this time had now made six or more complaints about harassment and discrimination directed toward him at CGU, all of which either received no response or met with Campbell's insistence not to file a grievance lest Plaintiff be further retaliated against by Defendants.



196.

197.

198.

199.

200.

201.

EXHIBIT A



[redacted]

202. [redacted]

203. [redacted]

204. [redacted]

205. [redacted]

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon



206. [redacted]

207. [redacted]

208. [redacted]

209. [redacted]

210. [redacted]

211. [redacted]

212. [redacted]

213. [redacted]

214. [redacted]

340 South Lemon
HEIT LAW GROUP
PROFESSIONAL CORPORATION



215. [redacted]

216. [redacted]

217. [redacted]

218. [redacted]

219. [redacted]

220. [redacted]

221. [redacted]

222. [redacted]

HEIT LAW GROUP PROFESSIONAL CORPORATION
340 South Lemon

223. [redacted]

224. [redacted]

225. [redacted]

226. [redacted]

227. [redacted]

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon



228. [redacted]

229. [redacted]

230. [redacted]

231. [redacted]

232. [redacted]

233. [redacted]

234. [redacted]

235. [redacted]

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon

236. 

237.

**First Cause of Action for Sexual Orientation Discrimination (Ed. Code § 200 et seq.)**

**(Against All Defendants and Does 1 -50)**

238.   Plaintiff refers to and incorporates by reference paragraphs 1 through 237 above, inclusive, as though set forth in full herein, and alleges this First Cause of Action for Sexual Orientation Discrimination in Violation of FEHA (Cal. Gov't Code §§ 12900 et seq.) against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

239.   Plaintiff suffered harassment that was so severe, pervasive, and offensive that it effectively deprived him of the right of equal access to educational benefits and opportunities.

240.   Defendants had actual knowledge of that harassment.

241.   Defendants acted with deliberate indifference in the face of the that knowledge.

**Second Cause of Action for Sexual Orientation Discrimination in Violation of FEHA (Ca.**

**Gov't Code §§12900)**

**(Against Defendant All Defendants and Does 1 -50)**

242.   Plaintiff refers to and incorporates by reference paragraphs 1 through 241 above, inclusive, as though set forth in full herein, and alleges this Second Cause of

35

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

1   Action for Sexual Orientation Discrimination in Violation of FEHA (Cal. Gov't Code §§ 12900

2   et seq.) against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators,

3   inclusive, and each of them, as follows as follows:

4       243.   Plaintiff applied for jobs at Defendant, CGU.

5       244.   Defendant, CGU refused to hire Plaintiff.

6       245.   Defendant, CGU refused to hire Plaintiff because of his sexual orientation.

7       246.   The Plaintiff was harmed.

8       247.   Defendant, CGU's conduct was a substantial factor in causing Plaintiff's harm.

9   **Third Cause of Action for Failure to Prevent Discrimination in Violation of FEHA (Ca.**

10   **Gov't Code §§12900)**

11   **(Against All Defendants and Does 1 -50)**

12       248.   Plaintiff refers to and incorporates by reference paragraphs 1 through 247 above,

13   inclusive, as though set forth in full herein, and alleges this Second Cause of Action for Sexual

14   Orientation Discrimination in Violation of FEHA (Cal. Gov't Code §§ 12900 et seq.) against all

15   Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of

16   them, as follows as follows:

17       249.   Plaintiff applied for jobs at Defendant, CGU.

18       250.   Defendant, CGU refused to hire Plaintiff.

19       251.   Defendant, CGU refused to hire Plaintiff because of his sexual orientation.

20       252.   The Plaintiff was harmed.

21       253.   Defendant, CGU's conduct was a substantial factor in causing Plaintiff's harm.

22   **Fourth Cause of Action for Violation of Title VII of the Civil Rights Act of 1964**

23   **(Against All Defendants and Does 1 -50)**

24       254.   Plaintiff refers to and incorporates by reference paragraphs 1 through 253 above,

25   inclusive, as though set forth in full herein, and alleges this Fourth Cause of Action for Violation

26   of the Civil Rights Act of 1964 against all Defendants and DOES 1 through 50 as aiders, abettors

27   and conspirators, inclusive, and each of them, as follows as follows:

28       255.   Plaintiff applied for jobs at Defendant, CGU.

FIRST COMPLAINT FOR DAMAGES

EXHIBIT A

256.   Defendant, CGU refused to hire Plaintiff.

257.   Defendant, CGU refused to hire Plaintiff because of his sexual orientation.

258.   The Plaintiff was harmed.

259.   Defendant, CGU's conduct was a substantial factor in causing Plaintiff's harm.

**Fifth Cause of Action for Violation of the Genetic Information Nondiscrimination Act of 2008**

**(Against All Defendants and Does 1 -50)**

260.   Plaintiff refers to and incorporates by reference paragraphs 1 through 259 above, inclusive, as though set forth in full herein, and alleges this Fifth Cause of Action for Violation of the Genetic Information Nondiscrimination Act of 2008 against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

261.   Plaintiff applied for jobs at Defendant, CGU.

262.   Based on information and belief, Defendant, Uhlmann obtained illegally information about Plaintiff genetic information, namely his positive status for HIV.

263.   Defendant, CGU refused to hire Plaintiff.

264.   Plaintiff's genetic information was a substantial factor in Defendant not hiring Plaintiff.

**Sixth Cause of Action for Violation of Unruh Act (Civil Code §51)**

**(Against All Defendants and Does 1 -50)**

265.   Plaintiff refers to and incorporates by reference paragraphs 1 through 264 above, inclusive, as though set forth in full herein, and alleges this Sixth Cause of Action for Violation of the Unruh Act (Civil Code §51) against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

266.   Defendant      denied      full      and      equal      access accommodations/advantages/facilities/privileges/services to Plaintiff.

267.   That a substantial motivating reason for Defendant conduct was its perception of Plaintiff's genetic information and sexual orientation.

268.   That Plaintiff's genetic information and sexual orientation, and association with others with the same status was a substantial motivating reason for Defendants' conduct.

269.   The Plaintiff was harmed.

270.   The Defendant's conduct was a substantial factor in causing Plaintiff's harm.

**Seventh Cause of Action for Fraudulent – Intentional Misrepresentation**

**(Against Defendant Uhlmann and Does 1 -50)**

271.   Plaintiff refers to and incorporates by reference paragraphs 1 through 270 above, inclusive, as though set forth in full herein, and alleges this Seventh Cause of Action for Fraudulent Intentional Misrepresentation against Defendant, Uhlmann and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

272.   Uhlmann represented to Plaintiff that a fact was true, namely that Plaintiff would receive the Johnston fellowship if he attended CGU.

273.   Uhlmann's representation was false.

274.   Uhlmann knew that representation was false when he made it and/or made it without regard for its truth.

275.   Uhlmann intended Plaintiff to rely on the representation.

276.   The Plaintiff reasonably relied upon Uhlmann's representation.

277.   The Plaintiff's reliance on Uhlmann's representation was a substantial factor in causing Plaintiff's harm.

**Eighth Cause of Action for Intentional Infliction of Emotional Distress**

**(Against Defendant Claremont Graduate University, Defendant Uhlmann, and Does 1 -50)**

278.   Plaintiff refers to and incorporates by reference paragraphs 1 through 277 above, inclusive, as though set forth in full herein, and alleges this Eighth Cause of Action for Intentional Infliction of Emotional Distress against Defendants, CGU, Uhlmann, and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

FIRST COMPLAINT FOR DAMAGES                    EXHIBIT A

279.    Defendant's conduct was outrageous.

280.    Defendants intended to cause Plaintiff emotional distress.

281.    Plaintiff did suffer emotional distress and suffered physical harm as a result of that distress in terms of elevated blood pressure and continuing dermatological trauma.

282.    Defendants conduct was a substantial factor in causing Plaintiff's severe emotional distress.

**Ninth Cause of Action for Negligent Infliction of Emotional Distress**

**(Against Defendant Claremont Graduate University, Defendant Uhlmann, and Does 1 -50)**

283.    Plaintiff refers to and incorporates by reference paragraphs 1 through 282 above, inclusive, as though set forth in full herein, and alleges this Eighth Cause of Action for Negligent Infliction of Emotional Distress against Defendants, CGU, Uhlmann, and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

284.    Defendants were negligent.

285.    Plaintiff did suffer serious emotional distress.

286.    Defendants' negligence was a substantial factor in causing Plaintiff's serious emotional distress.

**Tenth Cause of Action for Defamation Per Se**

**(Against All Defendants and Does 1 -50)**

287.    Plaintiff refers to and incorporates by reference paragraphs 1 through 286 above, inclusive, as though set forth in full herein, and alleges this Tenth Cause of Action for Defamation Per Se against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

288.    Defendant, Uhlmann acting in his capacity as a professor at CGU made statements to Plaintiff's classmates about Plaintiff.

289.    Plaintiff's classmates clearly understood Uhlmann statements to be about Plaintiff.

290.    Plaintiff's classmates understood these statements to mean that Plaintiff was and is in-fact a homosexual, although he is bi-sexual.

291.    Defendant failed to use reasonable care to determine the truth or falsity of these statements.

292.    Defendants' misconduct in posting those statements were a substantial factor in causing harm to Plaintiff's reputation, and created shame, mortification, and hurt feelings.

293.    The statements made by Defendants were done with malice, oppression, and/or fraud.

**Eleventh Cause of Action for Intentional Interference of Prospective Business Relations**

**(Against All Defendants and Does 1 -50)**

294.    Plaintiff refers to and incorporates by reference paragraphs 1 through 293 above, inclusive, as though set forth in full herein, and alleges this Eleventh Cause of Action for Intentional Interference of Prospective Business Relations against all Defendants and DOES 1 through 50 as aiders, abettors and conspirators, inclusive, and each of them, as follows as follows:

295.    The Plaintiff and CSUSB were in an economic relationship that probably would have resulted in an economic benefit to the Plaintiff.

296.    The Defendants knew of this relationship.

297.    The Defendants and their agents engaged in communications with CSUSB about Plaintiff and based on information and belief either instructed CSUSB not to hire Plaintiff as a professor or recommended strongly that CSUSB not hire Plaintiff into the tenure track position.

298.    That by engaging in this conduct Defendants intended to disrupt the relationship.

299.    That relationship was disrupted.

300.    The Plaintiff was harmed.

301.    The Defendants' conduct was a substantial factor in causing Plaintiff's harm.

FIRST COMPLAINT FOR DAMAGES                                        EXHIBIT A

## V. PRAYER FOR RELIEF

Plaintiff DR. JOSEPH J. JABLONSKI, JR., hereby prays for judgment against Defendants CLAREMONT GRADUATE UNIVERSITY, the Estate of MICHAEL UHLMANN, JEAN SCHROEDEL, HEATHER CAMPBELL, and DOES 1 to 50 inclusive, and each of them, as follows:

1. General, compensatory, and special damages in amounts to be proven at trial;
2. For prejudgment interest as permitted by Section 3291 of the California Civil Code and any other applicable statutes;
3. Damages from loss of future wages and benefits, together with interest, and damages for emotional distress that resulted due to Defendant's wrongful conduct;
4. Punitive Damages;
5. For attorney's fees, the costs of suit herein incurred; and,
6. For such other and further relief as this Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff DR. JOSEPH J. JABLONSKI, JR., hereby demands a trial by jury in this matter.

Dated: July 31, 2020                                         HEIT LAW GROUP, P.C.


By:_____

Brian M. Heit, Esq.

*Attorney for Plaintiff Dr. Joseph J. Jablonski, Jr.*

FIRST COMPLAINT FOR DAMAGES                     EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue. Suite 8933. Walnut. CA 91789

   I.   **EXHIBIT A – ACADEMIC TRANSCRIPTS**

  II.   **EXHIBIT B - EMAIL DATED JANUARY 17, 2019, TO PLAINTIFF FROM MARY NICHOLS.**

 III.   **EXHIBIT C - ACCEPTANCE LETTER**

  IV.   **EXHIBIT D - PLAINTIFF'S HAND-WRITTEN NOTES**

   V.   **EXHIBIT E - LETTER FROM JENNIFER MEROLLA DATED JUNE 26, 2009**

  VI.   **EXHIBIT F - LETTER GRANTING PLAINTIFF DEFERRAL TO FALL 2010**

 VII.   **EXHIBIT G - PHOTOS OF COATS UHLMANN GAVE PLAINTIFF**

VIII.   **EXHIBIT H - PHOTO OF CHRISTMAS MANGER**

  IX.   **EXHIBIT I - PLAINTIFF'S FELLOWSHIP RENEWAL REQUEST FORM DATED APRIL 12, 2011**

   X.   **EXHIBIT J - PLAINTIFF TO SCHROEDEL LETTER JUNE 27.2011 WITH CC: UHLMANN**

  XI.   **EXHIBIT K - PLAINTIFF'S PAPER ON SAME-SEX MARRIAGE**

 XII.   **EXHIBIT L - CGU POLICY AND PROCEDURE**

XIII.   **EXHIBIT M - BLANK CGU GRIEVANCE FORM**

 XIV.   **EXHIBIT  N -  ELLIS'S HAND-WRITTEN POST IT NOTE TO PLAINTIFF AND EMAIL TO ASHTON ELLIS WITH SAME-SEX DRAFT PAPER**

  XV.   **EXHIBIT O - CAMPBELL'S EMAIL TO PLAINTIFF DATED NOV. 22, 2016, SAYING "I FORGOT."**

 XVI.   **EXHIBIT P- PLAINTIFF'S FEB. 2019 LETTER TO CGU PRESIDENT JESSUP**

XVII.   **EXHIBIT Q - PLAINTIFF'S CGU TRANSCRIPTS**

XVIII.  **EXHIBIT R - KREWSON'S CV**

 XIX.   **EXHIBIT S: PLAINTIFF'S COVER LETTER DATED OCTOBER 29, 2019 TO THE CSUSB HIRING COMMITTEE)**

  XX.   **EXHIBIT T: PLAINTIFF'S DFEH RIGHT TO SUE LETTER**

 XXI.   **EXHIBIT U: MELISSA MAHONEY'S CV**

XXII.   **EXHIBIT V – PLAINTIFF'S EMAIL TO CAMPBELL DATED JAN. 23, 2018**

FIRST COMPLAINT FOR DAMAGES          EXHIBIT A

**EXHIBIT A**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

43

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

JABLONSKI, JOSEPH

902-2680-0   SPECIAL STUDENT

HARVARD UNIVERSITY
Faculty of Arts and Sciences

Prior Degrees:   AB   Univ. of Pennsylvania 1981

GGU Admissions

DEC 01 2008   *OFFICIAL*

REGISTRAR

Not valid unless signed & sealed.

| COURSE | TITLE | GRADES full half |
|---|---|---|
| | 1982-83 | |
| GOV 2100 | Seminar: Political Development | B |
| GOV 1060 | The History of Political Theory | B |
| GOV 1061 | The History of Political Theory | B+ |

COPY
OF AN ORIGINAL DOCUMENT FROM THE
FILES OF CLAREMONT GRADUATE UNIVERSITY

THE FACE OF THIS TRANSCRIPT HAS A CRIMSON BACKGROUND ON WHITE PAPER

EXHIBIT A

**RECORD OF:** JABLONSKI JR JOSEPH JOHN  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  BIRTHDATE: 01/17/60
**HOME ADDRESS:** MCCRACKEN RD  MILLBURY MA 01527
**SECONDARY SCHOOL OR COLLEGE:** ST JOHNS HIGH SCHOOL  SHREWSBURY MA

**UNIVERSITY of PENNSYLVANIA**
PHILADELPHIA
MATRICULATED: SEPT 1977

| COURSE DESCRIPTION | DEPT. | COURSE NUMBER | CREDIT | GRADE |
|---|---|---|---|---|
| FALL 1977-FACULTY OF ARTS AND SCIENCES | | | | |
| EXTRA-TERR LIFE | ASTRO | 6 | 1.0# | A |
| GEN CHEMISTRY I | CHEM * | 3 | 1.0# | P |
| GEN CHEM LAB I | CHEM | 50-A | 0.5# | B |
| CRAFT OF PROSE | ENGL | 1 | 1.0# | B |
| CALCULUS NASC I | MATH | 140 | 1.0# | B |
| TERM AVG 3.29 | | CUM AVG | 3.29 | |
| SPRING 1978-FACULTY OF ARTS AND SCIENCES | | | | |
| ANIMAL ORGANISMS | BIOL | 102 | 1.0# | B |
| GEN CHEM II | CHEM | 4 | 1.0# | B |
| GEN CHEM LAB | CHEM | 50-B | 0.5# | P |
| INTERMED FRNCH | FRNCH | 3 | 1.0# | B |
| RUSSIA 19-20 C | HIST | 149-B | 1.0# | P |
| CALCULUS NASC II | MATH | 141 | 1.0# | C |
| TERM AVG 2.94 | | CUM AVG | 2.67 | |
| FALL 1978-FACULTY OF ARTS AND SCIENCES | | | | |
| INTRO TO LAW | LG ST | 1 | 1.0# | C |
| INTRODUCTORY ECO | ECON * | 1-A | 0.0# | C |
| INTERMED FRENCH | FRNCH | 4 | 1.0# | P |
| ENGLND 1066-1688 | HIST | 50-A | 1.0# | A |
| INTROD STAT | STAT | 1-A | 1.0# | B |
| TERM AVG 2.00 | | CUM AVG | 2.68 | |
| SPRING 1979-FACULTY OF ARTS AND SCIENCES | | | | |
| STUART ENGLAND | HIST | 317 | 1.0# | B |
| SHAKESPEARE | ENGL | 35 | 1.0# | A |
| AMERICAN FICTION | ENGL | 89 | 1.0# | B |
| ANCIENT ROME | HIST | 27 | 1.0# | C |
| TERM AVG 3.00 | | CUM AVG | 2.77 | |
| FALL 1979-FACULTY OF ARTS AND SCIENCES | | | | |
| WRLD MIDDLE AGES | HIST | 30 | 1.0# | B |
| ENGL AUGUSTN AGE | HIST | 318 | 1.0# | B |
| INDEPENDENT STDY | HIST | 299 | 1.0# | A |
| 17TH C EUROPE | HIST | 415-A | 1.0# | B |
| TERM AVG 2.75 | | CUM AVG | 2.76 | |

**NO OFFICIAL ENTRIES BEYOND THIS POINT**

| COURSE DESCRIPTION | DEPT. | COURSE NUMBER | CREDIT | GRADE |
|---|---|---|---|---|
| SPRING 1980-FACULTY OF ARTS AND SCIENCES | | | | |
| INTRO EXPER PSYC | PSYCH * | | 1.0# | P |
| 18THC EUR INTEL | HIST | 415-B | 1.0# | A |
| INTRO POLITL SOC | SOC | 8 | 1.0# | B |
| CONTP SOC THEORY | SOC | 26 | 1.0# | B |
| TERM AVG 3.67 | | CUM AVG | 2.89 | |
| SUMMER1 1980-FACULTY OF ARTS AND SCIENCES | | | | |
| RESEARCH METHODS | SOC | 23 | 1.0# | A |
| TERM AVG 4.00 | | CUM AVG | 2.93 | |
| SUMMER2 1980-FACULTY OF ARTS AND SCIENCES | | | | |
| SCI & SACRED | REL S | 102 | 1.0# | A |
| TERM AVG 4.00 | | CUM AVG | 2.98 | |
| FALL 1980-FACULTY OF ARTS AND SCIENCES | | | | |
| HIST & BIOLOGY | HIST | 200-H | 1.0# | A |
| SOCIAL STRATIF | SOC | 10 | 1.0# | A |
| SOC ANALYSIS | SOC | 124 | 1.0# | A |
| MARX SOC ANALYSI | SOC | 523 | 1.0# | A |
| TERM AVG 4.00 | | CUM AVG | 3.13 | |
| SPRING 1981-FACULTY OF ARTS AND SCIENCES | | | | |
| AM REVOLUTION | HIST | 442 | 1.0# | A |
| GENERAL HONORS | SOC | 300 | 1.0# | A |
| POPULN & SOCIETY | SOC | 7 | 1.0# | A |
| SOC STRUC PERS | SOC | 12 | 1.0# | A |
| SOC OF MEDICINE | SOC | 58 | 1.0# | A |
| TERM AVG 3.80 | | CUM AVG | 3.23 | |

**NO OFFICIAL ENTRIES BEYOND THIS POINT**

**ACTIONS**

MAJOR-HISTORY
H-MAJOR-SOCIOLOGY
1980-1981 DEAN'S LIST
*****************
05/81 GRADUATED WITH BACHELOR OF ARTS

CGU Admissions
DEC 01 2008
OFFICIAL

NOV 26 2008
UNIVERSITY OF PENNSYLVANIA
PHILADELPHIA, PA 19104

COPY
OF AN ORIGINAL DOCUMENT FROM THE
FILES OF CLAREMONT GRADUATE UNIVERSITY

EXHIBIT A

GRADUATE — ACADEMIC RECORD

FAS SS 829 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
JABLONSKI,JOSEPH,J
76 MCCRACKEN RD
MILBURY MA
01527

UNIVERSITY OF PITTSBURGH
OFFICE OF THE REGISTRAR
PITTSBURGH, PA 15260

ACADEMIC DEGREES CONFERRED BY THE UNIVERSITY OF PITTSBURGH
MA APRIL 1983 SOCIOLOGY

SCHOOL/CAMPUS THE FACULTY OF ARTS & SCIENCES

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
STATUS OF STUDENT
SOC FULL 82-1

ADVANCED STANDING EVALUATED FOR THE FACULTY OF ARTS & SCIENCES FROM HARVARD UNIVERSITY
GOV 2100 SEMINAR: POLITICAL DEVELOP 4
GOV 1060 THE HIST OF POLITICAL THEORY 4

ADMISSION TO CANDIDACY FOR DEGREE AND DATE

COMPREHENSIVE EXAMINATION DATE
PASSED 4/15/83
FINAL EXAMINATION DATE

PRELIMINARY EXAMINATION FOR DOCTORATE DATE FINAL EXAM DATE

COMPREHENSIVE EXAM DATE DEGREE AND DATE
ADMISSION TO CANDIDACY FOR DEGREE AND DATE

NOTES

UNIVERSITY OF PENNSYLVANIA
1981

**FALL 81-82** 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

| DEPARTMENT | COURSE NUMBER | COURSE TITLE | CREDIT | GRADE | QUALITY POINTS |
|---|---|---|---|---|---|
| SOC | 301 | INTRO TO STAT I | 3 | A | 12.00 |
| SOC | 307 | SOC THEORY I | 3 | A | 12.00 |
| SOC | 349 | MODERNIZATION | 3 | A- | 11.25 |

**WINTER 81-82** 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

| DEPARTMENT | COURSE NUMBER | COURSE TITLE | CREDIT | GRADE | QUALITY POINTS |
|---|---|---|---|---|---|
| HIST | 252 | US SOC & POL | 3 | A | 12.00 |
| SOC | 232 | COM MIL SYSTEMS | 3 | A | 12.00 |
| SOC | 305 | SOC METH I | 3 | A | 12.00 |

**SPRING TERM 81-82** 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

| DEPARTMENT | COURSE NUMBER | COURSE TITLE | CREDIT | GRADE | QUALITY POINTS |
|---|---|---|---|---|---|
| SCC | 699 | INDEP STUDY | 3 | A | 12.00 |

**WINTER 82-83** 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

| DEPARTMENT | COURSE NUMBER | COURSE TITLE | CREDIT | GRADE | QUALITY POINTS |
|---|---|---|---|---|---|
| SOC | 298 | DIRRDG SPR RES | 3 | S | |

1106016

AGU Admissions
DEC 09 2008
OFFICIAL

Final

COPY
OF AN ORIGINAL DOCUMENT FROM THE
FILES OF CLAREMONT GRADUATE UNIVERSITY

AN OFFICIAL TRANSCRIPT BEARS THE EMBOSSED SEAL OF THE UNIVERSITY REGISTRAR

PITT.2175 (573-476)

EXHIBIT A

GRADUATE — ACADEMIC RECORD

FAS SS   829   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
JABLONSKI, JOSEPH, J
74 MCCRACKEN RD
MILLBURY                MA

01527

UNIVERSITY OF PITTSBURGH
OFFICE OF THE REGISTRAR
PITTSBURGH, PA 15260

ACADEMIC DEGREES CONFERRED BY THE UNIVERSITY OF PITTSBURGH

MA APRIL 1983 SOCIOLOGY

SCHOOL/CAMPUS — THE FACULTY OF ARTS & SCIENCES

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

STATUS OF STUDENT
SOC        FULL         32-1

ADVANCED STANDING EVALUATED FOR THE FACULTY
OF ARTS & SCIENCES FROM HARVARD UNIVERSITY
GOV 2100   SEMINAR: POLITICAL DEVELOP
GOV 1060   THE HIST OF POLITICAL THEORY

ADMISSION TO CANDIDACY FOR ___ DEGREE ___ AND DATE

COMPREHENSIVE EXAMINATION - DATE

PASSED 4/15/83
FINAL EXAMINATION - DATE

PRELIMINARY EXAMINATION FOR DOCTORATE - DATE

COMPREHENSIVE EXAM. DATE ___ FINAL EXAM. DATE

ADMISSION TO CANDIDACY FOR ___ DEGREE AND DATE

NOTES

CGU Admission
FEB 04 2009
OFFICIAL
Final MA
no gpa

UNIVERSITY OF PENNSYLVANIA
1981

| DEPARTMENT | COURSE NUMBER | COURSE TITLE | COURSE CREDIT | GRADE | QUALITY POINTS |
|---|---|---|---|---|---|
| FALL 81-82 | | | 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 | | |
| SOC | 301 | INTRO TO STAT | 3 | A | 12.00 |
| SOC | 307 | SOC THEORY I | 3 | A | 12.00 |
| SOC | 349 | MODERNIZATION | 3 | A- | 11.25 |
| WINTER 81-82 | | | 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 | | |
| PST | 252 | US SOC & POL | 3 | A | 12.00 |
| SOC | 232 | COM MIL SYSTMS | 3 | A | 12.00 |
| SOC | 305 | SOC METH I | 3 | A | 12.00 |
| SPRING TERM 81-82 | | | 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 | | |
| SOC | 299 | INDEP STUDY | 3 | A | 12.00 |
| WINTER 82-83 | | | 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 | | |
| SOC | 298 | DIRRDG SPR RES | 3 | S | |

COPY
OF AN ORIGINAL DOCUMENT FROM THE
FILES OF CLAREMONT GRADUATE UNIVERSITY

EXHIBIT A

N16618

GGU Admissions

DEC 0 9 2000

OFFICIAL

Final

N6BA

## TRANSCRIPT OF RECORD — UNIVERSITY OF PENNSYLVANIA LAW SCHOOL

(Dean, Vice-Dean or Registrar)

**NAME**

Jablonski, Jr., Joseph John

| | |
|---|---|
| SS# | 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 |
| Born | 1/17/60 |
| Matriculated | 9/3/85 on |
| Degree of | B.A., 1981 from University of Pennsylvania |
| Graduated (J.D. degree) | MAY 18 1987 |
| Adviser | |

CLASS 1987

Certified transcripts prepared by the Law School must carry the embossed seal of the Law School over the appropriate signature.

### SECOND YEAR 1985-96

**FIRST SEMESTER — FALL 1985**

| | Subject | Sem. Hrs. | Grade |
|---|---|---|---|
| SMITH | CORPORATIONS | 4 | QUALIFIED |
| SHAKOW | FEDERAL INCOME TAX I | 4 | QUALIFIED |
| ARONSTEIN | Transmission of Wealth | 4 | GOOD |

**SECOND SEMESTER — SPRING 1986**

| | Subject | Sem. Hrs. | Grade |
|---|---|---|---|
| SCOTT | ADVANCED CORPORATIONS | 2 | GOOD |
| Gutman | FEDERAL INCOME TAX II | 4 | GOOD |
| KHASNOWIECKI | REAL ESTATE FINANCE | 3 | GOOD |
| VANDERVELDE | Zoning | 3 | GOOD |
| | | 15 | |
| | | 17 | |

### THIRD YEAR 1986-87

**FIRST SEMESTER — FALL 1986**

| | Subject | Sem. Hrs. | Grade |
|---|---|---|---|
| GOODMAN | FEDERAL COURTS | 3 | GOOD |
| SUMMERS | VISUAL & THE ▆▆▆ | 1.5 | EXCELLENT |
| SPAETH | PROFESSIONAL RESPONSIBILITY | 3 | QUALIFIED |
| FRENKEL | SMALL BUSINESS CLINIC | 4 | PASS |
| MUNDHEIM | ▆▆▆ THE 65)* | 3 | GOOD |

**SECOND SEMESTER — SPRING 1987**

| | Subject | Sem. Hrs. | Grade |
|---|---|---|---|
| RAKOFF | ADMINISTRATIVE LAW | 3 | QUALIFIED |
| RUDOVSKY | CRIMINAL PROCESS | 3 | GOOD |
| SPAETH | EVIDENCE | 3 | GOOD |
| GOODMAN | INDEPENDENT STUDY | 3.5 | EXCELLENT |
| | | 14 | |
| | | 26 | |

Official transcripts bear the embossed seal of the Law School over the appropriate signatures. The transcript is issued to you in accordance with the Family Educational Rights and Privacy Act of 1974, Public Law 93-380. Under the provisions of this Act, no information about the record may be released by you without the student's written consent.

Entered 2nd year on advanced standing. 1st year of law school at Boston College Law School.

\* Indicates courses carried through two semesters

Must take either Criminal Law or Criminal Procedure.

Law Review — ...

Senior writing requirement ...

This transcript is issued in accordance with the Family Educational Rights and Privacy Act of 1974, Public Law 93-380. No information about this record may be released without the student's Written Consent.

COPY

OF AN ORIGINAL DOCUMENT FROM THE
FILES OF CLAREMONT GRADUATE UNIVERSITY

-57-

EXHIBIT A

**EXHIBIT B**

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789
HEIT LAW GROUP
PROFESSIONAL CORPORATION

44

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

CompuServe Mail - Message View   https://email.compuserve.com/msgview2.adp?folder=SU5CT1g=&ui...



| On CS: | Try CompuServe 6.0 | Send an E-Card |
| | CompuServe.com | Send a Gift |
| | Instant Messaging | White Pages |

**SAVE ON GROCERIES WITHOUT PAPER COUPONS!**    shortcuts.com    START SAVING TODAY!

⏷ **New Mail: Message**    ⏹⏹ Old Mail    ⏹⏹ Sent Mail    Help | Sign Off

| Get Mail | Create Mail | Address Book | Reply | Reply All | Forward | Keep As New | Delete |

**Subject:** graduate study at Baylor                    « Previous  |  Next »
**Date:** Sat, 17 Jan 2009 10:38 EST
**From:** 👤 "Nichols, Mary P." <Mary_Nichols@baylor.edu>
**To:** 👤 <jabljjj@cs.com>                                             ▲

Dear Mr. Jablonsky,


I am happy to report that you were selected by the Department's Graduate Committee for a short list of students whom we would like to consider for financial aid offers.  As you might be aware of our website, we offer for full funding for five years, including full tuition and a stipends starting at $12,000 per year. As part of our selection process, we would like to invite you to visit campus in the next few weeks, in order to meet faculty and graduate students, to attend classes, and to discuss your academic preparation and goals with the members of our Graduate Committee. We are able to offer you up to $400 to cover the costs of your travel. We would like you to experience the graduate student community that we have here.


We hope that you visit the department's graduate website, if you have not already, which contains a great deal of information about the program. In addition, I am now serving as Director of Graduate Studies and would be happy to answer any questions you have, either by email or phone. On the practical matter of your visit, we are inviting small groups of prospective students to visit during the weeks of February 2 and February 9.  Although individual plans may vary, we imagine your staying two nights, and being on campus for about a day and a half, to meet with faculty and students and to attend classes, if you wish. Please let me know if you are able to come either week, and one my assistants will coordinate the arrangements and times.


If you have any questions, please let me know. If you send me your phone number, and I'll be happy to give you a call.


I am very excited about your application, and look forward to meeting you.

Case 2:20-cv-10695-FLA-RAO    Document 1-2    Filed 11/23/20    Page 54 of 220    Page ID
#:293

Best,

Mary Nichols

Director of Graduate Studies

« Previous  |  Next »

| | | | | | | Keep | |
|---|---|---|---|---|---|---|---|---|
| **Get Mail** | **Create Mail** | **Address Book** | **Reply** | **Reply All** | **Forward** | **As New** | **Delete** |

©Copyright 2001 CompuServe Interactive Services, Inc.          Help | Sign Off
Legal Notices | Privacy Policy

-60-

EXHIBIT A

1/19/2009 9:25 AM

**<ins>EXHIBIT C</ins>**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

45

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



**Claremont**
GRADUATE UNIVERSITY

Office of Admission and Records

February 24, 2009

Joseph Jablonski
6921 N. 26Th Street
Arlington, VA 22213
United States

Dear Joseph:

I am delighted to inform you that upon the recommendation of the faculty, you have been admitted to the Ph.D. in Political Science program beginning with the 2009 Fall term. This offer reflects our positive assessment of your academic and professional promise and our sincere hope that you will choose to become a part of our scholarly community.

Enclosed you will find additional information for newly admitted students. Should you have any questions regarding your academic program as you are making the important decision about enrolling at CGU, please do not hesitate to contact the Politics and Policy Department.

We ask that you respond to our offer of admission by April 15th, 2009. To reserve your place in the class, please return the enclosed decision card with payment in the amount listed on the card, to Claremont Graduate University.  This non-refundable deposit will be applied towards your first semester's tuition costs.

I offer you my warmest congratulations on your admission and hope to greet you at Claremont in the near future.

Sincerely,

Sonia Gutierrez-Mendoza
Director of Admission & Records

Enc.

Harper Hall East • 160 East Tenth Street • Claremont, California 91711-6165

admiss@cgu.edu • Tel: 909.621.8069 / student.records@cgu.edu • Tel: 909.621.8285 / Shared Fax: 909.607.7285

A MEMBER OF THE CLAREMONT COLLEGES

EXHIBIT A

# BOSTON COLLEGE

GRADUATE SCHOOL OF ARTS & SCIENCES

February 9, 2009

ID: 031542016

Joseph Jablonski
6921 N. 26th Street
Arlington, VA 22213

Dear Mr. Jablonski:

Your application for admission has been reviewed by a faculty committee in the Department of Political Science. I am sorry to inform you that the committee did not include you among those recommended for admission to the Department's doctoral program. We are able to offer admission to only a small number of students in our doctoral programs each year, and this means, unfortunately, that we must send disappointing news to others, including many who have presented admirable credentials in support of their applications.

The committee did recommend, however, that you be offered admission to the Department's Master of Arts program to commence in September 2009, and this letter confirms that decision.

Enclosed is an acknowledgement form, which we ask that you complete and return by May 31, 2009. If you decide to enroll, new student information will be mailed to you throughout the coming months. Please note, a request for an admission deferral must be made in writing to me by the above date in order to be considered.

In fairness, I must say that, should you choose to accept this offer, there is no guarantee of admission into the doctoral program in a subsequent year. We hope, however, that you will consider our offer seriously, and we will be very pleased if you decide to join us at Boston College. Please feel free to contact our office should you have any questions or require additional information.

Sincerely,

*R. V. Howe*

Robert Howe
Associate Dean
Admissions & Financial Aid
Graduate School of Arts & Sciences

EXHIBIT A

**EXHIBIT D**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

46

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

http://webmail.aol.com/41757/cs.com/en-us/Suite.aspx

**From:** Laura Carrillo
**Sent:** Thursday, March 05, 2009 11:14 AM
**To:** 'jabljj@cs.com'
**Subject:** RE: Admission Status - PhD Pol Science

*[handwritten: Sandra Seymour 909-621-8079 ok 2:10 p.m EST 4-27-09]*

Hello Joseph:

Below is the acceptance email we sent you. Also, here is a link regarding tuition http://www.cgu.edu/pages/5418.asp, which may be helpful. Also, here is a link to student financing http://www.cgu.edu/pages/1161.asp.

Best, Jeanine

Laura Carrillo
Recruiter/Admissions Coordinator
School of Politics & Economics
Claremont Graduate University
160 E. Tenth St.
McManus 236
Claremont, CA 91711
Office 909-621-8699
Fax   909-621-8545
Laura.Carrillo@cgu.edu

*[handwritten notes: Lisa admiss @ cgu.edu; Sandra.seymour@cgu.edu; Michael Johnson Fellowship; 500 words essay; American Politics; 12 hrs; 3 yrs; 4-17-09; Seymour reading for Carl Johnson; after told Gold Summer]*

---

**From:** Laura Carrillo
**Sent:** Friday, February 20, 2009 4:48 PM
**To:** jabljj@cs.com
**Subject:** Admission Status - PhD Pol Science

Dear Joseph:

 Congratulations!  I am pleased to inform you that we have recommended you for admission to our **PhD in Political Science degree program** in the Department of Politics and Policy, **School of Politics and Economics** at Claremont Graduate University beginning in the **Fall Semester 2009.** You will be receiving an official letter of admission to our School from the Office of Admissions, but I wanted you to be informed of this news as early as possible so that you may begin whatever arrangements are necessary for starting classes in the fall semester.

We are pleased to inform you that you have been awarded a **50% tuition fellowship for the academic year 2009-2010** with official notification to follow shortly from the Office of Financial Aid. Should you have any questions about your award, please contact me by return email.  Once you have made a decision to accept admission, you may pay your enrollment deposit of $200.00.  Please contact Mayra de Armas as (909) 621-18285 to pay this over the phone with a Visa or Master card.

In the Department of Politics and Policy, students fulfill a standard set of core requirements and qualify in **two major doctoral fields.** From your **Personal Statement** it would seem that you are interested in **American Politics** and **Political Philosophy** . Please confirm that these are the two fields you plan to study.

As a PhD student, we have assigned **Mike Hoffpauir** as a student mentor (PhD Political Science student) to assist you with any questions you might want to ask about your program of study, or

about our student life on the CGU campus.  Please expect an email shortly.

SAVE THE DATE FOR THESE TWO UPCOMING EVENTS:

(1)  We have scheduled an OPEN HOUSE FOR ALL ADMITTED STUDENTS to give you an opportunity to
come to the CGU campus and meet with our faculty, staff and students to be held on **Monday, April
6, 2009**.  I will send you the agenda for the day's event shortly.  Please RSVP AS SOON AS
POSSIBLE if you can attend this event.

(2)  SPE NEW STUDENT ORIENTATION will be held this year on Friday, August 21, 2009 and we
would request that all incoming students endeavor to be at this event.  You will meet our faculty
and get registered for classes.  We will send you an update in the next few months to remind you.
Please RSVP for this event now if you can put it on your calendar.  You may RSVP by emailing
me back.

Once again, I give you my hearty congratulations. Should you have any questions at all regarding
your program, or our School, please do not hesitate to contact our recruiting/admissions office at
spe@cgu.edu or telephone us at (909) 621-8699.  Do remember to visit our website at
http://www.cgu.edu/pages/172.asp which contains information on our faculty, programs, events,
etc.

Sincerely,

## Jeanine E. Kraybill, M.A.

Recruiter
School of Politics & Economics
**CLAREMONT GRADUATE UNIVERSITY**
160 East Tenth Street
Claremont, CA  91711
Tel:  (909) 607-9101
Fax: (909) 621-8545
Email:   jeanine.kraybill@cgu.edu

5/5/2009 2:41 PM

**EXHIBIT E**

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

HEIT LAW GROUP
PROFESSIONAL CORPORATION

47

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



**Claremont**
**GRADUATE UNIVERSITY**

School of Politics and Economics

June 26, 2009

Mr. Joseph Jablonski
6921 N. 26th Street
Arlington, VA  22213

Re:   **Michael J. Johnston Fellowship in American Politics**
Department of Politics and Policy

Dear Joe:

We received your application to the Michael J. Johnston Fellowship in American Politics Fellowship Award for the academic year 2009-2010.  On behalf of the faculty in the Department of Politics and Policy, we regret to inform you that unfortunately you were not selected as the recipient of this award.

Competion for this award is very keen with our brightest eligible admitted students applying each year.

We sincerely look forward to your joining us in the fall semester and hope that you will enjoy the intellectual exchange here at Claremont Graduate University.

Sincerely,

Jennifer Merolla, Associate Professor & Department Chair
Department of Politics & Policy

EXHIBIT A

**EXHIBIT F**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

48

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



**Claremont**
GRADUATE UNIVERSITY

July 8, 2009

Office of Admission and Records

Joseph Jablonski
6921 N. 26Th Street
Arlington, VA 22213
United States

Dear Joseph:

Please be advised that your admission to the Ph.D. in Political Science program has been revised to reflect a new semester. Your admission now begins with the 2010 Fall term. This change supersedes your previous offer of admission.

Should you have any questions regarding your academic program and about enrolling at CGU, please contact the Politics and Policy Department. We ask that you respond to our offer of admission by returning the enclosed decision card within three weeks of the date of this letter. If you have not already submitted a tuition deposit, please include payment in the amount listed on the card. Checks and money orders can be made payable to Claremont Graduate University.

Again, congratulations on your admission and we in Student Affairs hope to greet you at CGU in the 2010 Fall semester.

Sincerely,

Sonia Gutierrez-Mendoza
Director of Admission & Records

EXHIBIT A

**EXHIBIT G**

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789
HEIT LAW GROUP
PROFESSIONAL CORPORATION

49

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



EXHIBIT A



EXHIBIT A

**EXHIBIT H**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

50

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



EXHIBIT A



EXHIBIT A

**EXHIBIT I**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

51

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



# Claremont
GRADUATE UNIVERSITY

## SCHOOL OF POLITICS & ECONOMICS
### FELLOWSHIP RENEWAL REQUEST FORM
### ACADEMIC YEAR 2011-2012

All students who wish to request or renew fellowship support and/or a research assistant position must complete this form. Deadline for submission is MAY 2, 2011 by email, or deliver to Sandra Seymour, Assistant to the Dean in McManus 240 (or mailbox). If you do not complete and return this form by the deadline, you will not receive financial aid from SPE regardless of your current level of aid.

Please complete each section carefully. You may <u>apply for fellowship aid</u>, or to <u>renew your fellowship aid</u>. Please indicate if you want to apply for a <u>research or teaching assistantship position</u>.

**PLEASE NOTE:** Students can have NO MORE THAN TWO (2) INCOMPLETES or permanent incompletes on their transcript. If you will be on <u>continuous registration or doctoral study</u> for the 2011-2012 academic year, you are not eligible for fellowship support.

## SECTION A: ENROLLMENT

JOSEPH J. JABLONSKI, JR.    25411061 8-1    POLITICS

**Student Name**   **Student ID**   **Department**   Ph.D,

**Street Address:** 4033 Mt. Baldy Rd.   **City/State:** Claremont, CA 91711   **Degree Program Enrolled**

**Email:** jabljjj@cs.com   **Tel:**

How many units will you be registering for: **Summer 2011** _0_   **Fall 2011** _12_   **Spring 2012** _12_

Are you in a dual, PhD Interfield, or joint degree program?   Yes ☐   No ☒

If yes, please indicate which programs/fields: _____ & _____

Number of CGU units completed as of the end of **Spring 2011:** _24_

Estimated graduation date: _2015_

## SECTION B: FELLOWSHIP SUPPORT

Are you currently receiving fellowship support:   Yes ☒   No ☐

If so, what is the percentage? _50%_

Do you have fellowship/aid funding from another source:   Yes ☐   No ☒   (possibly 100% from Michael Johnson Fellowship)

If so, where from and how much? possibly Michael Johnson Fellowship

Request for Increase in Funding Support:   Yes ☒   No ☐

## SECTION C: RESEARCH ASSISTANTSHIP

Are you requesting to be a research or teaching assistant:   Yes ☒   No ☐

Do you currently have a research assistantship award:   Yes ☒   No ☐   Fn. Prof. Jim Nichols

If yes, who is your faculty supervisor: Prof. Uhlmann

Have you applied for the Federal Work Study Program?   Yes ☐   No ☒

STUDENT SIGNATURE

_4-12-11_
DATE

| FACULTY/STAFF USE ONLY: | Approved_____ | Amount_____ % | RA/TA _____ |
|---|---|---|---|
| Denied_____ | Initial:_____ | GPA:_____ | Date:_____ |

-78-

EXHIBIT A

**EXHIBIT J**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

June 27, 2011

Dr. Jean Schroedel
Dean, School of Politics and Economics
Claremont Graduate University
160 E. Tenth Street
Claremont, CA 91711-5909

**Re: Michael J. and Mary Johnston Fellowship Award 2011**

Dear Jean,

As you know from discussions I had with you last Thursday, I am deeply disappointed that due to circumstances related to the physical and mental wellbeing of your Assistant, my name was not considered for the Michael J. and Mary Johnston Fellowship Award for 2011. My hard work this semester should have put me in the best possible position to secure this fellowship, whose criteria would appear to fit with my background, experience, and academic record.

Beyond my academic accomplishments, you know that I have made contributions to the American politics program here in terms of support and assistance for other students, including my present tutoring of our superb student Chris Wolfe and of Hillsdale President Larry Arrn's daughter Katie in ancient Greek. My interests in German, French, Latin, and Italian, are also relevant here.

As I mentioned to you at the beginning of this year, my personal relationship with the late Justice Lewis F. Powell, Jr. led to my publishing two law review articles that influenced the Supreme Court's current federalism jurisprudence. My personal correspondence with Justice Powell is now located in the Washington & Lee Law School library in Virginia.

My loss here is quite substantial, professionally and personally. The recognition offered by the Johnston Fellowship, quite apart from its monetary value, would have enhanced my ability to compete for prestigious post-doctoral fellowships and generally boosted my ability to secure jobs in a very difficult and competitive job market during a severe economic crisis. Monetarily, the loss to me is roughly $25,000 in tuition per year for three years, which would amount to $50,000-75,000 at a minimum. Coming from a family of modest means, educational debt is a major concern in these difficult and uncertain economic times.

I believe that you and I have developed not only a close professional relationship over the course of this semester, but a personal one as well. I am deeply grateful for the interest and support that you and Michael Uhlmann have shown me over the course of this academic year. I know that Prof. Uhlmann is concerned about this matter as well.

1

EXHIBIT A

Per your own discussion with me, I am both mindful and sensitive of the difficult position this matter puts you in at this juncture.  I will not pursue this matter further, privately or publicly, out of my deep respect for you, but I would hope, personally and morally, that you would find a way to make things up to me in some way.

I look forward to hearing from you on this matter.  I will be away on vacation from June 27 through July 9, and return on July 10.

Sincerely yours,

Joe Jablonski
4033 Mt. Baldy Rd.
Claremont, CA 91711

cc: Professor Michael Uhlmann

EXHIBIT A

**EXHIBIT K**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

53

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

**"Same-Sex Marriage Rights: An Historical and Values-Based APD Analysis of the American Legal Universe"**

**PP 301 American Political Development**
**Dr. Jean Schroedel**
**Spring 2011**
**Joseph J. Jablonski, Jr.**

0 8 MAY 2011

EXHIBIT A

Why is the study of same-sex marriage as a legal right so important?  Because the contemporary battle over the legal definition of "marriage," as an aspect of American citizenship and legal identity, is part and parcel of a quintessential theme in American Political Development (APD), the larger struggle for freedom and equality Americans have historically waged in defining themselves as a distinctive people.   The fundamental question of marriage as a civil right, and, more particularly, who may marry whom legally, lies at the seismic epicenter of the field of APD, for it implicates the larger questions of civic identity and citizenship addressed by scholars such as Rogers Smith. Smith 1997 and 1993.   The nature and purpose of marriage itself in America are undergoing transformation.

Implicated forthrightly in the study of the right to same-sex marriage is another profoundly important theme in APD, the issue of federalism and the states as laboratories of social and political experiment.  Tarr (1998) emphasizes that too often scholars have focused on the federal constitution to the exclusion of state constitutions when they attempt to make sense of the American legal landscape. (*See also* Rosenbaum 2009.) While the American state courts have been viewed as engines of social change by many political scientists over the years, nowhere is this more true than in the case of same-sex marriage rights (O'Connor and Yanus 2007.)

In the past, states, state supreme courts, and their state constitutions, were bastions of reactionary forces, issuing and enforcing rulings that kept in place the institution of slavery, various forms of legally sanctioned repression and degradation of women, anti-miscegenation laws proscribing interracial marriage, and segregation.  Today, state

1

-84-

EXHIBIT A

supreme courts, *Varnum* (IA 2009), *Kerrigan* (CT 2008), and *Goodridge* (MA 2003), have issued rulings that enlarge American community, expand American citizenship, and amplify spheres of individual autonomy and self-definition and self-determination.

Same-sex marriage rights is a high-stakes political game of mutually exclusive values being fought presently at the state level. Both proponents and opponents of same-sex marriage have used the legal system to incorporate their values-based visions into American political culture. For both sides, it's marriage or nothing. Ironically, state court rulings finding a right to same-sex marriage have intriguingly contributed to an emergent American civil religion transcending traditional Judeo-Christian constraints.

State constitutions may protect personal liberty against government incursion as zealously, and often more so, than does the U.S. Constitution, even where both constitutions employ essentially the same language. That the Massachusetts Constitution is in some instances more protective of individual liberty interests than is the U.S. Constitution, would not be surprising to scholars like Tarr (1998). Fundamental to the vigor of our federal system is that "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Goodridge,* 440 Mass. at 328.

Against the traditional Judeo-Christian argument that marriage as an institution has remained essentially the same for centuries in the law, the Massachusetts Supreme Judicial Court poignantly recapitulated, *Goodridge*, 440 Mass. at 349-350:

> "As a public institution and a right of fundamental importance, civil marriage is an evolving paradigm. The common law was exceptionally harsh toward women who became wives: a woman's legal identity all but evaporated into that of her husband. See generally C.P. Kindregan, Jr., & M.L. Inker, Family Law and

Practice §§ 1.9 and 1.10 (3d ed. 2002). Thus, one early Nineteenth Century jurist could observe matter of factly that, prior to the abolition of slavery in Massachusetts, "the condition of a slave resembled the connection of a wife with her husband, and of infant children with their father. He is obliged to maintain them, and they cannot be separated from him." But since at least the middle of the Nineteenth Century both the courts and the Legislature have acted to ameliorate the harshness of the common-law regime. In *Bradford v. Worcester*, 184 Mass. 557, 562 (1904) we refused to apply the common-law rule that the wife's legal residence was that of her husband to defeat her claim to a municipal "settlement of paupers." In *Lewis v. Lewis*, 370 Mass. 619, 629 (1976), we abrogated the common-law doctrine immunizing a husband against certain suits because the common-law rule was predicated on "antediluvian assumptions concerning the role and status of women in marriage and in society." Id. at 621. Alarms about the imminent erosion of the "natural" order of marriage were sounded over the demise of antimiscegenation laws, the expansion of the rights of married women, and the introduction of "no-fault" divorce. Marriage has survived all of these transformations, and we have no doubt that marriage will continue to be a vibrant and revered institution." Marriage as an American institution, both with respect to the mutual rights of marital partners as well who may enjoy the right of marriage, has undergone basic change over the course of American history.

The political controversy over marriage has, if anything, increased in intensity as the focus of this controversy has historically shifted in the American political landscape from marital equality for married females, to the removal of legal barriers to marrying partners of a different race, and now to the issue of whether the constitutional values of equality and freedom compel inclusion of same-sex couples in the institution of marriage. In a relevant paper presented at the American Political Science Association, Gordon, Tadlock and Popp (2004) found that political elites on both sides of the same-sex marriage rights issue have frequently used what they term as "frames of equality (pro-same-sex marriage) and [of] traditional moral values (anti-same-sex marriage)." They found that newspapers use these same "frames" in their articles on the issue; and of the articles they looked at they found a greater frequency of the traditional moral values frame; their research also determined that "the single best predictor of attitudes on the

3

EXHIBIT A

topic of same-sex marriage is whether or not the respondent attaches the value of

morality or equality to the issue." Gordon, Tadlock, and Popp 2004.

In collating and analyzing the historical universe of published American legal

decisions, state laws, and federal law, relevant to the issue of same-sex marriage rights,

this research paper confirms the findings of Gordon, Tadlock, and Popp, and moves

beyond them.   My research results validate the empirical expectation that justifications

for and against same-sex marriage in state court decisions and in state laws proscribing

same sex marriage, including the federal DOMA, all fall along the same mutually

exclusive "frames" of equality or traditional moral values when legal terminology is

sifted through that "values-sieve."   It also locates important recurring APD themes in the

same-sex marriage right context and discovers aspects of a more inclusive American civil

religion, or alternatively, a more inclusive American political culture worth further study.

Justifications for and against same-sex marriage do not partake of neutral legal

rationales, but are determined by value-laden principles revolving around either (I) an

expansive equality, deriving from (a)  a more inclusive definition of secular "civil"

marriage evolving in part from *Loving v. Virginia*'s expansion of the freedom to choose a

marriage partner by invalidation of anti-miscegenation laws; (b) application of *Brown v.*

*Board of Education's* rejection of the principle of "separate but equal" to the civil

union/marriage dichotomy;  (c)  *Lawrence v. Texas*'s expansive conception of "individual

autonomy and liberty" constitutionally protecting same-sex sexual expression, a

watershed case departing sharply from the "Sodom and Gomorrah" mindset of traditional

Judeo-Christianity; and (d) groundbreaking acceptance that "sexual orientation" is an

EXHIBIT A

immutable and constitutionally thus cognizable aspect of legal identity, constituting a

sharp break with the traditional Judeo-Christian view; **or** (II) an exclusive definition of

marriage rooted in the Judeo-Christian tradition that justifies limiting marriage to

opposite-sex couples; this values-tradition is buttressed by asserted state interests in (a)

protecting the "sanctity" of the institution of marriage, (b) procreation, or (c) providing

the only healthy environment to raise children in.

Some of the past and some of the present opposition to the right of same-sex

marriage no doubt derives from America's historical and traditional Judeo-Christian

opposition to any form of homosexual expression.   See *Kerrigan*, 289 Conn. at 178

("longstanding intolerance of intimate homosexual conduct;" *Whistleblower* 2010 *passim*

(collection of anti-same-sex marriage articles rooted in traditional Judeo-Christian

values); Phy-Olsen 2006, 113-148 (traditional Judeo-Christian values deem gays sinful

and preclude same-sex marriage rights).   Indeed, scholars have described the period of

roughly 15 years after the end of WWII as "antigay hysteria," during which gays were

prosecuted and persecuted in various explicit and implicit ways at the federal and state

levels. *See* Eskridge 1999.  For studies focusing on gay persecution by the federal

government amounting to what some scholars have characterized as a "purge," *see*

Johnson 2004; Chauncey 2004; Koppelman 2000.    The Supreme Court ruling in *Bowers*

*v. Hardwick*, (1986), later overruled on other grounds by *Lawrence v. Texas*, (2003),

doubtless contributed to anti-gay attitudes through the 80s and 90s.   As the *Kerrigan*

Court put it, "Much of the condemnation of homosexuality derives from firmly held

[traditional] religious beliefs and moral convictions."  289 Conn. at 178.

EXHIBIT A

The many states that have proscribed a same-sex marriage right either by state constitutional amendment or by statute, by exclusively defining marriage as the union of one and one woman in conformity with traditional Judeo-Christian values and principles, arguably challenge America's commitment to genuine equality and freedom for all citizens, at least from the standpoint of many gays and lesbians.  See Gerstmann 2008: 3. It should be noted, however, that the vast majority of citizens of states currently prohibiting same-sex marriage through state constitutional amendment, state statute, or by referendum or ballot initiative, believe strongly that everyone should possess the same legal rights irrespective of race, gender, ethnicity, national origin, or religion.  As Gerstmann and others explain, however, when it comes to the subject of same-sex marriage rights for gays and lesbians, these same citizens would not broaden the American value-laden concepts of legal equality and freedom to embrace sexual orientation, despite research increasingly confirming it to be an attribute not entirely of one's voluntary choosing.  Gerstmann 2008: 3.

My research finds that the politics of same-sex marriage is an historically determined process that arguably has roots in the values-based civil rights struggle for equality and freedom by women in the context of opposite-sex marriage and by blacks in the context of both oppressive anti-miscegenation laws as well as the separate but equal segregationist regime.  The institution of marriage underwent a major transformation in the early 20th century when it changed from a set of legally enforceable shackles degrading a wife to mere servant and indeed sexual slave of the husband, to a set of rules and laws elevating and guaranteeing a wife to be an equal partner in marriage with a

6

comparable range of freedom and opportunity for development as an individual in her own right.

As a result of anti-miscegenation laws, which were justified on the basis of a version of the Judeo-Christian Biblical story of the curse of Ham and in pseudo-scientific justifications for the inferiority of black race vis-à-vis the white races, marriage was defined in racial terms that restricted freedom of individuals to choose their marriage partners exclusively from their own race. Discriminatory law was justified as an expression of God's will. *Loving v. Virginia* (1967) invalidated anti-miscegenation laws in the U.S. Roughly ten years earlier, the landmark case of *Brown v. Board of Education* (1954) struck the "separate but equal" segregationist regime.

My research shows that state supreme court decisions finding a right to same-sex marriage, *Goodridge* (2003) in Massachusetts, *Kerrigan* (2008) in Connecticut, and *Varnum* (2009) in Iowa, are in general agreement that a person's sexual orientation is not something mutable for purposes of equal protection analysis, even if science has yet to confirm its immutability in any absolute sense. Gerstmann suggests one very promising manner in which to advance the debate on same-sex marriage, that is, is to shift it away from a debate about "special rights" for gay and lesbian people onto a plane of legal rights all Americans share. Gerstmann 2008: 3-4. The groundbreaking state supreme court decisions of *Goodridge* (Massachusetts)*, Kerrigan* (Connecticut), and *Varnum* (Iowa) all contribute importantly to the development of this "legal plane," which permits more inclusive definitions of American citizenship, and arguably more inclusive and at the same more communal forms of American civil religion, in spite of the care with

7

EXHIBIT A

which the courts finding a same-sex marriage right have tried to define marriage as a civil right in largely secular terms.

Today, same-sex marriage rights exists only in six jurisdictions, New Hampshire by legislation HB 436-FN-Local adopted by both bodies and signed into law by the governor on June 3, 2009; Vermont by state statute, 2009 Vt. Acts & Resolves 3;  District of Columbia, when the mayor signed a bill passed by the Council of the District of Columbia on December 15, 2009;[1] Iowa 2009, Connecticut 2008, and Massachusetts 2003, by judicial decision, with a few other jurisdictions, like California,[2] Maryland,[3] and New York,[4] explicitly recognizing same-sex marriage rights contracted in sister states. Nevertheless, the vast majority of jurisdictions in the U.S. still limit marriage exclusively to a man and a woman either by state constitutional amendment or by state statute.

---

[1] In 2008 the Coquille Tribe legalized same-sex marriage, with the law going into effect in May 2009.  The Coquille are a federally recognized sovereign nation in Oregon, and thus not bound by the Oregon Constitution which prohibits same-sex marriage.

[2] In California, "Marriages granted by any civil entity, foreign or otherwise, anytime before the passage of Proposition 8, remain legally recognized and retain full state-level marriage rights.  Subsequent state legislation established that any same-sex marriages granted by other jurisdictions after the passage of Proposition 8, [Nov. 5, 2008], retain the state rights that come with marriage, except for the legal term "marriage" itself."  Taken from Wikipedia on internet, www.wikipedia.org.

[3] In Maryland, "on February 24, 2010, Maryland's Attorney General, Doug Gansler, issued an opinion that Maryland law could recognize same-sex marriages performed in other U.S. states which permit same-sex marriage.  According to Attorney General Gansler, the opinion is binding on state agencies effective immediately."  Taken from Wikipedia on internet, www.wikipedia.org.

[4] In New York, "on May 14, 2008, the New York Governor issued a directive requiring that all state agencies recognize same-sex marriages performed in other jurisdictions."  Taken from Wikipedia on internet, www.wikipedia.org.

8

EXHIBIT A

The first wave of state Defense of Marriage Acts (DOMAs) were enacted in the early years of the 1970s, largely in response to lawsuits filed by same-sex couples seeking the right to marry from a state judiciary.   These state DOMAs all limit the institution of marriage to the Judeo-Christian formula of one man and one woman and therefore must be construed as the enactment of traditional Judeo-Christian moral values at the level of state law.

Correlatively, all court decisions in this era uniformly held that marriage can only be defined in terms of traditional Judeo-Christian values as "the union of a man and a woman and [held there was] no authority to the contrary."   For example, see *Baker v. Nelson* (Minn. 1971); *Jones v. Hallahan* (Ky.Ct.App.1973)(two females denied marriage license because marriage is exclusively defined as union of a man and a woman); *Singer v. Hara*(Wash. 1974)("[a]ppellants were not denied a marriage license because of their sex; rather, they were denied a marriage license because of the nature of marriage itself.") The *Singer* court found no defect in the state's marriage laws, under either the United States Constitution or the state constitution's equal rights amendment, based upon the rationale of *Jones*.

In the 1980s, advocates of same-sex marriage rights lost another round of battles at both the federal and state levels.   For example, see *Adams v. Howerton* (C.D.Calif. 1980), aff'd on other grounds, 673 F.2d 1036 (9th Cir. 1982); and *De Santo v. Barnsley* (Pa.Super.1984).   Convinced that their cause for marriage rights was hopeless, the gay movement shifted its attention to getting sodomy laws invalidated and achieving stronger legal protection against anti-gay discrimination and violence.   Significantly, gays and

9

EXHIBIT A

lesbians during the 1980s across the country mustered the personal courage to present

themselves publicly as gay and lesbian human beings and to demand increasingly in

various public forums that they be accorded the same intrinsic dignity and status as

"persons" as any straight person in America.   As scholars of this movement have argued,

the deep personal tragedy of the AIDS epidemic of the 1980s focused the nation's

sympathy and, in perhaps unexpectedly salutary fashion, broadened the nation's

understanding of the plight of the gay and lesbian community.  See, for example,

Koppelman 2006: 6-7.

In 1993, the Hawaii Supreme Court in 1993 in *Baehr v. Lewin* (Haw. 1993)

shocked the nation by ruling that a statutory prohibition on same-sex marriage

discriminated on the basis of "sex"[5] and thus was subject to strict scrutiny under the equal

protection guarantee clause of the Hawaii state constitution; after Hawaii in 1996 lost at

trial after remand, because it could not show any compelling state interest served by the

discrimination, Hawaiian citizens voted for a state constitutional amendment permitting

the legislature to confine marriage to strictly traditional heterosexual parameters in

conformity with the Judeo-Christian definition of marriage.  Gerstmann, pp. 4-5

Hawaiian citizens' intervention in the form of a constitutional amendment, that legislated

a traditional Judeo-Christian marriage formula, stopped any formal recognition of same-

sex marriage in the U.S. at this historical juncture.

At the federal level, in 1996, Congress responded to *Baehr,* a perceived crack in

the armature supporting traditional marriage, by passing the Defense of Marriage Act

---

[5] Not "sexual orientation" as in the cases of MA *Goodridge* (2003), CT *Kerrigan* (2008),
and IA *Varnum* (2009).

EXHIBIT A

(DOMA), Pub. L. 104-199, 100 Stat. 2419 (Sept. 21, 1996), that stated that, for any federal purpose, such as joint tax returns, survivor's benefits under social security, or provision of medical insurance for families of federal employees, same-sex marriage status would not be honored in any way.  The federal DOMA also, in apparent derogation of the full faith and credit clause of the U.S. Constitution, somewhat reminiscent of the slavery era, restated and slightly strengthened existing federal policy that states having strong public policy *contra* same-sex marriages were not required to recognize same-sex marriages performed in other sister states.[6]  See, for example, Koppelman 2006: 7-8.

The underlying premise of the legislation, echoed by the many prior state attempts to prohibit same-sex marriage through defining marriage exclusively as the union of a man and a woman, was the contention that any level of state recognition for same-sex marriage would jeopardize the institution of marriage which was viewed as being "weak" and on the proverbial cultural rocks of existence.  Indeed, the legislative history reflects a strong congressional concern about the likely consequences of legalizing same-sex "marriage" in Hawaii "would have on other states, federal laws, the institution of marriage, traditional notions of morality, and state sovereignty."  H.R. Rep. No. 104-664 at 1-18 (1996), reprinted in 1996 U.S.C.C.A.N. 2905-23.  It is noteworthy that President Obama recently issued an Executive Order refusing to enforce the federal DOMA, on the ground that the Executive Office of the President doubts DOMA's constitutionality on several grounds, signaling that President Obama views the subject of same-sex marriage

---

[6] On May 14, 2008, New York Governor David Paterson issued a directive requiring that all state agencies recognize same-sex marriages performed in other jurisdictions.

EXHIBIT A

rights as an important progressive American value supported by the U.S. Constitution, not just state constitutional law.[7]

Since *Baehr*, at least nine state supreme courts have ruled on the constitutionality of state action barring same-sex marriage rights, with mixed results.   See *Varnum* 2009 (right to same-sex marriage in IA constitution); *In re Marriage Cases* (Cal. 2008) (analyzing and rejecting the government's threshold argument that same-sex couples are not similarly situated to opposite-sex couples under CA constitution), s*uperseded in relevant part by constitutional amendment*, CAL. CONST. art. 1 § 7.5;[8] *Kerrigan* 2008

---

[7]See *The Examiner*, 2/23/2011, "Calling parts of the Defense of Marriage Act (DOMA) unconstitutional, U.S. Attorney General Eric Holder said in a press release on Wednesday that the Department of Justice would no longer defend the legislation in court.  The decision means that although the law would remain in effect until either repealed by Congress or struck down by the U.S. Supreme Court, litigants outside of the Justice Department would have to actively defend the law in lawsuits if they wish."

[8]See Emens 2009.  The status of same-sex marriage in California is *sui generis* among the states.  California formerly granted same-sex marriage licenses, but has now discontinued doing so.  On June 16, 2008, California began issuing same-sex marriage licenses pursuant to a ruling by the Supreme Court of California in *In re Marriage Cases*, based on an equal protection argument, comparable to *Goodridge, Kerrigan and Varnum;* California ended that practice on November 5, 2008, due to the passage of what is called Proposition 8 or Prop 8, an amendment to the California Constitution, like DOMAs in other states, that limited marriages to those between one man and one woman.  On August 4, 2010, federal judge Vaughn R. Walker declared the California ban contained in Prop 8 unconstitutional, but temporarily stayed his ruling.  On August 6, 2010, both proponents and opponents of same-sex marriage rights submitted their legal briefs to Judge Walker specifically arguing the issue of a long-term stay of the ruling.  By August 12, 2010, Judge Walker had scheduled to lift his stay.  On August 16, 2010, the U.S. Court of Appeals for the Ninth Circuit granted the motion to stay, ordered expedited briefing on the merits of the appeal, and directed the parties to brief the issue of standing. On August 17, 2010, the same Ninth Circuit panel ordered expedited briefing on the appeal.  The court also ordered both appeals calendared for oral argument during the week of December 6, 2010, in San Francisco.  The Ninth Circuit has now requested the California Supreme Court to rule on an issue essential to determining whether the Ninth Circuit has jurisdiction at all to hear the case.

EXHIBIT A

(right to same-sex marriage in CT constitution); *Conaway v. Deane* (Md. 2007)(gay and lesbians not politically powerless group, so no heightened scrutiny); *Lewis v. Harris* (N.J. 2006)(every right conferred to heterosexual couples through civil marriage must be made available to committed same-sex couples, and reserved to legislature to alter marriage; legislature passed "civil union" law); *Hernandez v. Robles* (N.Y. 2006)(rational basis to limit marriage to opposite-sex couples because more stable environment to raise children in); *Andersen v. King County* (Wash. 2006)( plaintiffs failed to satisfy burden to prove homosexuality is an immutable trait, so no heightened scrutiny); *Goodridge* 2003 (finding right to same-sex marriage in MA constitution); *Baker v. State* (Vt. 1999)(right to civil union, not marriage in VT constitution).[9]

Defense of Marriage Amendments and Defense of Marriage statutes at the state level, like California's Prop 8, have been used politically by the opponents of same-sex marriage either to preclude or severely discourage the possibility of state courts finding a right to same-sex marriage in the state constitution.[10]   State DOMAs cannot preclude a

---

If the Ninth Circuit has standing to hear the case, then the same-sex marriage rights issue, explicitly reserved in *Lawrence v. Texas*, will likely work its way up to the U.S. Supreme Court.

[9]Note that Vermont now permits same-sex marriage as a matter of state statute, see pp.5-6 above.

[10]"[O]ver forty other states have passed statutes or constitutional amendments to ban same-sex marriages. See Ben Schuman, Note, Gods & Gays: Analyzing the Same-Sex Marriage Debate From a Religious Perspective, 96 Geo. L.J. 2103, 2107-08 (2008) (recognizing forty-two states with laws prohibiting same-sex marriage as of November 8, 2007); Human Rights Campaign, Statewide Marriage Prohibitions (2008), available at htt p://www.hrc.org/documents/marriage_ prohibitions.pdf (mapping states' enactment of marriage prohibitions)." *Varnum*, 763 N.W.2d at 895.  See, e.g., *State v Carswell*, 114 Ohio St 3d 210; 871 NE2d 547 (2007) (constitutional provision, **Ohio Const art 15, §**

EXHIBIT A

finding by the U.S. Supreme Court, however, that a right to same-sex marriage exists in the U.S. Constitution that all states are bound to respect.[11]   State DOMAs have been largely driven by bi-partisan movements that define marriage in terms of the Judeo-Christian exclusive definition as the union of one man with one woman.

Sociologically speaking, it is not "marriage" *per se* as a value that is at stake in the legal battles over same-sex marriage, although opponents of same-sex marriage rights might very well prefer to cast the struggle as one over marriage itself for political purposes.  Both proponents and opponents ~~of same-sex marriage~~ place "marriage" at the axiological apex of personal commitment; and there is also a degree of consensus that

---

11, providing: "Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions."); *Knight v Superior Court of Sacramento Co,* 128 Cal App 4th 14; 26 Cal Rptr 3d 687 (2005) (statute, **Cal Fam Code 308.5**, providing that "[o]nly marriage between a man and a woman is valid or recognized in California"); *Devlin v Philadelphia,* 580 Pa 564; 862 A2d 1234 (2004) (statute, **23 Pa Cons Stat 1704**, providing that "marriage shall be between one man and one woman"); *Tyma v Montgomery Co,* 369 Md 497; 801 A2d 148 (2002) (statute, **Md Code Ann Fam Law 2-201**, providing that "[o]nly a marriage between a man and a woman is valid in this State"); *Heinsma v City of Vancouver,* 144 Wash 2d 556; 29 P3d 709 (2001) (statute, **Wash Rev Code 26.04.010(1),** providing that "[m]arriage is a civil contract between a male and a female"); *Lowe v Broward Co,* 766 So 2d 1199 (Fla App, 2000) (statute, **Fla Stat 741.212(1)**, providing that "[m]arriages between persons of the same sex entered into in any jurisdiction . . . are not recognized for any purpose in this state"); *Crawford vChicago,* 304 Ill App 3d 818; 710 NE2d 91 (1999) (statute, **750 Ill Comp Stat 5/201**, providing that a marriage is valid if it is "between a man and a woman"); *Slattery v New York City,* 266 AD2d 24; 697 NYS2d 603 (1999) (statute, **NY Dom Rel Law 12**, providing that "the parties must solemnly declare in the presence of a clergyman or magistrate and the attending witness or witnesses that they take each other as husband and wife"); *Schaefer v City of Denver,* 973 P2d 717 (Colo App, 1998) (statute, **Colo Rev Stat 14-2-104(1)(b)**, providing that a marriage is valid if it is "only between one man and one woman").

[11]See fn 8 above discussing California's Prop 8 litigation working its way up to the Supreme Court.

EXHIBIT A

"married" as opposed to "civil union" couples are accorded higher citizenship or social status value than unmarried couples in civil union status.

The Vermont Supreme Court took the lead in the same-sex marriage rights debate when in 1999 it ruled in *Baker v. State* (Vt. 1999), that same-sex couples must have the same legal benefits inuring to heterosexual married couples in the form of a "civil union," even if the Vermont Constitution, in its view, did not compel offering "marriage" itself. In response to the Court's decision, the Vermont state legislature, V.S.A. Section 1204, created "civil union," an institution legally mandated open to all couples, whether homosexual or heterosexual, that equalized civil union to marriage in every respect except the symbolic and value-laden name of "marriage."

*over-turning Bowers v. Hardwick*

In another tectonic shift in the value-laden legal landscape regulating private adult consensual conduct, the U.S. Supreme Court held in *Lawrence v. Texas* (2003), that Texas's homosexual sodomy law violated the U.S. Constitution and thus had to be struck down as unconstitutional.   Needless to say, Vermont's bold step in 2000 toward greater equality and freedom for gay and lesbian Americans in the concept of "civil union," together with the U.S. Supreme Court's impetus in 2003 in the same direction in *Lawrence,* gave renewed vigor and hope to the values-based struggle for same-sex marriage rights.

In 2003, California followed Vermont's lead and passed a law deeming committed same-sex relationships "domestic partnerships" for purposes of state law, 2003 CA.A.B. 205 Section 297-5(a), which was signed into law in September 2003.  Two years later, the California state legislature in 2005 went further than domestic partnership

EXHIBIT A

and gave gay and lesbian couples the right to marry under state law.   The governor

promptly vetoed the bill in the same year.   In 2005, Connecticut adopted its own set of

"civil union" laws, Conn. Public Act No. 05-10, Section 14, and other states, like New

Jersey, adopted laws recognizing "civil union" status, but attached less rights to this

status than Connecticut in 2005.   See Stauss 2004: 306-18 and Koppelman 2006: 157 n.

21.

    In 2003, the Supreme Judicial Court of Massachusetts ruled in the landmark

decision of *Goodridge v. Department of Public Health,* 798 N.E.2d 941 (Mass. 2003) that

it was unconstitutional under the Massachusetts state constitution on equal protection

grounds to allow only heterosexual couples to marry.   *Goodridge* found that same-sex

couples were a class deserving of heightened scrutiny, were similarly situated to

opposite-sex couples for equal protection analysis purposes, and thus the state unlawfully

discriminated against them by denying them the right to marry.   It was the first U.S. state

to issue marriage licenses to same-sex couples.

    The question before the *Goodridge* Court was whether the state's denial of same-

sex "marriage" rights to same-sex couples who desired to be married to one another

violated the equal protection clause of the Massachusetts state constitution; the same

question was presented in *Kerrigan* regarding the Connecticut state constitution, and in

*Varnum* regarding the Iowa state constitution.   *Goodridge, Kerrigan* and *Varnum* all

noted that the very issue *sub judice*, the right to same-sex marriage, had been explicitly

reserved in *Lawrence v. Texas*, (2003), which struck down Texas's criminal sodomy laws

as violative of the U.S. Constitution on the ground that Texas had reached too far into the

EXHIBIT A

"deeply personal realms of consensual adult expressions of intimacy and one's choice of an intimate partner," encompassed within the core concept of human dignity at the basis of the 14th Amendment.  Significantly, *Lawrence* repudiated the Judeo-Christian-natured contentions of Texas as devoid of constitutional bearing.  The spirit of *Lawrence* permeates *Goodridge, Kerrigan* and *Varnum*.

*Goodridge, Kerrigan and Varnum* all followed, albeit at the level of their respective state constitutions, the U.S. Supreme Court's equal protection analysis insofar as it identified two factors that must be met if a group is to be accorded what is called "quasi-suspect" classification and thus entitled to heightened scrutiny.  As the *Kerrigan* Court articulated, these two required factors are: (1) the group has suffered a history of invidious discrimination; see *United States v. Virginia* (1996); *Massachusetts Board of Retirement v. Murgia* (1976); and (2) the characteristics that distinguish the group's members bear "no relation to [their] ability to perform or contribute to society." *Frontiero v. Richardson* (1973) (plurality opinion).  289 Conn. at 166.  See also 440 Mass. at 320-321; 763 N.W.2d at 877.  *Goodridge, Kerrigan*, and *Varnum* concurred that gays and lesbians met both factors.

*Goodridge*, 440 Mass. at 339-340, *Kerrigan,* 289 Conn. at 182-188, 189-215, and *Varnum,* 763 N.W.2d at 892-893, all found relevant in determining whether statutory provisions pertaining to a particular group are subject to any heightened scrutiny, two additional considerations: (1) whether the characteristic that defines the members of the class as a discrete group is immutable or otherwise not within their control; *see, e.g., Lyng v. Castillo* (1986) (for purposes of suspectness inquiry, relevant consideration is

EXHIBIT A

whether members of class "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"); and (2) whether the group is "a minority or politically powerless." *Bowen v. Gilliard* (1987).[12]   *Goodridge, Kerrigan,* and *Varnum* all found a long history of discrimination against gay and lesbian persons as a minority and politically powerless group, all recognized immutable characteristics associated with "sexual orientation," and all concluded that "sexual orientation" meets all of the requirements of a quasi-suspect classification.  440 Mass. at 328-29; 289 Conn. at 175; 763 N.W.2d at 893.   See also *Note (1985)*.

For the *Kerrigan* Court, specifically, "the characteristic that defines the members of this group—attraction to persons of the same sex—bears no logical relationship to their ability to perform in society, either in familial relations or otherwise as productive citizens.  Because sexual orientation is such an essential component of personhood, even if there is some possibility that a person's sexual preference can be altered, it would be wholly unacceptable for the state to require anyone to do so."   289 Conn. at 186-187. The *Varnum* Court stated analogously, 763 N.W.2d at 885:

> Instead, a gay or lesbian person can only gain the same rights under the statute as a heterosexual person by negating the very trait that defines gay and lesbian people as a class—their sexual orientation.  *In re Marriage Cases*, 183 P.3d at 441.
>
> The benefit denied by the marriage statute—the status of civil marriage for same-sex couples—is so "closely correlated with being homosexual" as to make it

---

[12] See *Conaway v. Deane*, 401 Md. 219, 932 A.2d 571, 609–14 2007 (holding sexual-orientation-based legislation is not entitled to heightened scrutiny because lesbian and gay people are not politically powerless); *Andersen,* 138 P.3d at 974 (determining plaintiffs failed to satisfy burden to prove homosexuality is an immutable trait and consequently holding sexual orientation-based distinctions do not demand closer judicial scrutiny).

EXHIBIT A

apparent the law is targeted at gay and lesbian people as a class.  See *Lawrence*,
539 U.S. at 583.

Whether marriage as an institution exists independently of any traditional
religious basis is certainly one of the lines of a values-encased battle in the political war
over same-sex marriage rights.   *Varnum, Kerrigan*, and *Goodridge*, all solved this
values-based "Gordion knot" by, first of all, sharply distinguishing a "civil" from a
religious right to marriage, and, secondly, invoking church-state separation and religious
establishment principles to justify that distinction.  As in *Kerrigan* for Connecticut, and
*Varnum* for Iowa, the *Goodridge* Court stated that Massachusetts's action in denying a
same-sex couple a marriage license "[b]arred access to the protections, benefits, and
obligations of civil marriage, [and that by that state action] a person who enters into an
intimate, exclusive union with another of the same sex, is arbitrarily deprived of
membership in one of our community's most rewarding and cherished institutions."
*Goodridge*, and *Kerrigan* and *Varnum*, all held that by limiting "marriage" to opposite-
sex couples exclusively, the state denied same-sex couples the equal protection of the law
and impermissibly restricted an individual's freedom to choose a life partner predicated
in the seminal U.S. case of *Loving v. Virginia*.

As was similarly true in *Kerrigan* for Connecticut (2008) and *Varnum* in Iowa
(2009), *Goodridge* stated that its authority was limited to determining under the
Massachusetts state constitution "the legal and social status of civil marriage," that is, the
right to obtain a *civil* marriage license from the local county clerk's office.  In the same-
sex marriage context, *Goodridge, Kerrigan* and *Varnum* can be explained in APD terms
as an application and an extension of both *Lawrence v. Texas*'s and *Loving v. Virginia*'s

EXHIBIT A

severe limitation on the purchase of the Judeo-Christian tradition in defining the

fundamental rights of individual equality and liberty in the constitutional sense.  The

axiological implications of this political development in the area of same-sex marriage

rights cannot be more profound and cannot help but bear far-reaching legal ramifications

for future judicial attempts at précising the contours of "fundamental rights," spheres of

private individual autonomy and expression that are constitutionally impregnable from

either federal and/or state intrusion or burden.

*Goodridge, Kerrigan* and *Varnum* all clearly implied that it would indeed be

constitutionally inappropriate to permit determination of the nature and the extent of the

civil right to marriage by determinative reference to traditional Judeo-Christian values, as

opponents of same-sex marriage passionately urge.  All three state courts emphasized a

deep respect for the separation of church-state doctrine that necessitated that they had no

jurisdiction over "marriage" in a religious setting.   Indeed, *Varnum* put it in these terms:

> This proposition is the essence of the separation of church and state.
> As a result, civil marriage must be judged under our constitutional
> standards of equal protection and not under religious doctrines or the
> religious views of individuals. This approach does not disrespect or
> denigrate the religious views of many Iowans who may strongly believe in
> marriage as a dual-gender union, but considers, as we must, only the
> constitutional rights of all people, as expressed by the promise of equal
> protection for all.

In perhaps an effort to allay the opponents of same-sex marriage, *Goodridge,*

*Kerrigan* and *Varnum* all emphasized that their rulings would have no bearing on a

religious denomination's freedom to define marriage along the Judeo-Christian

20

EXHIBIT A

exclusivity of one man and one woman.[13]  *Varnum* also noted that there was no religious

consensus on the subject of same-sex marriage, in view of the increasing number of

religions recognizing its validity.  See 763 N.W.2d at 904-905.  *Varnum,* 763 N.W.2d at

905, explained that church-state separation and proscription against religious

establishment principles support same-sex marriage in that the court's

> mission to protect religious freedom is consistent with our task to prevent government from endorsing any religious view.  State government can have no religious views, either directly or indirectly, expressed through its legislation.  This proposition is the essence of the separation of church and state.

At the same time, *Kerrigan,* 289 Conn. at 251, stated:

> "religious autonomy is not threatened by recognizing the right of same sex couples to marry civilly.  Religious organizations . . . will not be required to perform same sex marriages or otherwise condone same sex marriage or relations."

*Goodridge* stated, "We begin by considering the nature of civil marriage itself.

In Massachusetts, civil marriage is, and  government creates civil marriage.  Since pre-

Colonial days has been, precisely what its name implies: a wholly secular institution."

-------------------

[13] V*arnum* denied reliance upon, but nevertheless footnoted the growing number of religious denominations and sects that recognize the right to same-sex marriage within their religious doctrine.  Many religions recognize same-sex marriage, such as Buddhists, Quakers, Unitarians, and Reform and Reconstructionist Jews.  See Schuman, 96 Geo. L.J. at 2108.  In the *Varnum* litigation, Amicus curiae Iowa and National Faith Leaders, Communities, and Scholars had noted that "the United Church of Christ encourages, but does not require, its local congregations to adopt wedding policies that do not discriminate between heterosexual, gay, and lesbian couples, while the Episcopal Church permits priests to perform liturgies and blessings at same-sex weddings as a matter of pastoral care."  *Varnum,* at n.31.  Additionally, many groups and clergy within various religions are endeavoring to include same-sex marriage in their religious doctrine. *Varnum,* at  n.31.

EXHIBIT A

In Massachusetts, from very early times, *Goodridge* explained, the requisites of a valid marriage have been regulated by statutes of the Colony, Province, and Commonwealth, a survey of marriage statutes from 1639 through 1834, shows that no religious ceremony has ever been required to validate a Massachusetts marriage.  The civil right of marriage is state-conferred and sufficient unto itself as a legal matter.

*Goodridge*, 440 Mass. at 1209-10, *Kerrigan,* 289 Conn. at 150-52, and *Varnum,* 763 N.W.2d at 906, all concur that equal legal rights does not cure the constitutional infirmity of *separate* but equal rights inherent in the civil union/marriage dichotomy.  For APD purposes, this should be understood as an extension of *Brown v, Board of Education* principles to the same-sex marriage right context.

In *Kerrigan*, for example, the plaintiffs argued that "marriage" is an institution of what they termed "unique and enduring importance in our society, one that carries with it a *special status.*" (emphasis supplied).  The *Kerrigan* Court held that the legislature in creating two categories of couples, one same-sex and one opposite-sex, and assigning to each respectively, civil union and marriage, necessarily discriminated against gay and lesbian persons as a class.  289 Conn. at 249.   In reasoning strikingly reminiscent of the landmark case of *Brown v. Board of Education*, the *Kerrigan* Court emphasized what it saw as the hugely damaging consequences of "a separate but equal formulation" in the civil union regime.

The opponents of same-sex marriage rights advance, even if they do not always denote it explicitly, a value-laden governmental interest to maintain or "protect" the traditional definition of marriage, either on grounds of "sanctity," procreative interests, or

EXHIBIT A

in the best interests of children.   See Bork 1996: 114 (rulings "enact the policy preferences of the cultural elite on the far left of the political spectrum.")  Iowa noted that this values-based rationale is likely traditional Judeo-Christian religious at its core, see *Varnum*, 763 N.W.2d at 904.

Similarly, Massachusetts opined that "it is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been." *Goodridge*, 798 N.E.2d at 961 n.23.   Similarly, *Kerrigan* rejected, 289 Conn. at 145, defendants' belief that Connecticut's statutory ban on same-sex marriage does not deprive the plaintiffs of a "fundamental [civil] right because, since ancient times, marriage has been understood to be the union of a man and a woman, and only such rights that are 'deeply rooted in this [n]ation's history and tradition . . . and implicit in the concept of ordered liberty' are deemed fundamental."

Marriage must be procreative, another Judeo-Christian values-based line of attack, is rejected by *Goodridge*, *Kerrigan,* 289 Conn. at 254-255, and *Varnum,* 763 N.W.2d at 897-899.   The "marriage is procreation" argument thus singles out the one unbridgeable difference between same-sex and opposite-sex couples and then transforms that difference into the essence of legal marriage.   As *Goodridge* stated, 440 Mass. at 333:

> The Commonwealth affirmatively facilitates bringing children into a family regardless of whether the intended parent is married or unmarried, whether the child is adopted or born into a family, whether assistive technology was used to conceive the child, and whether the parent or her partner is heterosexual, homosexual, or bisexual.  If procreation were a necessary component of civil marriage, our statutes would draw a tighter circle around the permissible bounds of nonmarital child bearing and the

EXHIBIT A

creation of families by noncoital means. The attempt to isolate procreation as "the source of a fundamental right to marry," post at 370 (Cordy, J., dissenting), overlooks the integrated way in which courts have examined the complex and overlapping realms of personal autonomy, marriage, family life, and child rearing. Our jurisprudence recognizes that, in these nuanced and fundamentally private areas of life, such a narrow focus is inappropriate.

*evidence 2*

In *Hernandez v. Robles*, New York's highest court held in 2006 that there is a rational basis to limit marriage to opposite-sex couples because it is a more stable environment to raise children in. *Goodridge* earlier rejected *Hernandez*'s reasoning on this point, 798 N.E.2d at 963; in agreement with *Kerrigan*, *Varnum* stated, 763 N.W.2d at 901 "germane analysis does not show how the best interests of children of gay and lesbian parents, who are denied an environment supported by the benefits of marriage under the statute, are served by the ban."

Significantly, the *Kerrigan* Court, 289 Conn. at 149, went further than either *Goodridge* and *Varnum*, in its same-sex marriage rights analysis, in stating that "marriage has been characterized as 'intimate to the degree of being sacred,'" citing the seminal cases of *Griswold v. Connecticut* (1965), and *Turner v. Safley* (1987) as well, for the principle that "many religions recognize marriage as having spiritual significance" and "an institution more basic in our civilization than any other," citing *Williams v. North Carolina,* 317 U.S. 287, 303 (1942). *Kerrigan* thus not only rejects the Judeo-Christian "sanctity" of marriage, but counterpoises *its own* sanctity in the freedom to choose a same-sex marriage partner. *Kerrigan* also quoted extensively from *Lawrence v. Texas's* quasi-religious language, 539 U.S. at 573-74, "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the *mystery* of human life." (emphasis supplied)  289 Conn. at 235.

EXHIBIT A

While *Kerrigan*, like *Goodridge* and *Varnum*, defined the institution of marriage in putatively secular as opposed to religious terms, *Kerrigan* intriguingly attributes a "spiritual" and "sacred" values-based dimension to same-sex marriage; in *Kerrigan*'s own words, 957 A.2d at 425, from the "strongest human rights principle." *Kerrigan* attributes to the institution of civil marriage, now open to same-sex and opposite-sex couples equally, a "religious" dimension à la *Griswold* that transcends the Judeo-Christian tradition and confers upon it a "sacredness" and "spirituality" liberated from the very restrictive confines of traditional American religion. Unlike *Kerrigan*, which my research shows to be the strongest statement of the right to same-sex marriage in America today, *Varnum* and *Goodridge* rather explicitly reserve the sacralization function to religious denominations. In this respect, my research bears implications for the study of an emergent American civil religion that rides autonomously from traditional Judeo-Christian values and principles or parallels reformulated and more expansive Judeo-Christian or other religiously grounded principles.

*[handwritten margin note: This would benefit from more development]*

Finally, *Goodridge*, *Kerrigan*, and *Varnum* all significantly converge on the principle that the primary state goal in recognizing "marriage" is the "unitive feature[] of human partnerships, a goal that is as equally applicable to lesbian and gay couples as it is to straight ones." See Eskridge 2003: 169. My research thus confirms what Eskridge recognizes as a trend toward axiologizing the priority of the couples' rights over procreation, that is, that '[t]he traditionalist policy of procreation is not an important goal per se of modern marriage legislation, and even if it were, it would not outweigh the couples' rights." For all the Judeo-Christian opponents' claims about procreation, in the modern polity, the unitive rather than the procreative goal of marriage supports the union.

EXHIBIT A

**WORKS and LEGAL AUTHORITIES CITED:**

*Adams v. Howerton*, 486 F.Supp. 1119 (C.D.Calif. 1980), aff'd on other grounds, 673 F.2d 1036 (9th Cir. 1982).

*Andersen v. King County*, 138 P.3d 963 (Wash. 2006).

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), superseded by state constitutional amendment.

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), appeal dismissed, 409 U.S. 810 (1972).

*Baker v. State*, 744 A.2d 864 (Vt. 1999).

Bork, Robert 1996. *Slouching Towards Gomorrah.* New York: Harper Collins.

*Bowen v. Gilliard*, 483 U.S. 587, 602, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987).

*Bowers v. Hardwick*, 478 U.S. 186, 192, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), overruled on other grounds by *Lawrence v. Texas*, 539 U.S. 55, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

*Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

Chauncey, George 2004. *Why Marriage? The History Shaping Today's Debate Over Gay Equality.* New York: Basic Books.

*Commonwealth v. Munson*, 127 Mass. 459, 460-466 (1879).

*Conaway v. Deane*, 932 A.2d 571 (Md. 2007).

*Crawford v. Chicago,* 304 Ill App 3d 818; 710 NE2d 91 (1999) (statute, **750 Ill Comp Stat 5/201).**

*De Santo v. Barnsley*, 476 A.2d 952 (Pa.Super.1984).

*Devlin v Philadelphia,* 580 Pa 564; 862 A2d 1234 (2004) (statute, **23 Pa Cons Stat 1704).**

Emens, Elizabeth F., *Intimate Discrimination: The State's Role in the Accidents of Sex and Love*, 122 Harv. L. Rev. 1307 (2009).

EXHIBIT A

Eskridge, William N., 1999.  *Gaylaw: Challenging the Apartheid of the Closet.*
Cambridge, MA; Harvard University Press.

Eskridge, William N., Jr., 2003.  "The Same-Sex Marriage Debate and Three
Conceptions of Equality, Marriage and Same-Sex Unions: A Debate," in *Marriage and
Same-Sex Unions.* Lynn D. Wardle, Mark Strasser, William C. Duncan and David Orgon
Coolidge, eds. Pp. 167-189.  Westport, Connecticut: Praeger.

*Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Gerstmann, Evan, 2008. *Same-Sex Marriage and the Constitution.*  Cambridge:
Cambridge University Press.

*Goodridge v. Dept. of Public Health,* 440 Mass. 309, 798 N.E.2d 941 (2003).

Gordon, Ann., Tadlock, Barry, and Popp, Elizabeth, 2004. "Framing the Issue of Same-
Sex Marriages: Traditional Values vs. Equal Rights"  *Paper presented at the annual
meeting of the American Political Science Association.*

*Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

*Heinsma v City of Vancouver,* 144 Wash 2d 556; 29 P3d 709 (2001) (statute, **Wash Rev
Code 26.04.010(1).**

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006).

*In re Marriage Cases*, 183 P.3d 384, 435 n.54 (Cal. 2008), *superseded in relevant part by
constitutional amendment*, CAL. CONST. art. 1 § 7.5.

Johnson, David K. 2004, *The Lavender Scare: The Cold War Persecution of Gays and
Lesbians in the Federal Government.*  Chicago: University of Chicago Press.

*Jones v. Hallahan*, 501 S.W.2d 588, 589-90 (Ky.Ct.App.1973).

*Kerrigan v. Commissioner of Public Health*, 289 Conn. 135, 957 A.2d 407 (Conn. 2008).

*Knight v Superior Court of Sacramento Co,* 128 Cal App 4th 14; 26 Cal Rptr 3d 687
(2005) (statute, **Cal Fam Code 308.5**).

Koppelman, Andrew, *Why Gay Legal History Matters*, 113 Harv. L. Rev. 2035 (2000).

EXHIBIT A

Koppelman, Andrew 2006, *Same Sex, Different States*. New Haven: Yale University Press.

*Lawrence v. Texas*, 539 U.S. 558, 603, 123 S.Ct. 2472, 2480, 2485, 156 L.Ed.2d 508 (2003).

*Leskovar v Nickels,* 140 Wash App 770, 780; 166 P3d 1251 (2007).

*Lewis v. Harris*, 908 A.2d 196 (N.J. 2006).

*Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817 (1967).

*Lowe v Broward Co,* 766 So 2d 1199 (Fla App, 2000) (statute, **Fla Stat 741.212(1)**).

*Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986).

*Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

Note, *"The Constitutional Status of Sexual Orientation: Homosexuality as Suspect Classification," 98 Harv. L.Rev 1285, 1305 (1985)*.

O'Connor and Yanus 2007, "'Til Death-Or the Supreme Court-Do Us Part: Litigating Gay Marriage, The Politics of Same-Sex Marriage," in Rimmerman, C., & Wilcox, C. (eds.) 2007, *The Politics of Same-Sex Marriage*. Chicago: University of Chicago Press.

*Opinions of the Justices to the Senate*, 440 Mass. 1201, 1207, 802 N.E.2d 565 (2004).

Phy-Olsen, Allene 2006. *Same-Sex Marriage*. Westport, CT: Greenwood Press.

*Plessy v. Ferguson*, 163 U.S. 537 (1896).

*Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004).

Rimmerman, C., 2007. "The Presidency, Congress, and Same-Sex Marriage," in Rimmerman, C., & Wilcox, C. (eds.) 2007, *The Politics of Same-Sex Marriage*. Chicago: University of Chicago Press.

Rimmerman, C., & Wilcox, C. (eds.) 2007, *The Politics of Same-Sex Marriage*. Chicago: University of Chicago Press.

EXHIBIT A

Rosenbaum, Tyler 2009.  Laboratories of Constitutionality: How State High Courts Paved the Way for Federal Courts to Invalidate Prohibitions on Same-Sex Marriage, http://works.bepress.com/tyler_rosenbaum/1.


*Schaefer v City of Denver,* 973 P2d 717 (Colo App., 1998) (statute, **Colo Rev Stat 14-2-104(1)(b)).**

Ben Schuman, Note, *Gods & Gays: Analyzing the Same-Sex Marriage Debate from a Religious Perspective*, 96 Geo. L.J. 2103, 2106–08 (2008).

*Singer v. Hara*, 11 Wash.App. 247, 522 P.2d 1187, 1196, review denied, 843 Wash.2d 1008 (1974).


*Skinner* v. *Oklahoma,* 316 U. S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

*Slattery v New York City,* 266 AD2d 24; 697 NYS2d 603 (1999) (statute, **NY Dom Rel Law 12).**


Smith, Rogers 1993.  "Beyond Tocqueville, Myrdal, and Hartz: The Multiple Traditions in America," *American Political Science Review* 87: 549-566.

Smith, Rogers 1997. *Civic Ideals: Conflicting Visions of Citizenship in U.S. History.*  New Haven: Yale University Press.

*State v Carswell,* 114 Ohio St 3d 210; 871 NE2d 547 (2007) (constitutional provision, **Ohio Const art 15, § 11**).

Stauss, David 2004. *The End or Just the Beginning for Gay Rights under the New Jersey Constitution?,* 36 Rutgers L.J. 289, 306-18.

Tarr, G. Allan, 1998.  *Understanding State Constitutions.*  Lawrenceville, NJ: Princeton University Press.

*The Examiner*, 2/23/2011, "Obama calls parts of the Defense of Marriage Act (DOMA) unconstitutional."

*Turner v. Safley*, 482 U.S. 78, 96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

*Tyma v Montgomery Co,* 369 Md 497; 801 A2d 148 (2002) (statute, **Md Code Ann Fam Law 2-201**).

EXHIBIT A

*United States v. Virginia*, 518 U.S. 515, 531-32, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009).

*Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

*Whistleblower*, "America's Gay Obsession," Vol. 19, No. 11, Nov. 2010.

*Williams v. North Carolina*, 317 U.S. 287, 303, 63 S.Ct. 207, 87 L.Ed. 279 (1942).

This is a strong & well written defense of same sex marriage, I like the APD framing.

Further expansion of the anti-position from cases, such as Bowers, would be good. Follow this with a table contrasting the two positions, Next time go out of comfort zone.

A

30

EXHIBIT A

**EXHIBIT L**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

54

114

EXHIBIT A



### Claremont
GRADUATE UNIVERSITY

## SCHOOL OF POLITICS & ECONOMICS

# STUDENT HANDBOOK

## 2010-2011

### FALL SEMESTER EDITION

EXHIBIT A

# SCHOOL OF POLITICS & ECONOMICS



**Claremont**
GRADUATE UNIVERSITY

<span style="color:red">**2010-2011**</span>

## *Welcome to the School of Politics & Economics!*



We are proud that you have chosen to pursue your academic goals in this unique learning environment.  The faculty and staff in the School of Politics and Economics are devoted to providing you with a quality academic experience.

You will find our programs intellectually challenging and rewarding.  As a student, you will have the opportunity to develop within the limits of degree requirements, a course of study and research that is best suited to your specific needs and interests.  You will acquire technical and analytical skills that apply to real world problems and employment.

### ACADEMIC ADVISORS

Each new student is assigned a faculty advisor and in some instances two (Politics and Policy PhD students) and a student mentor.  We encourage you to develop a good relationship with your faculty advisor(s).  Your first source of information should be this handbook.  You should read it thoroughly prior to making any major program decisions, and you should refer to its content throughout your academic  program.

### NEWS & EVENTS

Please be sure to subscribe to the SPE email listserv (you can do this from the SPE website) so you will be informed of SPE announcements and upcoming events throughout the year.  CGU has a very organized and active Graduate Student Council and they post notices of their events at the CGU website.

### CONSULT YOUR HANDBOOK REGULARLY

We want your academic career to be successful and therefore provide you with this handbook with each department's guidelines for navigating your way through important processes vital to your success at CGU.  Please take the time to read through the handbook to familiarize yourself with the information contained herein.

Do not hesitate to visit our administrative offices located in McManus 237, 2nd Floor—the department staff are ready to help you.

*Jean Schroedel*

*Dean, School of Politics & Economics*

## TABLE OF CONTENTS

1. **ACADEMIC CALENDAR**

2. **ACADEMIC INTEGRITY**

3. **DEPARTMENT OF ECONOMICS**

4. **DEPARTMENT OF POLITICS & POLICY**

5. **SPE TRANSDISCIPLINARY PROGRAMS**

6. **OFFICE OF CAREER MANAGEMENT**

7. **SPE FACULTY**

EXHIBIT A

ACADEMIC CALENDAR

EXHIBIT A



# ACADEMIC CALENDAR
## 2010 – 2011

### FALL 2010

| | | |
|---|---|---|
| Apr 12 | Registration begins | |
| Aug 25 | New International Student Orientation | |
| Sept 6 | Labor day observed | |
| Sept 14 | Withdrawal of students not registered | |

| | REGULAR | MODULE 1 | MODULE 2 |
|---|---|---|---|
| Last day to register without late fee | Aug 6 | Aug 6 | Oct 25 |
| First day of classes | Aug 30 | Aug 30 | Oct 25 |
| Last day to add/drop | Sept 13 | Sept 7 | Nov 1 |
| Last day for 100% refund | Sept 13 | Sept 7 | Nov 1 |
| Last day for 75% refund | Sept 27 | Sept 14 | Nov 8 |
| Last day for 50% refund | Oct 11 | Sept 21 | Nov 15 |
| Last day to drop without W | Oct 11 | Sept 21 | Nov 15 |
| Last day of semester/session | Dec 18 | Oct 23 | Dec 18 |

| | |
|---|---|
| Sept 29 | Last day to submit Intent to Receive Degree Forms for this semester |
| Nov 19 | Last day to schedule dissertation defense |
| Nov 25-26 | Thanksgiving Break |
| Nov 29 | Last day to defend dissertations |
| Dec 13 | Due date for Dissertation/Thesis/Critique |
| Dec 13 | Due date for final degree requirements (this semester's candidates) |
| Dec 13-17 | Final Exam Week |
| Dec 17 | Last day for changes to semester registration/enrollment records |
| Dec 18 | Last day of the semester/Fall degrees awarded |
| Jan 3 | Grades due from faculty |

### SPRING 2011

| | |
|---|---|
| Nov 17 | Registration begins |
| Jan 12 | New International Student Orientation |
| Jan 17 | Martin Luther King Jr. Holiday observed |
| Feb 2 | Withdrawal of students not registered |

| | REGULAR | MODULE 1 | MODULE 2 |
|---|---|---|---|
| Last day to register without late fee | Dec 17 | Dec 17 | Mar 21 |
| First day of classes | Jan 18 | Jan 18 | Mar 21 |
| Last day to add/drop | Feb 1 | Jan 25 | Mar 28 |
| Last day for 100% refund | Feb 1 | Jan 25 | Mar 28 |
| Last day for 75% refund | Feb 15 | Feb 1 | Apr 4 |
| Last day for 50% refund | Mar 1 | Feb 8 | Apr 11 |
| Last day to drop without W | Mar 1 | Feb 8 | Apr 11 |
| Last day of semester/session | May 7 | Mar 12 | May 7 |

CGU Registrar's Office, 01/10

-118-                                            EXHIBIT A

ACADEMIC INTEGRITY

EXHIBIT A

# ACADEMIC INTEGRITY

## GENERAL REQUIREMENTS FOR SATISFACTORY ACADEMIC PROGRESS

All students are expected to maintain a **minimum grade point average of 3.0** in all coursework taken at Claremont Graduate University with no more than two incomplete courses at any time.   In addition, doctoral students must show satisfactory progress in research and examinations as judged by the faculty in their academic program, and must make timely progress toward the degree as defined in the university's time to degree policy as described in the bulletin.

Failure to maintain the applicable minimum standard may result in the student being placed on academic probation for the following semester by the faculty in their academic program. Students placed on probation who have not met the minimum standard by the end of the next semester are subject to dismissal from the university.   Individual academic programs may require a higher grade point average and/or additional standards of progress.   See appropriate sections of the bulletin.

### SCALE OF GRADES

*The grade-point system currently in use at CGU is as follows:*

| | |
|---|---|
| A+ | 4.0 |
| A | 4.0 |
| A- | 3.7 |
| B+ | 3.3 |
| B | 3.0 |
| B- | 2.7 |
| C+ | 2.3 |
| C | 2.0 |
| C- | 1.7 |
| S | Satisfactory (B or better)* |
| I | Incomplete |
| U | Unsatisfactory |
| PI | Permanent Incomplete |
| 00 | Audit |
| GP | Grade Pending |
| W | Withdrawal |
| **\*S grade is recommended for research courses ONLY and is not calculated into a student's grade point average** | |

EXHIBIT A

"To take an idea, even a suggestion, or the peculiar expression of another without acknowledgment of its source is to give the reader the false impression that the idea is your own.  This is plagiarism...."[7]

"Plagiarism exists when a writer "*leads his reader to believe that what he is reading is the original work of the writer when it is not.*"[8]

Each form of plagiarism implicitly claims originality but is based, in fact, upon the words or ideas of someone else.

### How Can Plagiarism Be Avoided?

The key to avoiding plagiarism is documentation.  When you take words, ideas or facts, which are not common knowledge[9] from someone else, cite your source.  Proper format may be found in any manual of style.  Among such manuals are:  The University of Chicago Press, *The Chicago Manual of Style*, Fourteenth Edition (Chicago:  University of Chicago Press, 1993) or Kate L. Turabian, *A Manual for Writers of Term Papers, Theses and Dissertations* (Chicago:  University of Chicago Press, 1996).

***Thus plagiarism must be avoided.  Through proper documentation we may enhance the academic integrity of ourselves, the School of Politics and Economics and Claremont Graduate University.***

---

[1]Langdon Elsbree and Frederick Bracher, Heath's College Handbook of Composition, Eighth Edition (Lexington, Mass.: D.C.Heath, 1972), p. 596.

[2]William Coyle, Research Papers, Fifth Edition (Indianapolis:  Bobbs-Merrill, 1980), p. 105.

[3]Sidney and Carolyn Moss, The New Composition by Logic, Revised Edition (Carbondale: Southern Illinois University Press, 1978), p. 29.

[4]James Lester, Writing Research Papers, A Complete Guide, Third Edition, (Glenview IL:  Scott, Foresman, 1980), p. 49.

[5]Helene Hutchison, The Hutchison Guide of Writing Research Papers (New York:  Glencoe Press, 1973), p. 179.

[6]Porter Perrin, Writer's Guide and Index to English, Third Edition (Chicago:  Scott Foresman, 1959), p. 635.

[7]Florence Hilbish, The Research Paper (New York:  Bookman Associates, 1952), p. 112.

[8]Harold Martin and Richard Ohmann, The Logic and Rhetoric of Exposition, Revised Edition (New York:  Holt, Rinehart and        Winston, 1963), p. 274.

[9]For a further discussion of the idea of "common knowledge" see Hilbish, op.cit., pp. 112.

EXHIBIT A

DEPARTMENT OF ECONOMICS

EXHIBIT A

DEPARTMENT OF ECONOMICS 2010-2011                                             Page 1



**PROFESSOR PAUL ZAK, DEPARTMENT CHAIR**
**DEPARTMENT OF ECONOMICS**
**DIRECTOR, CENTER FOR NEUROECONOMICS AND BEHAVIORAL ECONOMICS STUDIES**
**909-621-8788**
**Paul.zak@cgu.edu**

## GENERAL INFORMATION

### FORMS

During your academic career at CGU, sometime or another you will need to complete various forms (for graduation, registration, changes in fields, etc). They are available for download from the CGU Student Records website at:

http://www.cgu.edu/pages/179.asp

### GPA REQUIREMENTS

All students must maintain a minimum of a 3.0 (B) average to remain in good standing. Falling below this level is grounds for academic probation or termination of enrollment after 24 units of coursework.

### INDEPENDENT STUDIES

Both M.A. and Ph.D students are allowed to take up to **TWO** independent study courses during their academic program, which must be approved by their faculty advisor and department chair.

### TRANSFER OF CREDIT POLICY

A formal transfer of units is processed by obtaining a *Transfer of Credit Form* which can be downloaded from the CGU website. The completed form must then be submitted with a transcript to the student's faculty advisor for review and approval. In order to transfer units from another institution, students must have earned the equivalent of a B or better in a graduate level semester course.

**M.A. STUDENTS** may petition to transfer up to 10 semester units into a 48-unit master's degree program.

EXHIBIT A

3) Two additional approved courses related to business and financial economics. A partial list of possibilities:

- Econ 265 Industrial Organization
- Econ 267 Law and Economics
- Econ 273 Economics of Innovation
- Econ337 Behavioral Finance and Risk Management
- Econ 350 International Money and Finance
- SPE 301 Behavioral Neuroscience of Decision-Making

Faculty Contacts:    Arthur.Denzau@cgu.edu
                     Thomas.Willett@cgu.edu


### *International Economic Policy & Development*

This track offers a program roughly similar to applied economics programs in graduate schools of public policy, diplomacy and law, with the added availability of courses in international business and management, as well as politics.

**Required Field Courses**

1) Econ 247  International Trade Theory and Policy (4 units)
2) Econ 350  International Money and Finance  (4 units)
3) Applied intl. economic policy or development course (4 units), such as:
    - Econ 224 Asian Political Economy
    - Econ342 Asian Economic Development
    - Econ359 Finance and Development
    - Econ 374  Economic Policies in Developing Countries
4) One course in the Politics of International Economic Relations such as:
    - PP 411  International Political Economy (4 units)
5) Two additional approved courses (8 units) from the broad areas of international economics and development, international and comparative political economy and international management, such as:
    - Econ 358  Advanced Topics in Intl. Monetary and Financial Economics
    - PP 366  Political and Economic Development in Latin America
    - SPE 302  Political Economy of Development

### *Political Economy & Public Policy*

This track offers a program roughly similar to the economic concentrations in schools such as the Kennedy School of Government at Harvard University and a number of graduate schools of public policy and interdisciplinary graduate programs in applied political economy.  It provides a useful background for many positions in business and government, and is an especially attractive option for students considering pursuing a law degree.

EXHIBIT A

Elective Courses Cont'd
4. Economic Development (PP 336, SPE 302)
5. Globalization (PP371, PP 411, PP417)
6. Political Economy and Public Policy (PP 330, PP350)
7. China and the Global Economy (Econ 342, SPE297)
8. Financial Economics (Econ 336, Econ 337)
9. Quantitative Methods (Econ 308, Econ 382, PP 481, PP 482, PP 487)
10. Neuroeconomics and Behavioral Economics (SPE301, Econ318, Econ319).

Faculty contacts:        James.Lehman@cgu.edu
                         Thomas.Willett@cgu.edu
                         Arthur.Denzau@cgu.edu

**Completion of Required Forms for M.A. degree**

Upon completion of degree requirements, there are two forms that must be filed:

- *Intent to Receive a Degree*
- *Final Approval of Master's Degree.*

**Departmental Process**

1) Student files *Intent to Receive a Degree* with the Office of the Registrar.

2) Student completes top portion of a *Final Approval of Master's Degree* and submit to the Program Coordinator.  *(Both of these forms can be downloaded from the CGU website)*

**B.A./M.A.  4+1 Program**

Undergraduate students in the Claremont consortium can earn a Master of Arts in Economics along with their B.A. in Economics in five (5) years.  This degree is appropriate for a career in government, industry, policy, advocacy, or the non-profit sector should consider enrolling An M.A. from the Claremont Graduate University (CGU) also has the added advantage of making its recipients more competitive in the application and admissions process of Ph.D. and Law programs around the country.  Students who have completed our program have effectively demonstrated to other institutions their capacity to do quality work at the graduate and/or professional level.

**Program Application and Requirements**

Students apply for admission during the Fall Semester of their junior year.  Acceptance into the program is based on an evaluation of the student's undergraduate grades and performance and recommendations, each demonstrating the student's preparation for graduate training. Prerequisites that must be completed before study in residence at CGU begins include calculus 2, intermediate micro, intermediate macro, and basic statistics.  Upon the receipt of their undergraduate degree, the student becomes a full-time student in CGU for the remaining year of study. It is essential that students meet with a faculty advisor at CGU *during* their junior year to plan

You should meet with your advisor each semester to ensure that you are making good academic progress and that you are on track to satisfy your degree requirements.

### TRANSFER OF CREDIT/COURSE WAIVERS

Ph.D students may petition to transfer up to 24 semester units of graduate study, generally toward completion of their field requirements, into the doctoral program. Transfers will *not* be considered until at least one year of coursework (24 units) has been completed. Students who wish to obtain transfer credits must complete the *Course Transfer Approval* form available from the CGU website. The completed form and a transcript showing the course(s) taken should be submitted to the student's academic advisor who, along with the department chair, must approve the transfer. Students must have earned the equivalent of a B or better in a graduate level course in order to transfer units from another institution.

Though we recommend that *core* courses be taken at CGU since the material will appear in qualifying exams, it is occasionally possible to waive these courses if students have taken an equivalent graduate course. In this case, the student must obtain the *Course Transfer Approval* form from the CGU website and submit it and supporting material (syllabi) to the professor teaching the core course. A waiver for some courses requires that an exam be taken.

### PROGRAM REQUIREMENTS

1) A minimum of 72 units of graduate-level course work, including completion of core course requirements listed below.

2) Successful completion of one major field of study (five courses). Please note that for Ph.D interfield students, some of the economics fields will require only four courses). Available standard fields and their respective requirements are listed below:

   Business & Financial Economics
   Industrial Organization
   International & Development Economics
   International Money & Finance
   Neuroeconomics and Behavioral Economics
   Public Choice & Public Economics

   We also have a PhD option in Global Commerce and Finance available.

3) Completion of the institutional research tool requirement. This requirement is met by successful completion of the Mathematics and Econometrics sequences.

4) Successful completion of qualifying examinations in microeconomics, macroeconomics and the major field of study.

5) Completion and successful defense of the doctoral dissertation.

EXHIBIT A

## REQUIREMENTS FOR THE APPLIED FIELD IN GLOBAL COMMERCE AND FINANCE

### Econ Core

| | |
|---|---|
| 16 units | **Micro**<br>Econ 313 Microeconomic Analysis I<br>Econ 316 Math Methods in Micro<br>SPE 315 Game Theory **or** Econ 317 Advanced Microeconomics II<br>SPE 324 Economics of Management and Organization |
| 8 units | **Macro**<br>Econ 302 Macroeconomic Analysis I<br>Econ 350 International Money & Finance OR an approved substitute |
| 20 units | **Quantitative and Research Methods**<br>Econ 308 Math for Economists I<br>Econ 382 Econometrics I<br>Econ 383 Econometrics II<br>Econ 384 Econometrics III<br>SPE 471 Strategic Modeling for PEB Decisions |
| 8 units | **Additional Core Classes from the MA in Economics - concentration in Global Commerce and Finance**<br>Econ 351 The Global Political Economy **or**<br>An approved substitute in international economics<br>Econ 337 Behavioral Finance and Risk Management |
| 8 units | **Political Economy and T-Course Requirements**<br>Approved T-course and a course in political economy or public choice, such as:<br>SPE 410 Foundations of Political Economy<br>SPE 411 International Political Economy<br>Econ 300 Political Economy and Social Inquiry or<br>Econ 286 Public Choice |

### Elective Fields

| | |
|---|---|
| 12 units | International Money and Finance<br>Business and Financial Economics<br>International Commerce and Development<br><br>Students take core quals in micro and macro based on Economics 313 and 302 respectively, and a field qual |

### Total: 72 Units

EXHIBIT A

| *Second Fall* | *January* | *Second Spring* |
|---|---|---|
| Econ316 | Micro Qual | Econ 384 |
| Econ318 | | |
| Econ 383 | | |

Students who find a four-course load too demanding could delay taking Econ313 until the second fall, but we advise against this. Econ313 includes basic material that is useful in the spring courses.

3. *Students who do not fit into one of the above categories* (for example, those who cannot take a full course load because of work or other responsibilities) should still attempt to complete core courses as soon as possible. They should start the econometrics sequence as soon as possible. If they expect to specialize in a field that relies mostly on microeconomics (for example, industrial organization or public choice), they should begin the microeconomics core as soon as possible. If they expect to specialize in a field that relies mostly on macroeconomics (for example, growth or international), they should begin the macroeconomics core as soon as possible. Remember: the goal is to acquire as many tools as possible before taking field courses.

## DOCTORAL FIELD REQUIREMENTS

Courses should provide the students with the background to successfully complete the field qualifying examination.   The advisor should be consulted in order to maximize exposure to key concepts.

### BUSINESS & FINANCIAL ECONOMICS

This field integrates key findings and approaches from several business-related fields including finance, organization theory, strategy, and the theory of the firm. This field is particularly suitable for those who wish to enter the private sector or teach in a business school. Students on this track are exposed to many of the concepts and results presented in MBA programs, but the material is covered at a more advanced level. Students have the opportunity to specialize in either applied microeconomics or financial markets.

1) Econ 337 Behavioral Finance and Risk Management, Econ 336 Financial Economics, or another approved finance course

2) Two (2) of the following courses:

- Econ 326 Advanced Industrial Organization
- Econ 335 Financial Economics and Economic Organization
- Econ 338 Advanced Topics in Money and Finance
- SPE 324 Economics of Management and Organization

EXHIBIT A

### INTERNATIONAL & DEVELOPMENT ECONOMICS

This field is designed to give students a broad overview of the key elements of global economics including international trade theory and policy, international money and finance, and development economies. Students then specialize with one or more advanced courses in one of these three areas. This gives students a strong background for academic appointments as well as work in the public and private sector.

Choose two (2) of the following three (3) courses:
1) Econ 347 International Trade **OR**
    Econ 355 International Trade Theory and Policy **OR** Econ 374 Trade and Development Policies
    AND
2) Econ 350 International Money and Finance

One (1) additional approved course that has a substantial focus on the economics or political economy of growth, trade, or policy. *Recommended courses include, but are not limited to:*

- Econ 304 Growth and Development
- Econ 342 Asian Economic Development *or*
- Econ 224 Asian Political Economy
- PP 471 Decision Making Models
- SPE 360 Advanced Political Economy
- Econ 329 Political Economy of Institutions & Development
- SPE 302 Political Economy of Development
- PP 336 Political and Economic Development in Latin America
- Econ 354 Advanced Growth and Development
- SPE 207 China in the Global Economy
- [note: check class lists]

*Faculty Contacts:*
art.denzau@cgu.edu
James.Lehman@cgu.edu

### International Money & Finance

This field emphasizes the key concepts essential for students wishing to pursue careers in academics, government, and the private sector in the areas for international finance, global macroeconomics, and the political economy of international monetary and financial relations. It is based on the premise that specialists in any of these areas require a broad understanding of the interrelationships among exchange rates, international financial markets, open economy macroeconomics, and the political economy influences which drive government policies in these areas.

1) Econ 350 International Money and Finance

2) Econ 358 Advanced Topics in International Monetary and Financial Economics
    **OR** an alternate approved advanced seminar

3) An approved course in Finance (example - Econ336 Financial Economics)

EXHIBIT A

Psychology
- o SBOS 260 Perception & Cognition
- o SBOS 325 Psychology of Thinking
- o SBOS 351n Attitudes and Social Influence
- o SBOS 318 Overview of Social Psychology

Additional psychology and neuroscience courses may also be taken.

*Faculty Contacts:*
joshua.tasoff@cgu.edu
paul.zak@cgu.edu

### PUBLIC CHOICE & PUBLIC ECONOMICS

The public choice and public economics field encompasses the application of microeconomics to political behavior and to the role of the state in economic life. It attempts to treat alterations in the institutions of politics as outcomes conditioned by such variables as transaction costs, property rights, social values, technology and factor quantities. Using this framework, issues of voting, coalition formation, types of representation, including autocracy, bureaucracy, public enterprise, "outsourcing," as well as constitutional and legal structures are considered. The traditional role of taxes, public expenditures and regulations are analyzed using public choice under the rubric of public economics:

1) Econ 343/286 Public Choice **OR** SPE 410 Foundations of Political Economy

2) SPE 360 Advanced Political Economy

3) Three (3) approved courses from economic/organization and regulation, domestic and international political economy, law and economics, management, mathematics, normative economics, politics and policy, philosophy, public economics/finance, social psychology and sociology/anthropology

*Faculty Contacts:*
thomas.borcherding@cgu.edu
art.denzau@cgu.edu

### Other fields

Additional fields can be constructed with approval of the department executive committee and dean. Other fields require a faculty member who will supervise the field and rigor commensurate with existing fields.

EXHIBIT A

DEPARTMENT OF ECONOMICS  2010-2011                                                Page 19

## CHOOSING A DISSERTATION CHAIR AND COMMITTEE

The dissertation proposal requires five inputs from you: your topic, the chair of your committee, the other committee members, a written summary of your proposed research, and a formal presentation of your proposed research.

First, determine your topic and the chair of your committee. You should consult faculty when determining your topic. Often the topic determines the appropriate chair. In most cases, the chair of your field qualifying exam will be the most obvious person to chair your dissertation committee. Discuss your topic with your preferred chair and other faculty members to determine levels of interest.

In recent years, the three-essay dissertation has become increasingly common. In such a dissertation, the student aims to write three related papers, rather than one long dissertation on a single topic. Consult your chair when deciding which format is appropriate for you. If your topic can be broken down into subparts, or if you have several topics that can all be part of a dissertation, then this option may make sense for you. Keep in mind that not everything you write has to be part of your dissertation (more on this below).

Once you have your topic and chair, you must assemble a committee of at least three faculty members (one of which is the chair).  At least **two** of these members must be from CGU; the third member may be chosen from the extended faculty in the Claremont Colleges.  Consult your chair when determining who should be on the committee.

Before writing your written summary, consult with your advisor (your dissertation chair). The length, content, and complexity of your written summary will depend on the nature of your topic.

## DEPARTMENTAL PROCESS

1) Student files *Dissertation Committee Information Form* with Program Coordinator.
2) Student schedules defense with committee members and notifies Program Coordinator, *giving at least two weeks notice for processing time.*
3) *Form Two* is filed with Registrar's office after successful defense and all necessary revisions are complete.  A 350-word summary of the proposal **must** accompany the form.
4) Student advances to candidacy and is considered ABD (All But Dissertation).

**Dissertation Defense:**
*Completion of Doctorate*

There are several important process issues to consider during the period prior to defense of the dissertation.  Paying careful attention to format and timing requirements can save valuable time and eliminate unnecessary frustration.  A publication titled *Information Concerning the Preparation and Submission of Doctoral Dissertations* is available from the Registrar's office and the CGU website.

*Financial Aid*

Department-administered Institutional Financial Aid is awarded in the form of Tuition Fellowships, Teaching Assistantships, Research Assistantships and Work-Study assignments.  Awards are made annually for continuing students, and determined by performance and merit criteria.

## Application Process

**The deadline for applying for institutional aid for the successive academic year (2011-2012) is April 30, 2011.**  The *Fellowship Renewal Request Form* can be downloaded from the SPE website, or can be obtained from the Financial Aid Coordinator (Assistant to the Dean).   Awards for successive academic-year fellowships and research assistantships will be made by the Admissions and Financial Aid Committee.   Questions and concerns about financial aid awards should be directed to the Financial Aid Coordinator (Assistant to the Dean).

## Research Assignments

Faculty make every effort to match student interest and skill level to the needs of the research supervisor.  In some cases the match will not be ideal.  In general, the more advanced student has greater input into the assignment decision.   Both the supervisor and the student will have the opportunity to evaluate the quality of the learning and work experience.

## Teaching Assistantships

Teaching assignments are made according to departmental needs.

## Payroll

First-time research/teaching assistants need to file appropriate payroll forms with the CGU Human Resources Office (this must be done immediately upon enrollment in order to receive checks).  Students must be registered to receive a payroll check.   Checks are delivered bi-weekly to the department office.

EXHIBIT A

**DEPARTMENT OF POLITICS & POLICY**

EXHIBIT A

DEPARTMENT OF POLITICS & POLICY  2010-2011                                                    Page 22



PROFESSOR JENNIFER MEROLLA, DEPARTMENT CHAIR
DEPARTMENT OF POLITICS & POLICY
TEL: 909-621-8695
Email: jennifer.merolla@cgu.edu

## GENERAL INFORMATION

The requirements, rules and regulations for the Department of Politics and Policy provided in this Handbook are binding on both the Department and each student entering the program during the **2010-2011 Academic Year** unless changed by mutual consent.   The information provided here is organized into four parts:

***General Advice, General Requirements, M.A. Requirements/Information and Ph.D Requirements/Information***

### GENERAL ADVICE

❖   FACULTY ADVISORS

Both MA and Doctoral students will be assigned faculty advisors to whom they may go for advice and help.   Students are required to obtain approval of courses before accessing online registration (*see Online Registration under General Requirements*).   Students may change their advisor(s) as their interests shift by sending an e-mail to the Program Coordinator.

Doctoral students are assigned a faculty advisor in each of the two major fields of study. Students should meet with their advisors at least once each semester for advice and to ensure that she/he is on track to satisfy the degree requirements.   In addition, approval of transfer units from another institution must be signed off by one of your faculty advisors and the Department Chair.

All faculty advisors must be members of the core graduate faculty in the Department of Politics and Policy.   Students with a Political Philosophy major field may choose a faculty advisor from our Political Philosophy field committee (Mark Blitz, Charles Kesler, James Nichols, Alfred Balitzer, or Sharon Snowiss).

EXHIBIT A

approved by the Department Chair; (3) incompletes must be satisfied within the first year of doctoral study registration (two semesters); (4) although the expectation is that students will defend their dissertation proposals within six months of the successful completion of their qualifying examinations, the rule is that the proposal must be defended within one year. A student who fails to comply with this time frame will be required to retake his/her qualifying examinations.

❖   TRANSDISCIPLINARY COURSE REQUIREMENT

All doctoral students are *REQUIRED* to complete the transdisciplinary course requirement during their **SECOND** year of coursework (except those students registering for TNDY401i: The Nature of Inquiry-Transdisciplinary Perspectives). The course will count as four (4) of the regular 72 or 80 units toward your degree— it will not add any additional units to your degree requirements, nor count against the total number of transfer units from previous graduate course work. It can be taken for a grade of satisfactory, pass or fail (however, students taking TNDY 401i: The Nature of Inquriy-Transdisciplinary Perspectives must take it for a letter grade). The list of T-courses changes from year to year. Students should discuss with their advisor which course will be most beneficial for them.

If a first year doctoral student wishes to take a transdisciplinary course other than TNDY401i: Nature of Inquiry-Transdisciplinary Perspectives, he/she may petition to take the course <u>before</u> (but not after) the second year, using the normal petition process. If a M.A. student wishes to take a transdisciplinary course, he/she must also petition to take the courses. For students interested in petitioning to take a T-course under above circumstances , the petition form is available on the registrar's webpage:

http://www.cgu.edu/include/Academic_Petition.pdf

❖   TRANSFER OF CREDIT POLICY

Formal transfer of units requires the submission of a transcript, and, in some cases, syllabi of courses, to the faculty advisor who will determine which courses are appropriate for transfer. Students must have earned the equivalent of a B or better in a graduate level course in order to transfer units in from another institution.

**MA** students may petition to transfer up to 10 semester units into a 48-unit master's degree program, or up to six (6) semester units into a 36-unit master's degree program.

**PH.D** students may petition to transfer up to 24 semester units into a doctoral program from another graduate institution. However, please note the following restrictions:

- No more than 4 units can be used to fulfill requirements in each qualifying field. At least five of the six courses in each field must be taken at CGU.

Students are allowed to take up to two (2) undergraduate courses 100-level or above, which must be approved by your faculty advisor.

❖   **INDEPENDENT STUDIES**

Both M.A. and Ph.D students are allowed to take up to two independent study courses, which must be approved by the faculty advisor and department chair, during their academic program.

❖   **FREE AUDIT**

Students who register for a full course load (12 units) may take an additional course for audit free of charge.  Students who have completed course requirements and are registering for Doctoral Study may also register for an audit free of charge.

❖   **RESEARCH TOOLS**

The Department of Politics and Policy requires that students be certified in **TWO** research tools to fulfill degree requirements.

**M.A. STUDENTS:**

| | |
|---|---|
| **Tool #1:** | PP481 Quantitative Research Methods (4 units) |
| **Tool #2:** | PP482 Advanced Quantitative Research Methods (4 units), **OR**<br>PP483 Legal Research Methods (4 units), **OR**<br>PP484 Experimental and Qualitative Methods (4 units), **OR**<br>SPE315 Game Theory (4 units), **OR**<br>SPE471 Strategic Modeling for Politics, Economics, & Business Decisions (4 units), **OR**<br>TNDY401i The Nature of Inquiry-Transdisciplinary Perspectives |
| | **Note:**  A substitute approved by a Faculty Advisor and the Department Chair |

**PH.D. STUDENTS:**

| | |
|---|---|
| **General Tool #1:** | TNDY401i The Nature of Inquiry-Transdisciplinary Perspectives (4 units)<br>PP481 Quantitative Research Methods (4 units), or approved substitute |

EXHIBIT A

USE OF OTHER TOOLS TAKEN AT OTHER INSTITUTIONS:

Students who have already taken a research tool at another institution and wish to request a waiver of a research tool, e.g., PP481 or PP482, will be required to take an exam to determine whether she/he has sufficient knowledge of the substance of the course. A core faculty member will administer the exam.

## MASTER OF ARTS DEGREE PROGRAMS

In the Master's degree programs, students concentrate on one primary area of study.

The unit requirements for the M.A. degrees are as follows:

| MAIS | International Studies | 36/48 units |
|------|----------------------|-------------|
| MAP | American Politics | 36/48 units |
| MAIPE | International Political Economy | 48 units |

The two research tools required are described under the previous section, i.e., "General Requirements."

Once the course requirements for the Master's degree the student is pursuing are completed, she/he must follow one of two courses of action depending upon whether the unit requirements necessitate a research paper or not.  If they do, the student submits an *M.A. Research Paper Prospectus* to the Program Coordinator.   Once the research paper committee is established, the paper written, and the paper is successfully defended, then the final steps are the same for those required to write the research paper, and those who were not required:  two forms must be filed to graduate:  Filing *The Intent to Receive a Degree Form* is the responsibility of the student.  This form can be obtained from the CGU Student Records website:  The Program Coordinator is responsible for filing *Final Approval of Master's Degree* form.

## MASTER OF ARTS IN INTERNATIONAL STUDIES

**The MAIS requires completion of 9 or 12 courses (36 units and a research paper, or 48 units with no research paper).**

The goals of the program include the development of substantive knowledge in comparative and/or world politics; an understanding of the linkage between politics and economics in the international arena; an ability to use a variety of tools in the study of comparative and/or world politics; and, a capacity to use theoretical knowledge for practical purposes.  Each MAIS student works out an individualized curriculum in consultation with his or her advisor.   The career path a student wishes to pursue upon graduation heavily

DEPARTMENT OF POLITICS & POLICY  2010-2011                                   Page 30

**TRACK 1:  FOREIGN AFFAIRS (4 courses + research paper; 7 courses otherwise)**

**Choose at least two (2) topical courses**
- PP362 Foreign & Defense Policy
- PP369a  Comparative Foreign Policy
- PP371 Globalization & Diversity
- PP373 The Domestic Politics of Foreign Economic Policy

**Choose at least two (2) advanced topical courses**
- PP361 Comparative Politics of the Middle East
- PP363 Asian Politics
- PP366 Political and Economic Development in Latin America
- PP368  Special Topics in Defense and Security Policy
- PP375/POST 225 Politics of Africa
- PP438 Dynamic Modeling Seminar in Foreign & Defense Policy

**TRACK 2:  STRATEGIC POLICY (4 courses + research paper; 7 courses otherwise)**

**Required (2) courses**
- SPE 315 Game Theory
- SPE471 Strategic Models of Politics, Economics and Business Decisions

**Choose four (4) of the following courses**
- PP354 Political Risk Analysis
- PP408 Seminar in World Politics: Political Demography
- PP412 Regional Integration
- PP419 Seminar in International Political Economy
- PP430 Perspectives in Conflict and Peace
- PP438 Dynamic Modeling in Foreign and Defense Policy
- PP447 Seminar in Social Network Analysis
- SPE316 Seminar in Computational and Agent Based Modeling

*course approval required by faculty advisor
** see "Use of foreign language as a research tool" under the "General Requirements" section.

**Faculty Contacts:**
Jacek.Kugler@cgu.edu
Eunyoung.Ha@cgu.edu

EXHIBIT A

**Research Tools (8 units):**
- PP481 Quantitative Research Methods, **AND**
- PP482 Advanced Quantitative Research Methods, **OR**
- PP483: Legal Research Methods, **OR**
- PP484 Experimental and Qualitative Methods, **OR**
- SPE315 Game Theory

**Electives (4-16 units):**
- One to Four courses (to meet 36 or 48 unit requirement)

**Faculty Contacts:**
Jennifer.Merolla@cgu.edu
Jean.Schroedel@cgu.edu

36 UNITS + MASTER'S RESEARCH PAPER, OR 48 UNITS AND NO RESEARCH PAPER

**POLITICAL PHILOSOPHY CONCENTRATION**

**Core Course Requirement (4 units):**
- PP450 Major Works in Political Philosophy

**Subfields (complete one course in each subfield-12 units):**
- Ancient & Medieval Theory
- Modern Theory
- Contemporary Theory

**Expertise in Depth (8 units):**
- Choose two (2) additional courses in one of the subfield areas  (One of these should be a thematic or issue course; the second should focus in depth on the work of one theorist)

**Research Tools (4 units):**
- TNDY 401I The Nature of Inquiry:  Transdisciplinary Perspectives, **OR**
- PP483: Legal Research Methods

**Electives (8-20 units):**
- Two to Five courses (to meet 36 or 48 unit requirement)

36 UNITS + MASTER'S RESEARCH PAPER, OR 48 UNITS AND NO RESEARCH PAPER

**Faculty  Contacts:**
Charles.Kesler@claremontmckenna.edu
Mark.Blitz@claremontmckenna.edu
James.Nichols@claremontmckenna.edu
Sharon_Snowiss@pitzer.edu

**TRACK 1: APPLIED POLITICAL ECONOMY** (20 UNITS)

**Core Course Requirement:**
- PP373 The Domestic Politics of Foreign Economic Policy
- PP418 Seminar in International Political Economy

**Choose two (2) courses from the following list:**

- PP371 Globalization & Diversity
- PP408 Seminar in World Politics: Political Demography
- PP412 Regional Integration
- PP419 Seminar in International Political Economy
- ECON272 Environmental Economics
- ECON235 Money and Banking
- ECON247 International Trade Theory and Social Inquiry
- SPE348 Regulatory Policy
- SPE349 Energy and Environmental Policy

**Choose one (1) course from the following list:**

- PP361 Comparative Politics of the Middle East
- PP363 Asian Politics
- PP366 Political and Economic Development in Latin America
- PP375/POST 225 Politics of Africa

**TRACK 2: APPLIED AGENT-BASED POLITICAL ECONOMY** (20 UNITS)

**Core Course Requirement:**
- PP438 Dynamic Modeling Seminar in Foreign & Defense Policy
- SPE472 Complexity Theory in economics and Politics

**Choose Three (3) courses from the following list:**

- PP447 Seminar in Social Network Analysis
- SPE316 Seminar in Computational and Agent -Based Modeling
- ECON286 Public Choice
- SPE471 Strategic Modeling for Politics, Economics & Business Decisions

**NOTE: NO MASTER'S RESEARCH PAPER REQUIRED**

**Faculty Contacts:**
Jacek.Kugler@cgu.edu
Mark.Abdollahian@cgu.edu
Gyung-Ho.Jeong@cgu.edu
Eunyoung.Ha@cgu.edu

EXHIBIT A

## COURSEWORK REQUIREMENTS

**AMERICAN POLITICS FIELD**
**Core Course Requirement (4 units):**
- PP300 American Politics & Institutions

**Choose Five (5) additional courses from the following subfields (20 units)**

**One (1) course** from *American Political Thought & Development*
- PP301 American Political Development
- PP310 The Presidency and the Constitution
- PP312 Perspectives on Judicial Power
- PP315 Deliberative Democracy
- PP321 Judicial Review, Democracy and the Constitution
- PP451 The Federalist
- PP457 John Locke

**Two (2) courses** from *National Institutions*
- PP305 Executive-Congressional Relations
- PP306 Legislative Process & Public Policy
- PP307 The Modern Presidency
- PP311 American Presidency
- PP316 The Administrative State
- PP318 American Politics, Courts and Public Policy
- PP326 American Constitutional Law I: Civil Liberties, **OR**
- PP327 American Constitutional Law II: National Powers

**Two (2) courses** from *Individual & Collective Behavior*
- PP301 American Political Development
- PP302 American Political Behavior
- PP308 Political Psychology
- PP309 Women and the Political Process
- PP313 Representation and Elections
- PP314 Political Parties in the U.S.
- PP323 Racial, Ethnic & Social Minorities in American Politics
- PP329 Public Opinion
- PP 341 U.S. Immigration Policy

Students interested in designing a second major field must consult with a faculty advisor and submit the proposed field with coursework required and a field committee (from core faculty) to the Department Chair for approval.

**Faculty Contacts:**
Jean.Schroedel@cgu.edu
Jennifer.Merolla@cgu.edu
Michael.Uhlmann@cgu.edu

Ancient & Medieval Political Philosophy Cont'd
- PP464 Ethics and Politics: Aristotle and Cicero
- PP465 Medieval Political Philosophy
- PP466 Basic Concepts in Political Philosophy: Plato's Republic

Modern Political Philosophy
- PP451 The Federalist
- PP453 Idealism and Nihilism
- PP457 The Political Philosophy of John Locke
- PP457a The Political Philosophy of Rousseau
- PP457b The Political Philosophy of Machiavelli
- PP457c Political Philosophy of Montesquieu
- PP458 The Problem of Freedom in Recent Political
- PP459 Liberal Individualism and Communitarianism
- PP468 American Political Thought and Development

Contemporary Political Philosophy
- PP454 Contemporary Figures in Political Philosophy: Ortega y Gasset and Arendt
- PP455 Feminist Political Thought
- PP462 Contemporary Political Theory
- PP463 The Political Philosophy of Heidegger

2) **Expertise in Depth** - Choose two (2) courses in one of the subfield areas (8 units) listed:
- One (1) course should be a thematic, or "issue course
- The second course should focus on the work of one theorist

**Faculty Contacts:**
Mark.Blitz@claremontmckenna.edu
Charles.Kesler@claremontmckenna.edu
James.Nichols@claremontmckenna.edu
**Sharon_Snowiss@pitzer.edu**

EXHIBIT A

### TRACK 7: POLITICAL PARTICIPATION

- PP302 American Political Behavior
- PP313 Representation and Elections
- PP329 Public Opinion

### TRACK 8: WOMEN AND POLICY

- GOVT287 Women and the Law
- GOVT290 Women & the Political Process

**Faculty Contact:**
Heather.Campbell@cgu.edu


## WORLD POLITICS FIELD

### Core Course Requirement (12 units):

- PP400 World Politics
- PP411 International Political Economy
- PP420 American Foreign Policy

### Choose one (1) course from each of three subgroups below (12 units):

- PP430 Perspectives in Conflict & Peace, *OR*
- PP408 Seminar in World Politics: Political Demography

- PP438 Dynamic Modeling in Foreign Security & Defense Policy, *OR*
- PP447 Seminar in Social Network Analysis, *OR*
- SPE316 Seminar in Computational and Agent Based Modeling

- PP418 Seminar in International Political Economy, *OR*
- PP412 Integration

**Faculty Contacts:**
Jacek.Kugler@cgu.edu
Mark.Abdollahian@cgu.edu
Gyung-Ho.Jeong@cgu.edu

EXHIBIT A

**INTERNATIONAL & COMPARATIVE POLITICAL ECONOMY FIELD**
(Note: for PhD Interfield Students only)

**Core Course Requirements (12 units)**

*Political Economy:*
- SPE410 Foundations of Political Economy
- PP400 World Politics
- PP350 Comparative Political Systems

**Choose two (2) courses from the following selection:**
- SPE360 American Political Economy
- PP411 International Political Economy
- PP352 Comparative Political Economy

**Choose three (3) courses from the following selection:**

- PP418 Seminar in International Political Economy
- PP412 Integration
- PP408 Seminar in World Politics: Political Demography
- PP373 The Domestic Politics of Foreign Economic Policy
- PP371 Globalization and Diversity
- PP461 Comparative Politics of the Middle East **OR** PP363 Asian Politics **OR**
- PP366 Politics in Latin America **OR**
- PP375/POST225 Politics of Africa
- PP438 Dynamic Modeling Seminar
- PP447 Seminar in Network Analysis
- SPE316 Seminar in Computational & Agent-Based Modeling

**Faculty Contacts:**
Mark.Abdollahian@cgu.edu
Eunyoung.Ha@cgu.edu
Jacek.Kugler@cgu.edu
Gyung-Ho.Jeong@cgu.edu

## PH.D QUALIFYING EXAMINATIONS

The typical student reaching the qualifying exam stage at CGU has completed 20 years of formal education.  Despite all of this time and effort, very few students have had the opportunity to examine systematically how the relevant knowledge they have gained can be integrated and reassembled into a coherent framework of thought that is both professionally useful and intellectually exciting. Qualifying exams, when taken seriously, afford the opportunity to construct such a framework.  They mark one of life's rare occasions in which you will have the obligation and the luxury of spending several months

EXHIBIT A

Each of the qualifying exams will be prepared and read by a field committee of at least two faculty members.. The student taking the examination may nominate an additional reader. The nominee(s) will normally be selected from among the faculty members with whom the student has studied.

No books, articles, or notes (electronic or otherwise) may be consulted during the exam. Each exam will be hand written or taken by computer in a room designated by the department. Students will be notified of results of exams as soon as possible.

## What You Are Expected To Know

Being "fact smart" is clearly important, but it is never sufficient for passing exams. You will be expected to demonstrate a theoretical grasp of the important ideas in each of your chosen fields. You must be able to identify the basic sorts of questions and relevant conceptual frameworks that guide scholarship. Moreover, you must know who the prominent thinkers are, and how their writings have helped to shape the development of thought over time. In the exam field, you should also be prepared to offer your thoughts on current research priorities in that field. This would involve reflections on the key issues that need to be addressed, as well as the best methodologies or approaches for addressing those issues.

## How to Prepare for Qualifying Exams

The day-to-day preparation for qualifying exams normally takes place over an extended period comparable to a semester of full-time study. Beyond the review of class notes, survey texts, and influential books and articles selected from reading lists, you should devote much of your time to organizing the material you are studying around two basic questions: "Why?" and "So What?" The first question requires you to move beyond mere description of a field (the "Who?" and "What?") and to think critically about the relationships between ideas, institutions, and politically relevant actions. Implicit in this question is the "How" question: How are things connected to each other?

The "So What?" is intended to remind you that preparation for exams is largely an exercise in extracting what is fundamental and significant about an otherwise unmanageable body of knowledge. Students who fail to be selective and systematic in their review are likely to be overwhelmed by information. Remember T.S. Elliot: "... where is the knowledge lost in information?"

Review sessions for each field are scheduled in advance of the qualifying examinations where specific instructions, guidelines and preparation techniques will be provided by the field committee members. Consulting your faculty advisor(s) is also recommended. One general method of preparing for exams that has proven to be helpful is to prepare lecture notes or outlines for a hypothetical survey course in each of your chosen fields. By organizing the work within the bounds of a course plan of about fifteen weeks, you will have a clear incentive to be highly selective about what concepts, theories, applications, and illustrations to include. Moreover, you will have to think about how the ideas and approaches in each successive field fit together and build on previous knowledge. Developed in the format of a three-ring, expandable notebook, the course plan and lecture notes can be easily updated and refined as your mastery of the field increases. In the process of preparing for exams in this way, you will have produced materials that may serve you someday in teaching a survey course in the field. At the very least, you will have a highly personalized reference work for use in your final review before exams.

You should also be prepared to move beyond the broad survey to in-depth mastery of a few topics of particular interest. The definition of these specialized topics, as with all detailed

Any member of the field committee may submit questions for inclusion in the examination. The examination should include questions that are general to the field and questions that are specific to the sub-fields studied by each student. The examination questions must be acceptable to a majority of the members of the field committee.

**THE PhD QUALIFYING EXAM FIELD COMMITTEES ARE:**

**AMERICAN POLITICS**
    Jean Schroedel, Chair
    Joseph Bessette
    Jennifer Merolla
    Michael Uhlmann

**COMPARATIVE POLITICS**
    Eunyoung Ha, Chair
    Melissa Rogers

**INTERNATIONAL AND COMPARATIVE POLITICAL ECONOMY**
[Interfield students only]
    Thomas Willett
    Jacek Kugler
    Art Denzau
    Gyung-Ho Jeong
    Eunyoung Ha
    Mark Abdollahian

**POLITICAL PHILOSOPHY**
    Mark Blitz, Chair
    Alfred Balitzer
    Charles Kesler
    James Nichols
    Sharon Snowiss

**PUBLIC POLICY**
    Heather Campbell, Chair
    Art Denzau
    Jean Schroedel

**WORLD POLITICS**
    Jacek Kugler, Chair
    Mark Abdollahian
    Gyung-Ho Jeong

### DISSERTATION PROPOSAL

**As noted in the "General Requirements" section above, our expectation is that dissertation proposals should be completed within six months of passing the qualifying examinations—though our rules allow you a maximum of a year.  If the proposal is not successfully defended within that period, the qualifying exams will need to be retaken.**

The dissertation proposal should fully describe the question(s) you will study, the theoretical context and methods of research you will use, and the possible outcomes expected in the study.   The proposal should be prepared in consultation with the chair and with other members of your dissertation committee.  When you and the committee are satisfied with the proposal, it must be defended orally in a public gathering called for that purpose.  The dissertation proposal must be completed and defended no later than one year after successful completion of all of the qualifying exams. This one-year deadline is an outside limit; normally six months should suffice for preparation of the dissertation proposal. The dissertation proposal may not be defended until successful completion of written and oral qualifying exams.

In order to adhere to this timetable, it is important that you explore possible dissertation topics soon after completion of the qualifying examinations. Possible topics should be discussed with faculty acquainted with the field, particularly with that faculty member you would like to have as committee chair. Early formal approval of the committee by the Department Chair is especially important when one or more of the proposed committee members are from outside of the department.

A dissertation proposal varies in length, but usually ranges from 25-35 pages. Its purpose is to provide a concise plan for the research program that will form the basis of your dissertation. Preparation of a good proposal is vital to identifying and clarifying the theoretical and empirical problems involved in your study.

**Research Question**

The purpose of the first section of the proposal is to tell the reader the topic of your dissertation. The research question and hypotheses (or, in a theoretical dissertation, key assumptions and assertions) should be stated clearly, their significance argued, and key concepts fully defined.

Writing this first section of the proposal is the crux of the entire dissertation process. It takes a great deal of effort to refine a topic or an object of curiosity into a researchable question. One needs to ask, "What makes the issue a problem? Why is it important enough to be studied? In what form is the question researchable?"

Your initial formulation of the research question in your proposal will not represent your final thoughts on the subject. There is always a temptation to want to read everything

Your proposal should conclude with a tentative table of contents. This should take the form of chapter headings followed by a paragraph or two describing the subjects, goals and contents of each chapter. The tentative table of contents is important chiefly as a way of dividing your overall research question into a series of smaller steps.

Finally, you must include with your proposal an abstract of 350 words. This abstract will be submitted to the registrar when the proposal has been defended and approved by the committee.

**Dissertation Proposal Defense**

To provide you with a final check on the adequacy of your proposal, you will be required to defend it publicly. This defense will give you a chance to demonstrate the significance of the work you intend to do, your knowledge of the relevant literature, and your ability to carry out the research. It will provide an opportunity for your committee to probe the adequacy of your proposal and to make suggestions for its refinement. Successful conclusion of the oral defense is the last step leading to advancement to candidacy.

The oral defense will be approved by the Department Chair and scheduled through the department office *no sooner than two weeks* after all committee members have received a tentatively approved final draft of the proposal. The oral defense generally lasts about an hour, during which the student is asked to describe the purpose and objectives of the study, to summarize the previous literature on the subject, and to argue the significance of the proposed study within the field. Members of the committee, other faculty, and doctoral students may be present, may ask questions, and may make suggestions or challenge any part of the proposal. The final deliberations and decision on the acceptability of the proposal, along with the determination of any modifications that need to be made, rests with the dissertation committee alone.

In the course of carrying out a dissertation, adjustments in the aims and scope of the research are frequently necessary. Minor changes should be made in consultation with the dissertation committee. Should a complete change of topic be required, both the written proposal and its oral defense must be repeated.

**IRB Approval for Dissertation Research**

Ph.D students whose dissertation research involves collecting information from human subjects must obtain Institutional Research Board (IRB) approval of their research before the Chair of the Dissertation Committee may sign the form acknowledging the successful completion of the Dissertation Proposal Defense. IRB approval must be sought after completion of the oral defense and before starting the project. To expedite this process the Chair of a Dissertation Committee may authorize submission of a request for IRB approval of the proposed research prior to the oral defense.

## INSTITUTIONAL FINANCIAL AID

Institutional support will be determined at the time a student is admitted to the program. All students are assessed at the end of the spring semester to determine if they remain in good academic standing and are making progress toward their degree.  Failure on either of these grounds will lead to the reduction or withdrawal of institutional support.   The criteria used are as follows:

- Students are expected to maintain a minimum cumulative GPA of approximately 3.5.

- Students can have no more than two (2) incompletes, or permanent incompletes, on their record.  Students with more than one will receive a warning letter from the department and have until July 31 to complete the coursework necessary to remain eligible for continued support in the next academic year.

- Students must make acceptable progress toward degree completion by finishing a minimum of 12 credits every academic year.  Part time students should note that taking only one class in the Fall and Spring semester (8 credits) will **not** maintain your eligibility for institutional support in the next academic year.  Students should also be aware that course offerings during the summer tend to be limited and they should plan accordingly.  Time limits for completion of both M.A. and Ph.D. degrees exist and are discussed elsewhere in this handbook.

- Awards for MA students will remain the same throughout their period of study, providing the students meet the minimum support requirements outlined above. Doctoral students will be assessed each year.  The new award will remain in place for the rest of the student's course of study, again assuming the student meets the minimum support requirements outlined above.

- Awards apply only to the number of tuition units needed to complete a degree: 36 or 48 units for M.A. degrees; 72 or 80 units for Ph.D. degrees.   The interfield Ph.D. between politics and economics requires 80 units.  Students who have completed coursework are not eligible to receive institutional aid.

- There is a limited number of Research Assistantship positions available each year to students who are still in coursework.  Faculty members select their own RAs.  Typical awards require 10 hours of work per week during the academic semesters.

### PROFESSIONAL INSTITUTES

The Department of Politics and Policy wishes to support active participation in institutes by students.  To this end, we will seek to provide assistance based on the following criteria:

EXHIBIT A

transmitted to the Program Coordinator.   Your placement dossier will be mailed out within 10 days of receipt of all required documents. A fee of $1.00 is charged after 25 files have been sent.

The academic job market is highly specialized and differs in some important ways from the job market in government or private business. Some of the same skills are important in job searches both inside and outside of academia, such as preparation of a *curriculum vitae* and self-presentation in an interview. In these areas, the Office of Career Services may be as helpful to the academic job seeker as to the non-academic job applicant. In other areas, however, the academic job market must be approached with different strategies, and you should utilize different resources in your search. This section will focus on the features peculiar to academic job searches, particularly in political science.

## LOCATING JOB OPENINGS

❖ **ACADEMIC POSITIONS**

Virtually *all* academic positions are listed under "eJobs"on the website of the American Political Science Association (http://www.apsanet.org).  This goes for all tenure track jobs at four-year colleges and universities, as well as most temporary positions (which are usually replacements for faculty on sabbatical). The eJobs Placement Service is available free of charge to members of APSA.  Members may become Premium eJobs Subscribers for an additional fee of $20 which gives them access to the daily printable PDF of every job listed. In addition, members may post their own resemes to the eJobs database and arrange interviews through the eJobs Placement Service.

The one segment of the academic job market that is generally *not* covered in the Newsletter is positions in two-year community colleges and very small four-year colleges.   These positions may be of special interest to someone who is determined to locate in a particular area, since the community job market tends to be regional (that is, faculty are recruited from Graduate Universities in the region), which the four-year college and university market is national.  If you want to look for a position at a two-year institution, the best approach is to make a list of all such institutions in the area and write to them directly.

❖ **TIMING OF THE ACADEMIC JOB MARKET**

Because of the rhythm of the academic year, academic job searches follow an annual cycle. The greatest number of new ads for positions in the profession will be found on eJobs during August, September, October and November.  That is when most departments advertise the positions they expect to fill for the following September. This means that the academic job market has a very long lead-time: you may see an ad in October for a position that you might interview for in December or January. You may be offered the position as late as March, to begin the following September!

your dissertation, perhaps the introduction or one of the substantive chapters that will demonstrate your research skills. (Your dissertation advisors are best placed to help you decide what to include as a writing sample). Every job search yields many applications from almost-Ph.D.s who have no publications and who enclose no writing sample. Such applications cannot be taken as seriously as they should be, because they offer no basis for independent evaluation by the search committee.

No application is complete without letters of reference. These should come from people who are familiar with your dissertation and, if you have teaching experience, with your teaching. General "character" references of the kind you might get from your supervisor when you were a camp counselor do not help you in this context. **Three to four letters** are the norm; in the unlikely event that a department wants more letters, they will say so in their advertisement.

Although you have a right to see your letters of reference, the sad truth is that confidential letters are taken more seriously because they are assumed to be frank. One way to exert some control over confidential letters is to review with the prospective letter writer the areas that she might cover. For example, if you have selected someone to be your reference because she has seen you teach, be sure to mention that you would like an evaluation of your teaching to be included in the letter. Suggesting which superlatives the referee should use in the letter goes too far, but you can make sure that the group of letters, taken as a whole, covers as many facets of your qualifications as possible.

❖  WHAT DEPARTMENTS ARE LOOKING FOR

It is important to enter the job market with appropriate expectations. You will submit many applications (depending on your field, but perhaps numbering in the dozens), and you will be rejected many times. Most of those rejections will be due to a mismatch between what the department is looking for and the substantive fields you offer - something you can do nothing about. Don't let them get you down.

Secondly, the academic job market is a national market. We all have regions of the country where we would prefer to live, but you should limit your applications to the minimum extent possible. Why not wait till you have seen the actual opportunities offered to you before making decisions about preferred life style? A first job is the last job for very few academics; what you want at this point is to get started somewhere, so that you can build the research and teaching credentials that will enable you to move on should you choose to do so.
Every job listing in "eJobs" generates between 50 and 250 applications, depending on the field.  From the perspective of the job candidate, then, the odds of being offered any one position are long. But, from the perspective of the department conducting the search, 100 applications may yield only a handful which can be seriously considered for the position. What must you do to be included among that handful?

❖ THE INTERVIEW PROCESS

There is a pre-market interview process that many schools hold at each APSA meeting.

The further winnowing of candidates from 15 to a small number to be interviewed is the most difficult part of the process to describe. If people on the search committee know someone in your program, they may call to hear more about you. You may be called yourself and asked to submit more written material. Your dissertation chair may be called for further comments about you and to get an update on your dissertation progress. If time and scheduling permit, an appointment may be arranged at a political science conference to gather some first hand impressions of you. Through all of these channels, as well as through a careful reading of your written materials, a list of three or four candidates will be identified to be interviewed.

Academic interviews are unlike any other experience you are likely ever to have. They often last two days, sometimes three. They require that you be "on" constantly, in conversations with faculty, with students, and with deans. The interview poses challenges that have no parallels in the universe, such as trying to explain your research in a formal "job talk" to a group that includes faculty and students from all fields of the discipline. Some in your audience may know almost as much about your topic as you do, while others may have no idea why anyone would ever do research on your topic in the first place. You must find a way to explain your work that offers something to both groups.

A full description of the interview process, and strategies for success, is beyond the scope of this document.  For funny stories and sage advice, see Donald Chisholm, "The Long Voyage Home," in PS (two parts: Fall 1988 and Winter 1989). For that matter, PS regularly contains articles about the academic job market, as well as information on research grants, conferences, and other matters of interest to graduate students. PS is a publication of the American Political Science Association, sent automatically to all members and available to others at Honnold Library. Your faculty advisor(s) will also be a source of information and experience concerning all aspects of the application and interview process, and you should ask as many questions of as many people as you can.

❖ NON-ACADEMIC POSITIONS

There is a great variety of non-Academic positions available to graduates of the Department of Politics and Policy.  A diverse and extensive list can be found in the "SPE Student Career Newsletter" prepared by the Office of Career Management at CGU.  Check its website or go directly to http://www.cgu.edu/pages/2744.asp

SPE TRANSDISCIPLINARY PROGRAMS

EXHIBIT A

# SCHOOL OF POLITICS & ECONOMICS

## *TRANSDISCIPLINARY PROGRAMS*

### MASTER OF ARTS IN PUBLIC POLICY

The **Master of Arts in Public Policy** is a 48-unit degree program that builds knowledge of current government programs and debates about them. Students learn the technical skills to assess how politics influences policy choices as well as how to design more effective programs and how to evaluate the impact of existing programs.

Though the skills of the MAPP can be applied to a wide variety of policies, we are particularly strong in urban issues. Our location in the Los Angeles metropolitan area provides firsthand exposure to the most pressing social and economic issues in the country - the growth of immigrant populations, suburban sprawl and traffic congestion, transformation of the economy from manufacturing to international trade and finance, education reform, and restructuring government to increase responsiveness.  A concentration on local education policy is possible by working with faculty in the School of Educational Studies.

Working with the Evaluation Program in the School of Behavioral and Organizational Sciences, students can also develop expertise in a variety of evaluation approaches – including stakeholder empowerment, organizational learning, or implementation evaluation. These approaches complement the emphasis on modeling program impacts and assessing causal effects of government policies covered in the public policy courses. **Note:**   All Students are required to obtain faculty advisor approval for courses

CORE COURSES (8 units)
- PP330   Public Policy Process
- PP338 Policy Design and Implementation

RESEARCH METHODS (12-16 units)
- PP481 Quantitative Research Methods
- PP482 Advanced Quantitative Research Methods
- PP487 Computer Applications in Data Analysis
  **OR**
- ECON308  Mathematics for Economists
- ECON381  Econometrics I
- ECON382  Econometrics II **OR** ECON383  Econometrics III

**Note: one (1) additional Methods course can be taken to support the Track**

## MASTER OF ARTS IN PUBLIC POLICY CONT'D

Choose two (2) courses from the following list (8 units)
- PP447 Seminar in Social Network Analysis
- SPE471 Strategic Models for Politics Economics and Business Decisions
  (Note: cannot double count for credit in Cost Benefit Section)

### TRANSDISCIPLIINARY TRACKS (16 UNITS)

#### TRACK 4: EVALUATION WITH SBOS

- PSY315b Foundations of Evaluation (2 unit course)
- PSY315z Comparative Evaluation Theory
- PSY354 Evaluation Procedures
- SPE348 Regulatory Policy

#### TRACK 5: EDUCATION WITH SES

- EDUC525 The Politics of Inequality in Education
- EDUC537 Issues in Contemporary Urban Education
- EDUC450 Dilemmas in American Higher Education
- EDUC456 Public Policy Dimensions of Higher Education

#### TRACK 6: HEALTH POLICY WITH SGH

- CGH300 Theoretical Foundations in Health Promotion and Education
- CGH302 Epidemiology

Choose two (2) courses from the following list (8 units)

- CGH303 Health Services in the US and Abroad
- CGH304 Environmental and Occupational Health
- SPE348 Regulatory Policy

#### TRACK 7: WOMEN IN PUBLIC POLICY

- Poli 252 Women and Public Policy
- Govt 287 Women and the Law
- PP 340 Women and the Policy Process
- **OR** any approved courses from other CGU schools

EXHIBIT A

## MASTER OF ARTS IN PUBLIC POLICY & EVALUATION CONT'D

### Core Evaluation Courses (SBOS) - 12 units
- Psych 315b  Foundations of Evaluation
- Psych 315z  Comparative Evaluation Theory
- Psych 354b  Evaluation Procedures

Evaluation/Method Elective (examples)
- Psych 315a  Theory-Driven Program Evaluation
- Psych 352l  Professional Development in Evaluation & Applied Methods

### Research and Statistical Methods (either SPE or SBOS courses) - 12 units

SPE
- PP481  Quantitative Research Methods
- PP482  Advanced Quantitative Research Methods

Methodology Elective  (examples)
>              Survey Research Methods
>              Decisions-Making Models

SBOS
- Psych 302   Research Methods
- Psych 308a  Intermediate Statistics
- Psych 308b  ANOVA
- Psych 308c  Applied Multiple Regression
- Psych 308d  Categorical Data Analysis

### Elective Courses (8 units)
With the approval of their Academic Advisor, students may take elective courses at any CGU school. For M.A. students who wish to transfer to a Ph.D. program, 4 units of electives could be satisfied through a Transdisciplinary course. No units from graduate programs outside CGU may be applied to this degree program.

### Faculty Contact in SPE:
Heather.Campbell@cgu.edu

EXHIBIT A

## Master of Arts in Religion and American Politics Cont'd

Representative Elective Courses (offerings will differ from year to year)
- PP 301 American Political Development
- PP 326 American Constitutional Law I: Civil Liberties
- PP 327 American Constitutional Law II: National Powers
- PP 302 American Political Behavior
- PP 308 Political Psychology
- PP 323 Racial, Ethnic & Social Minorities in American Politics

- Rel 462 History of American Religion from First Contact to the Civil War
- Rel 466 History of American Religion from the Civil War to the Present
- Rel 472 Race and Religion in America
- Rel 320 American Scriptures
- Rel 337 Feminist Theologies in North America
- Rel 405 Religion, Power, and Resistance
- Rel 410 Islamic Ethics
- Rel 426 Theology of Globalization
- Rel 452 Gender, Violence, and Religion
- Rel 453 Women in the Book of Genesis
- Rel 455 Liberation Theology

Note: Courses in CST and the colleges to be added

**Faculty:**

Political Science
Jean Schroedel
Michael Uhlmann
Jennifer Merolla
Ken Blickenstaff

Religion
Richard Bushman
Vincent Wimbush
Hamid Mavani
Anselm Min
Tammi Schneider
Karen Torjesen
Rosemary Reuther

CST
Helene SlessarevJamir
Others as relationships are worked out

EXHIBIT A

## Master of Arts in Politics, Economics & Business Cont'd

**THE CURRICULUM**
Twelve courses totaling 48 units are required for the MAPEB. The program can be completed in four (4) semesters of full-time coursework, or on a part-time basis.

**CORE COURSES: 20 UNITS**

- SPE 471:  Strategic Modeling for Politics, Economics, & Business Decisions – 4 units
- ECON 313: Microeconomics  or SPE 324 Economics of Mgmt & Organization (both 4 units)
- MGT 326:  Financial Accounting – 4 units
- MGT 335:  Corporate Finance – 4 units   **OR**
- MGT 328:  Budgeting and Finance for Non Profits – 4 Units
- MGT 340:  Strategy – 4 units

**RESEARCH TOOLS: 8 UNITS**

- MGT 306:  Quantitative Methods – 4 units
- PP 481:  Quantitative Research Methods – 4 units
- PP482:  Advanced Quant. Research Methods – 4 units
- PP487 Applied Data Analysis – 4 units

**TRACK 1:  RISK MANAGEMENT 20 UNITS**

- Econ337: Behavioral Finance & Risk Management – 4 units
- SPE 315:  Game Theory -  4 units   OR
- MGT 307: Game Theory – 2 units (plus 2 unit elective)
- MGT 383:  Economics of Strategy – 4 units
- SPE 320:  Foundations of Complex Adaptive Systems – 4 units
- SPE448:  Seminar in Computational & Agent Based Modeling – 4 units
- MGT 358: Negotiations & Conflict Resolutions- 4 units
  *PLUS 2 Unit Internship and 1 Elective for 20 unit total in Track*

**TRACK 2: FINANCIAL POLICY – 20 UNITS**

- Econ 350: Global Money and Finance – 4 units *OR*
- Econ336: Financial Economics – 4 units
- Econ 337: Behavioral Finance and Risk Management – 4 units OR
- MGT 373: Financial Strategy and Policy – 4 units
- MGT 402: Asset Management Practicum  - 4 units  * Faculty approval necessary
- SPE 324:  Economics of Management and Organization – 4 units OR
- ECON 347:  International Trade and Policy – 4 units
  *PLUS 2-Unit Internship optional, OR 1 Elective for 20 unit total*

EXHIBIT A

SPE TRANSDISCIPLINARY PROGRAMS 2010-2011                              PAGE 69

## PH.D INTERFIELD IN ECONOMICS-POLITICAL SCIENCE

The **PhD interfield** degree program combines courses from both departments in the School of Politics and Economics for an interdisciplinary political economy degree.  Students must be accepted into the PhD interfield by both the Department of Politics and Policy and the Department of Economics. The PhD interfield also has a modified qualifying exam structure based on the requirements in both departments. The Department of Economics qualifying exam requirements combine testing on Econ 302 or 313 and a field of application.  The qualifying exam in the Department of Politics and Policy is a field of application. [Note: Diplomas for graduates of the interfield PhD program will be printed to show the primary department the student is registered under first. i.e., PhD Interfield Political Science-Economics or PhD Interfield Economics – Political Science]

This program requires a minimum of **80 units** composed of a core, a methods minor field, a political science major field, and an economics major field.

Students in the PhD interfield degree program must pass qualifying examinations in both major fields of study, defend a dissertation proposal and dissertation that meets rigorous methodological standards and draws from both major fields.

### DEGREE REQUIREMENTS

#### CORE COURSE REQUIREMENTS (7 courses –28 units)

***Political Economy:***
- SPE410 Foundations of Political Economy

Choose two (2) of the following three (3) courses:
- SPE360 American Political Economy
- PP411 International Political Economy
- PP352 Comparative Political Economy

***Economics:***
- Econ313 Microeconomic Analysis
- Econ302 Macroeconomics I

Choose two (2) of the following four (4) courses: (by approval of the Field Advisor)
- SPE315 Game Theory*
- Econ316 Advanced Microeconomics I
- Econ317 Advanced Microeconomics II* **OR**
  SPE317 Advanced Game Theory*
- Econ 303 Advanced Macroeconomics
  ***\*AT LEAST ONE OF THESE CLASSES IS REQUIRED***

EXHIBIT A

## DUAL DEGREE PROGRAMS

We are pleased to offer under our dual degree programs the **PHD IN ECONOMICS OR POLITICAL SCIENCE/MBA,** or **PHD IN ECONOMICS OR POLITICAL SCIENCE/EMBA.**  These exciting dual degree programs combine Ph.D level research and coursework with a slightly abbreviated MBA or EMBA curriculum, providing a comprehensive examination of the global economy from both business and political economy perspectives. Students qualify for competitive careers in various fields, including the non-profit sector, the corporate arena, governmental organizations, and consulting companies.

The training focuses on:

- Advanced analytical thinking and research skills while experiencing a full range of business disciplines
- Strategic pro-active decision making and problem-solving approaches
- Applied practical knowledge in addition to the theories behind the practice
- The resources necessary for positions dealing with partnership between knowledge producers, corporations, governmental agencies, and non-profit institutions.

Graduates earn both a Ph.D in Economics or Political Science and an MBA (or EMBA). These programs require a total of 96 units of course work, forty-eight (48) units from the School of Politics and Economics and forty-eight (48) units from the Peter F. Drucker and Masatoshi Ito Graduate School of Management. Taken as a dual degree, students save approximately 32 units of coursework, equivalent to an extra year and a half of full-time study.   Students must apply to both SPE and the Drucker-Ito School.  Students who are currently in a Ph.D program in the School of Politics and Economics or the MBA (or EMBA) program in the Drucker-Ito School may apply to join the dual degree program if fewer than 16 units have been completed at the time of application. Applicants should demonstrate outstanding academic achievement and excellent scores on either the Graduate Management Admissions Test (GMAT), or the Graduate Record Examination (GRE), as well as prior professional work experience.

### PH.D IN ECONOMICS OR POLITICAL SCIENCE/MBA

**CURRICULUM FOR PH.D IN ECONOMICS/MBA:**

**ECONOMICS**
- Econ 300 Political Economy and Social Inquiry **OR** *TNDY401I Nature of Inquiry*
- Econ 302 Microeconomics I
- Econ 303 Macroeconomics II
- Econ 308 Math for Economists
- Econ 313 Microeconomics I
- Econ 316 Math Microeconomics I
- Econ 317 Math Microeconomics II
- Econ 382 Econometrics I
- Econ 383 Econometrics II
- Three (3) approved courses from a selected field

## PH.D IN ECONOMICS OR POLITICAL SCIENCE/EMBA

Graduates earn both a Ph.D in Economics or Political Science and an EMBA. The program requires a total of 96 units of course work, forty-eight (48) units from the School of Politics and Economics and forty-eight (48) units from the Peter F. Drucker and Masatoshi Ito Graduate School of Management. Taken as a dual degree, students save approximately 32 units of coursework, equivalent to an extra year and a half of full-time study.  Students must apply to both SPE and the Drucker-Ito School.  Students who are currently in a Ph.D program in the School of Politics and Economics or the EMBA program in the Drucker-Ito School may apply to join the dual degree program if fewer than 16 units have been completed at the time of application. Applicants should demonstrate outstanding academic achievement and excellent scores on either the Graduate Management Admissions Test (GMAT), or the Graduate Record Examination (GRE), as well as prior professional work experience.

### CURRICULUM FOR PhD POLITICAL SCIENCE/EMBA

**POLITICS & POLICY**
- *TNDY401I Nature of Inquiry*
- PP481 Quantitative Research Methods **OR** Mgt 306
- PP482 Advanced Quantitative Research Methods
- SPE315 Game Theory
- Six (6) courses from a selected field
- Two (2) approved electives

### EXECUTIVE MANAGEMENT PROGRAM (Core Courses 16 units)
- Mgt 511 Financial Accounting
- Mgt 512 Financial Management
- Mgt 513 Quantitative Methods
- Mgt 514 marketing Management
- Mgt 515 Organizational Behavior
- Strategy/Leadership – 8 units required
- Elective Courses -  24 Units of Elective Courses (Note:  Up to 8 units of electives can be take outside of the Executive Management  Program.)

**OFFICE OF CAREER MANAGEMENT**

EXHIBIT A

# THE OFFICE OF CAREER MANAGEMENT
## CLAREMONT GRADUATE UNIVERSITY
*1263 N. Dartmouth Ave. Claremont CA 91711*

## CAREER RESOURCES FOR SPE STUDENTS

*PH: (909) 621-8177  EMAIL: career.center@cgu.edu WEB: http://www.cgu.edu/pages/166.asp*

**Basic Services**
- Career advising appointments
- Résumé and cover letter critiques
- Mock interviews customized to your job search with an OCM career counselor plus an online mock interviewing system utilizing the OCM webcam available through the Career Center (or you can use your own).
- On-campus Career Workshops on resume and cover letter writing, interviewing and developing your networking skills.
- Employer site visits, check the OCM online calendar for details! http://www.cgu.edu/pages/1444.asp
- Self assessment tools – The OCM recommends *CareerLeader* and *Career Anchors*. Visit our website for more information on these tests http://www.cgu.edu/pages/5789.asp. Contact the Career Center for availability and access.
- Experience and NaceLink are databases for jobs where all jobs are listed when we receive them.

**OCM Library Resources for SPE students**

- Careers for Number Crunchers and Other Quantitative Types
- Guide to America's Federal Jobs
- Politics, Government and Activism
- An Insiders Guide to Political Jobs in Washington
- Capitol Weekly (state jobs in California)
- Academic Job Search Handbook *and more!*

**On Campus Recruiting:**

*eRecruiting in Experience* - *Complete your eRecruiting registration profile, upload your resume and begin searching for jobs or internships, applying to positions and signing up for interviews today! eRecruiting includes employers that are exclusive to CGU and all CGU resume collections are managed in eRecruiting. To register, go to:* **http://cgu.erecruiting/com**

> *USERNAME: Your CGU email address [firstname.lastname@cgu.edu]*
> *PASSWORD: cguocm*

Please change your password immediately after your first login to protect your privacy.

After sending your file, we will notify you via email that your file has been sent, to whom, and the amount due on your account.

## CREDENTIAL FILE FEE STRUCTURE

**Activation Fee**…………………………………………………………..$50.00
**Yearly Reactivation Fee**…………………………………………………..$50.00

**File Request Fees**
Each request up to 20 requests in a single year…………………………$5.00
Each request over 20 in a single year…………………………………..$3.00

**Special Handling Charges**
Fax Charges…………………………………………………. $3.00 + .25¢ per page
Express Mail Charges…………………………………………………. $18.00
Fed Ex Charges…………………………………………………..$18.00

**Payment is due at the time of service.** We allow a $20.00 balance for files previously sent. No further request will be honored until the balance is paid. You may pay by check, Master Card or Visa. Checks should be made payable to: *Claremont Graduate University* and mailed to our office:

Office of Career Management
1263 N. Dartmouth Ave.
Claremont, CA 91711

**What is the difference between a "confidential" and "non-confidential" Credential File?**

Your Credential File is designated "confidential" if you choose to not have access to your letters of recommendation.  Though the vast majority of Credential File users choose the confidential option, the Office of Career Management will maintain your file whether you choose the confidential or non-confidential option.  Please note, however, that the ***Office of Career Management will not, under any circumstances, review or evaluate your letter(s) of recommendation.***

## Letters of Recommendation

It is your responsibility to put a recommendation form in the hands of each person whom you wish to have written a letter supporting your bid for employment.  The writer should return these letters directly to the Career Center.  Three such confidential and non-confidential reference forms are included with each Credential File packet; more are available upon request. Recommendations are written on the writer's own letterhead.  However, **the white copy of the signed confidential or non-confidential form should accompany all letters.**

EXHIBIT A

## NON-ACADEMIC JOB SEARCHES

Before you engage in a non-academic job search, we recommend you visit:

*The Office of Career Management*
*Claremont Graduate University*
*1263 N. Dartmouth Ave.*
*Claremont, CA 91711*
*909.621.8177*
*career.center@cgu.edu*

### HOW DOES THE OFFICE OF CAREER MANAGEMENT HELP ME FIND A JOB?

If you decide to engage one of our career counselors for help in facilitating your job search, we will work with you to design an action plan that meets your individual needs. After developing an understanding of your goals and professional aspirations, we can help you work through any of the components of a successful job search. The primary components of the job search process include:

- *Self Assessment:* learning how to leverage your strengths and minimizing any obstacles created by your weaknesses
- *Research:* identifying the economic sectors where you want to work and the organizations that meet your criteria for job satisfaction
- *Search strategy:* prioritizing your target organizations and making the best use of the time you have available for job search
- *Networking:* meeting people who can provide you with information and opportunity
- *Tools:* writing effective resumes and cover letters
- *Interviewing skills:* honing your effectiveness in traditional, behavioral, case, telephone and informational interviews
- *Negotiating:* ensuring you get the best offers possible and minimizing the risk of being under-valued
- *Decision-making:* determining which opportunities are best suited to your professional and personal goals

The Office of Career Management can help you with any or all of the components of the job search by:

- Nurturing contacts with employers and alumni who have a track record of hiring or networking with CGU students
- Providing you with access to materials, databases and websites that are a source of career information and job leads
- Engaging in a consultative relationship with you that is highly individualized and flexible, depending upon which aspects of the job search are most important to your success

EXHIBIT A

SPE FACULTY

EXHIBIT A

# SCHOOL OF POLITICS & ECONOMICS

## FACULTY

### DEAN



**JEAN SCHROEDEL,** Dean, *Ph.D. Political Science, Massachusetts Institute of Technology.* Dr. Schroedel's areas of specialization include American politics, executive-Congressional relations, Congress and public policy; the modern presidency; American political development; women in the political process, state regulation of the fetus, gender politics in the workplace, race and sex discrimination in employment; AIDS policymaking, gun control, and women and the law. Schroedel's recent book, *Is the Fetus a Person? A Comparison of Policies Across the Fifty States,* was awarded the American Political Science Association's 2001 Victoria Schuck Award.

### DEPARTMENT OF POLITICS & POLICY



**HEATHER CAMPBELL,** Associate Professor, PhD Public Policy Analysis, Carnegie Mellon University.  Her research interests are broadly based in policy analysis and evaluation, with the explicit goal of understanding how to improve policies and practices.  She has particular interests in environmental justice, urban environmental policy analysis research and teaching.



**EUNYOUNG HA,** Assistant Professor, *PhD Political Science, University of California, Los Angeles.* Her research areas include comparative politics, political economy, and political institutions.  Her primary research interest involves the impact of globalization and domestic political institutions on domestic political economy, in particularly as manifested in the following areas: inequality, poverty, growth, unemployment, inflation, welfare spending, and taxation.  She currently studies the impact of globalization and government ideology on aspects of economic performance such as economic growth, unemployment, and inflation and how these impacts are different between developed and less developed countries.



**GYUNG-HO JEONG,** Assistant Professor, *P.h.D. Political Science, Washington University in St. Louis.*  His primary research interests are in the fields of international political economy and political methodology (Bayesian statistics). He is interested in applying theories of legislative and bureaucratic politics and quantitative methods to explain trade, monetary, and immigration politics.

## DEPARTMENT OF ECONOMICS CONT'D

 **ARTHUR T. DENZAU**, Professor, *Ph.D Economics, Washington University*. Areas of specialization include public finance, public economics, industrial organization, local educational finance, technological change, institutional change, political economy of Japan, technological change, micro-economic theory, law and economics, political economy of trade, history of thought, and econometrics.  His current research deals with the problems of Asian economics, political economy and the role of mental models.

 **JOSHUA TASOFF**, Assistant Professor, *Ph.D Economics, University of California, Berkeley.  His* research interest is mainly in psychology and economics (behavioral economics) and his secondary research interests are in political economics, experimental economics and applied economic theory.

 **PAUL ZAK**, Professor and **Department Chair**, *Ph.D. Economics, University of Pennsylvania.* Teaching and research interests include macroeconomics, finance and general equilibrium theory, neuroscience and economics, neuroeconomics, social cognition producing cooperation or conflict, decision-making under uncertainty, the neural foundations of human capital, and the effect of institutional design on economic development. He is Director of the Center for Neuroeconomics Studies.

 **THOMAS D. WILLETT**, Horton Professor of Economics, Claremont Graduate University and Claremont McKenna College. *Ph.D Economics, University of Virginia.* Dr. Willett is Director of the Claremont Institute for Economic Studies and the Horton Professor of Economics in the Department of Economics, Claremont Graduate University and Claremont McKenna College. Areas of specialization include international and monetary economics, political economy, and economic policy, international financial crises and public choice or political economy analysis of national and international economic policies. A major facet of his professional activity has been to improve the dialogue between economists and political scientists. He is the Director of the Claremont Institute for Economic Policy Studies, and former head of the International Research Department at the U.S. Treasury.

EXHIBIT A



**JAMES LEHMAN**, *Clinical Professor, PhD. Economics, Duke University*.  Dr. Lehman's areas of specialization include Microeconomics, International Economics, Economic History of China and Japan (19th and 20th centuries), Trade and Development Policy, International Trade and Finance, Money and Banking, Public Finance.



**MICHAEL UHLMANN**, Clinical Professor, *Ph.D. Government, Claremont Graduate University, LL.B., University of Virginia Law School.*  Dr. Uhlmann's areas of specialization include American Politics, Constitutional Law, The Administrative State and the Judiciary.  In addition to previous teaching assignments with Claremont McKenna College and the George Mason University Law School, Dr. Uhlmann practiced law in Washington, D.C. and has had a distinguished career in government, including service as staff and committee counsel in the U.S. Senate, Assistant General Counsel of the Federal Trade Commission, Assistant Attorney General in the U.S. Department of Justice and Special Assistant to the late President Ronald Reagan.

### RESEARCH ASSISTANT PROFESSOR



**HAL NELSON,** *Research Assistant Professor, Ph.D. Public Administration and Policy, Portland State University.*  Dr. Nelson's teaching interests include international political economy, international relations, international energy policy, international environmental politics and policies, methods.  His research interests include international political economy, international climate policy, civic engagement and decision making.

EXHIBIT A

## CMC POLITICAL PHILOSOPHY CONT'D



**JAMES H. NICHOLS, JR.,** Professor, *Ph.D Government, Cornell University.* Dr. Nichols is Professor of Political Science at Claremont McKenna College and Avery Fellow at Claremont Graduate University.  Educated at Yale and Cornell, he has also taught at McMaster University, the Graduate Faculty of the New School for Social Research, and Yale University.  He spent a year working at the National Endowment for the Humanities in Washington, as Associate Director of the Division of General Programs.  He teaches political philosophy and Questions of Civilization and team-teaches a course on the foundations of political economy.  His publications include *Epicurean Political Philosophy: On the* De rerum natura *of Lucretius*; translations with introduction, notes, and interpretative essays of Plato's *Gorgias* and *Phaedrus*; and articles on pragmatism, human rights, Plato's view of philosophic education, liberalism, and political economy.  He is at present working on the political philosophy of Alexandre Kojève.



**HARRY NEUMANN,** Emeritus Professor, *Ph.D Johns Hopkins University***.**  He is adjunct professor of Political Philosophy at the Claremont Graduate University.  He has taught at Michigan State University, Lake Forest College and Scripps College.  He has held fellowships at the Rockefeller University, New York, the Center for Hellenic Studies in Washington, D.C., among others.  He is the author of *Liberalism* and numerous publications.  His interest is political philosophy from Thucydides to Heidegger.

## PITZER COLLEGE---POLITICAL PHILOSOPHY



**SHARON SNOWISS,** Professor, *Ph.D University of California, Los Angeles.*  Dr. Snowiss' areas of specialization include ancient, modern and contemporary Political Philosophy as well as Comparisons of Eastern and Western Thought; Futurology, Including Forecastings, Science Fiction, Altered States of Consciousness, Social and Philosophical Impact of Technology, Genetic Engineering; French Literature and Politics; Feminist Political Thought; Mind/Body Healing and Qi Gong.

EXHIBIT A

SPE Faculty  2010-2011                                                              Page 88

## EXTENDED FACULTY IN ECONOMICS CONT'D

**PATRICIA DILLON, PhD University of Southern California (Scripps College)**
Emerging Economies in Europe and Asia, Managerial Economics, Personal Finance

**DARREN FILSON, PhD in Economics, University of Rochester (Claremont McKenna College)**   Business & Financial Economics, Industrial Organization, Technological Change, Mathematical & Quantitative Methods, Game Theory

**ERIC HELLAND, PhD Washington University  (Claremont McKenna College)**
Law and Economics, Microeconomics, Industrial Organization, Environmental Economics

**GREGORY HESS, PhD Johns Hopkins University (Claremont McKenna College)**
Public Economics, Macroeconomics

**MANFRED KEIL, PhD London School of Economics (Claremont McKenna College)**
Macroeconomics, Econometrics

**KONSTANTINE KLIOUTCHKINE, PhD University of California, Berkeley (Pomona College)** German and Russian.

**MICHAEL KUEHLWEIN, PhD Massachusetts Institute of Technology (Claremont McKenna)**
Macroeconomics

**STEPHEN V. MARKS, PhD Princeton University (Pomona College)**
Indonesian Economy, Law and Economics, Trade and Regulatory Policies

**KERRY O'DELL, PhD University of California, Berkeley (Claremont McKenna College)**
American Economic History, Macroeconomics, Monetary and Financial Economics, International Trade and Finance

**GARY N. SMITH, PhD Yale University (Pomona College)**  Economics Statistics, Economic Modeling, Security Valuation and Portfolio Theory, Financial Decisionmaking.

**SLAVI SLAVOV, PhD Stanford University (Claremont McKenna College)**
International Finance, Macroeconomics

**JANET SMITH, PhD University of California, Los Angeles (Claremont McKenna College)**
Economics of Strategy, Industrial Organization, Microeconomics

**MICHAEL STEINBERGER, PhD Massachusetts Institute of Technology (Pomona College)** Labor Economics,  Macroeconomics, Political Economy.

**MARC D. WEIDENMIER, PhD University of Illinois (Claremont McKenna College)**
Macroeconomics, Development of American Markets, Financial & Business Forecasting

EXHIBIT A

SPE Faculty  2010-2011                                                    Page 90

## EXTENDED FACULTY IN POLITICS & POLICY CONT'D

**ADRIAN PANTOJA, PhD Claremont Graduate University (Pitzer College)** Latino political behavior, immigration, racial and ethnic politics, public opinion, and American politics.

**JOHN PITNEY, PhD Yale University (Claremont McKenna College)**
American Politics, Congress, presidency, political organizations and parties, public policy, media politics

**RALPH ROSSUM, PhD University of Chicago (Claremont McKenna College)**
Constitutional Law, American Founding, Criminal Justice and Procedure

**JOHN SEERY, PhD University of California, Berkeley (Pomona College)**
Democratic Theory, Feminist Politics, Political Theory

**PAUL STEINBERG, PhD University of California, Santa Cruz (Harvey Mudd College)**
Comparative Environmental Politics, transnational social movements, political science research methods

**RICHARD WORTHINGTON, PhD University of Oregon (Pomona College)**
Environmental Action, Globalization, Science Policy, Information Technology

-172-                                              EXHIBIT A

**EXHIBIT M**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

55

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A



# Grievance Statement Form
**Claremont Graduate University**
160 E. Tenth Street, Claremont, CA. 91711
TEL: 909.607.9448
FAX: 909.607.7285

Personal information to be completed by the student (please print or type).

Name (Last, First)_____ Date:_____

Student ID #:_____

_____
Mailing address (Street)                    (City)                              (State)        (Zip)

_____          _____
Daytime phone number                        Email address

State the date of incident, party against whom the grievance is being made, and the dates of attempted resolution. Attach additional sheets if necessary.

_____
_____
_____

State the policy or procedure that has been violated.  Attach additional sheets if necessary.

_____
_____
_____

State your rationale to support your allegation.  Attach additional sheets if necessary.

_____
_____

State your suggested resolution.  Attach additional sheets if necessary.

_____
_____
_____

_____          _____
Signature                                          Date

(Rev'd 12/2004)

EXHIBIT A



**Grievance Statement Form**
**Claremont Graduate University**
160 E. Tenth Street, Claremont, CA. 91711
TEL: 909.607.9448
FAX: 909.607.7285

**Claremont**
**GRADUATE UNIVERSITY**

## STUDENT GRIEVANCE PROCEDURE

1. **Definitions**
   a) A "grievance" is a statement by a student that he/she has been wronged by either a failure to follow, or a breach by Claremont Graduate University of its established policies and practices which includes, but is not limited to, discrimination on the basis of race, color, creed, place of national origin, gender, sexual orientation, age, or disability. **Complaints regarding faculty judgment of academic performance, which do not allege discrimination on any basis listed above, are not subject to a grievance procedure.**
   b) A "student" is anyone who was properly enrolled in the University at the time the perceived wrong occurred.
   c) A "complaint" is the formal statement of his/her grievance that a student files with the Dean of Students.

2. **Time Limits**
   a) Complaints of grievances arising from situations that may occur after the ratification of this procedure must be filed within **six** calendar months after the situation took place.
   b) The time limits in this Student Grievance Procedure do not include periods when the University is in recess.
   c) Anyone who cannot perform some procedural step on time must ask the Vice President for Student Affairs and Dean of Students (hereafter "Dean of Students") for an extension before the time limit has been exceeded. Failure on part of the student to observe any time limit or to receive an extension shall be taken by the Committee to mean that the student has abandoned his/her complaint, and no further action on the matter shall be allowed. Failure on the part of someone named in a complaint either to observe a time limit or to receive an extension shall be taken by the Committee to indicate that person's agreement with all statements in the complaints.

3. **The Committee**
   The grievance committee consists of two faculty members from the faculty grievance committee, two students appointed by the Graduate Student Council and the Dean of Students or his/her representative acting as Chair.

4. **Settlements Prior to a Hearing**
   a) If the grievance can be resolved by some mutual consent of both parties before it comes to hearing, and the resolution requires some formal administrative action under the established policies of the University, then the Dean of Students shall forward to the Provost and Vice President for Academic Affairs a statement of the grievance and its proposed resolution. This statement must be approved by both parties. The Provost and the Vice President for Academic Affairs may then either approve the resolution and take the required action or order that the remainder of the procedure be carried out.

   b) If the proposed resolution does not require such administrative action, then the resolution shall be considered the final step in the procedures, and no subsequent complaints or defenses on the matter shall be heard.

(Rev'd 12/2004)

EXHIBIT A

### STEP ONE

| WHO ACTS | WHAT ACTION |
|---|---|
| Student | Meet with the person(s) immediately involved in the dispute and discuss the problem. This step is voluntary if the grievance involves allegation of discrimination, sexual harassment, or sexual assault. |
| Other Party | Discuss the problem with the student. |

**Time limit:** The meeting between the student and the other party must take place within **ten** business days after it is requested.

### STEP TWO

| WHO ACTS | WHAT ACTION |
|---|---|
| Student | If Step One has not resolved the problem, consult with the Dean of Students. |
| Dean of Students | Consult with the student involved. Try to resolve the difficulty. |

**Time limit:** The student must consult with the Dean of Students within **five** business days after meeting with the other party, or, if no meeting has been held, within **five** days after the end of the time limit in Step One.

### STEP THREE

| WHO ACTS | WHAT ACTION |
|---|---|
| Student | If Steps One and Two have not resolved the problem, complete the Grievance Form and by completing the form you are requesting the Dean of Students to arrange a meeting between you, the other party, and the Dean of Students. This step is not required if the grievance involves an allegation of discrimination, sexual harassment, or sexual assault. Students raising this type of allegation will not be required to meet with the other party or to participate in informal resolution attempts as a prerequisite to filing a Statement of Grievance under Step Four, below. |
| Other Party | Meet with the student and the Dean of Students. |
| Dean of Students | Meet with the student and the other party. If the problem cannot be resolved at this meeting, direct the parties involved to complete a Statement of Grievance (student) and a Response to Grievance (other party). |

**Time limit:** The meeting between the Dean of Students, the student and the other party must take place within **ten** business days after the student requests it. If the matter remains unresolved, the student and the other party must submit completed statements to the Dean of Students within **five** business days following the meeting. These documents shall be sent to the Chair of the Committee on Student Grievances within **three** days following their receipt.

### STEP FOUR

| WHO ACTS | WHAT ACTION |
|---|---|
| Student | If the grievance involves an allegation of discrimination, sexual harassment, or sexual assault, and the student chooses not to participate in Step Three, the student must file a Statement of Grievance with the Dean of Students to request a hearing. |
| Other Party | Provide a Response to Grievance to the Dean of Students, if not previously submitted in Step Three. |
| Dean of Students | The original statements shall be forwarded to the Chair of the Committee on Student Grievances (CSG). Generally, each party shall receive a copy of the opposing party's statement. However, if the grievance involves an allegation of discrimination, sexual harassment, or sexual assault, a copy of the complainant's statement will not be provided to the opposing party if it is not necessary to identify the complainant in order for the accused to respond, or in order to investigate and resolve the complaint. Notify the Provost and Vice President for Academic Affairs, the Chair or the supervisor of the department of the other party, the Graduate Student Council, and, if appropriate, the administrator responsible for the issue under debate that a formal grievance hearing will be held. **Only the name of the parties involved shall be made known; all other details must be held in strict confidence.** |
| Committee on Student Grievances | Conduct a hearing on the grievance in accordance with the approved procedures and submit recommendations to the Provost and the Vice President of Academic Affairs and to the principles. |

(Rev'd 12/2004)

EXHIBIT A

**Time limit:** A hearing must be scheduled within **fifteen** business days after the committee receives the Statement of Grievance forms from the Dean of Students.  Recommendations must be submitted to the Provost and the Vice President of Academic Affairs and to the principles within **three** business days following completion of the hearing.

**STEP FIVE**

| WHO ACTS | WHAT ACTION |
|---|---|
| Provost and Vice President of Academic Affairs | Review the documents to make sure that all steps in this procedure have been followed; then consider the recommendations of the Committee on Student Grievances, make a decision, and send a written notification of the decision to all parties. |

**Time limit:** The decision of the Provost and Vice President of Academic Affairs must be made within **ten** business days following receipt of the comments.

**APPEALS**
Either of the parties involved in the grievance may appeal the decision of the Provost and Vice President of Academic Affairs to the President of the Graduate University.  If an appeal is filed, the other party will be notified and provided an opportunity to respond.  An appeal must be made within **five** business days after the Provost and the Vice President of Academic Affairs has announced his/her decision, and any response to the appeal must be made within **five** business days of notice that an appeal has been filed.  The decision of the President shall be final and must be made within **ten** business days following receipt of an appeal and any response from the other party.  Both parties will receive written notice of the President's decision.

(Rev'd 12/2004)

EXHIBIT A

**EXHIBIT N**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

56

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

7/6/20, 1:48 PM

Fw: requested paper

Brian Heit <Brian@heitlawgroup.com>
Mon 7/6/2020 12:55 PM
**To:** Guile Gomez <guile@heitlawgroup.com>

📎 2 attachments (43 KB)
FinalSchroedelResearchPaperCover25.doc; FinalSchroedelResearchPaperCover25.doc;

---

**From:** Joe Jablonski <jabljjj@cs.com>
**Sent:** Sunday, June 14, 2020 1:37 PM
**To:** Brian Heit <Brian@heitlawgroup.com>
**Subject:** Fwd: requested paper

Exhibit ___: Plaintiff's Email to Ashton Ellis in response to Ellis's request for the paper of same-sex marriage.


-----Original Message-----
To: ashtonellis@gmail.com
Sent: Mon, May 9, 2011 5:31 pm
Subject: re: requested paper

Hi Ashton,

Here it is.  Your presentation was also very good.
I'll be around if you want to chat about this paper.
Hope your summer is relaxing and productive.

Joe

-179-                                                        EXHIBIT A

5-9-2011

JOE,

PLEASE EMAIL ME
YOUR SAME-SEX MARRIAGE
PAPER. FASCINATING!

THANKS, ASHTON

ashtonellis@gmail.com

EXHIBIT A

**<u>EXHIBIT O</u>**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

57

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

Fwd: PP 483 - 1 Legal Research Methods

## Joe Jablonski <jabljjj@cs.com>
Tue 6/30/2020 2:15 PM

**To:**  Guile Gomez <guile@heitlawgroup.com>

Campbell email to Plaintiff dated Nov. 22, 2016

-----Original Message-----
From: Joe Jablonski <jabljjj@cs.com>
To: brian@heitlawgroup.com <brian@heitlawgroup.com>
Sent: Sun, Jun 14, 2020 2:06 pm
Subject: Fwd: PP 483 - 1 Legal Research Methods

Exhibit ____: Campbell's Email to Plaintiff dated Nov. 22, 2016, saying "I forgot."

-----Original Message-----
From: Heather Campbell <Heather.Campbell@cgu.edu>
To: Joe Jablonski <jabljjj@cs.com>
Sent: Tue, Nov 22, 2016 4:26 pm
Subject: Re: PP 483 - 1 Legal Research Methods

Joe,

The answer to this is very simple, but true: I forgot.

I am sorry.

Heather

Heather  E. Campbell, PhD
Chair and Professor
Politics and Government
Claremont Graduate University
McManus 242
heather.campbell@cgu.edu
909-621-8689

*Rethinking Environmental Justice in Sustainable Cities: Insights from Agent-Based Modeling*, Campbell, Kim and Eckerd (2015).

On Nov 22, 2016, at 4:17 PM, Joe Jablonski <jabljjj@cs.com> wrote:

Hi Heather,

I notice that Ashton Ellis is teaching Legal Research Methods in Spring 2017.

I remember mentioning the possibility of teaching that course to you about a year and half ago when Blickenstaff resigned.

EXHIBIT A

7/6/20, 11:43 AM

I also remember asking you to let me know when the course was being taught again as I had an interest in teaching it.

I have filed over 50 briefs in the federal appellate courts and have argued over 35 cases in the federal appellate courts.  I have appeared before both Supreme Court Justice Ruth Bader Ginsburg (when she was on the D.C. Circuit) and also Justice Clarence Thomas (when he was on the D.C. Circuit).  I have published law review articles in DePaul and Richmond law reviews on federalism issues that came before the Supreme Court in the *Seminole Tribe of Florida* case, now a leading 11th Amendment opinion.

Further, my arguments in the Czarkowski case in the Federal Circuit were published by the Federal Circuit in Czarkowski v. MSPB.  See attached.   It was a cutting edge case dealing with whether the MSPB had jurisdiction over a Navy special projects employee's case against the government.  It is a published opinion and I filed the case as a solo practitioner.  The oral argument was challenging and I remember a feeling of satisfaction that I had met allthree judges' concerns in that case.  It was a good feeling to have defeated the MSPB General Counsel's office in the Federal Circuit.

I also filed winning briefs in a cutting edge tort case Sutton v. McDonalds in the Fourth Circuit, see attached, just before I started school here at CGU.  I am a member in good standing of three bars, Massachusetts, D.C., and Virginia.  I also would have been Justice Lewis Powell's in 1988 were it not for an illness he contracted in that time period.  My correspondence with Justice Powell is archived at Washington & Lee Law School in Virginia.

I also clerked for a federal appellate judge by the name of Danny Boggs in the U.S. Court of Appeals for the Sixth Circuit, where I wrote draft opinions for the Sixth Circuit.

I was also a member of the University of Pennsylvania Law Review, one of the oldest law reviews in the United States, where I edited articles from leading law professors in the Ivies and other top schools.

These are only a few of my accomplishments as an appellate lawyer in the federal courts.

I would appreciate your letting me know why I was not informed of this opening.

Thank you.

Sincerely,

Joe Jablonski
<Suttoncase081914.U.pdf><Czarkowski03-3300-2011-03-27.pdf>

-183-

EXHIBIT A

**EXHIBIT P**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

58

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

**VIA USPS CERTIFIED MAIL DATED FEBRUARY 4, 2019**
**RETURN RECEIPT REQUESTED**
**#7018 1130 0000 3081 5099**

February 4, 2019

Mr. Len Jessup
President, Claremont Graduate University
150 E. 10th Street
Claremont, CA 91711

**Re: Title IX violations, DFEH violations, Fraud, Fraud in the Inducement, Breach of Contract, Continuing Harassment, Professional Reputation Harm, Defamation-Slander, Work-Place Hostility**

Dear President Jessup:

Pursuant to the suggested 60-day Notice requirement under California state law, please find enclosed a copy of Notice and a Right to Sue Letter in the DFEH Matter Number: 201812-04416605.  Copies of the Notice and Right to Sue Letter were also sent by certified mail, bearing today's date,  individually, return receipt requested, to each of the individually named respondents in this matter, bearing #s: 7018 1130 0000 3081 5105, 7018 1130 0000 3081 5112, 7018 1130 0000 3081 5129.

As painful as this matter is for me, I could not live another day without bringing this matter to your attention in this 14-page letter herein enclosed.

I regret to inform you of what appears to me to be a pattern of unprofessional and discriminatory conduct on the part of CGU faculty, dating back to February 2011 and continuing to the present here at CGU.  As is obvious from the Complaint, the matter described below relates to the actions and omissions of three professors in particular, i.e., Dr. Michael Uhlmann, Dr. Jean Schroedel, and Dr. Heather Campbell.  The most recent action by these professors, which was preceded by a death threat against me from CGU student Kalen Ferrell Smith on Nov. 21, 2017, was an effort to set me up and get me dismissed from the university on a false charge of "unprofessional speech" in late December 2017-early January 2018.  The plan went awry when a student witness came to my defense and refuted these bad faith charges.  This most recent action is, as shown below, part of a long pattern of unacceptable conduct.  I am aware of other CGU students who have been harmed by these professors.

Not only do the actions of these professors, in my opinion, violate federal and California state law guaranteeing my civil rights, but they are also constitute fraud, fraud in the inducement, harassment, breach of contract, defamation/slander, and violate my 1st Amendment rights under the US and California state constitutions.  Their actions and omissions also violate CGU's own written policies and procedures designed to protect students like myself from the kind of invidious discrimination these professors engaged in against me. Their actions and omissions are

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

indicative of an utter contempt toward me as a CGU graduate student.  Their actions and
omissions against me appear to have been premeditated and calculated to harm me
professionally, financially, emotionally, and personally.   These actions and omissions have been
engaged in for the purpose of chilling free speech at the university.  These actions have harmed
my professional reputation, past, current and future prospects for both permanent and adjunct
positions here at CGU, and have caused me to incur enormous student debt (greater than
$275,000) which, in the absence of the alleged unlawful conduct, would not have accrued.
Scholarship and fellowship opportunities have been taken away from me by these three
professors.

By their actions from February 2011 continuing to the present, these three professors, Uhlmann,
Schroedel and Campbell, have worked to harass, to intimidate me, to silence my voice protected
under the 1st Amendment, and to harm my professional reputation, to harm my physical and
mental health, and to destroy the possibility of present and future employment as a professor here
at CGU and elsewhere.  All three professors knew of my interest in teaching here at CGU on a
permanent basis.  Indeed, before Uhlmann found out that I supported a right to same-sex
marriage in the US Constitution, he told me, several times, that I was a "natural teacher" and,
given my talents, I could expect to become a permanent professor of political science and
political theory here at CGU.  Before February 2011, Schroedel often mentioned to me that CGU
needed a permanent political theory professor on its faculty.

These three professors have not only harmed me individually both professionally and personally,
but they have caused harm to numerous other students who have complained to me privately
about them.  I have counseled and comforted dozens of graduate students at the PhD level over
my several years here at CGU.  The harm that these professors have done to the reputation of
CGU as an institution of higher learning is substantial, in my opinion. It is also my conviction,
after studying this matter, that Uhlmann not only enlists his advisees to visit invidious comments
and make up false charges against students, such as myself, as recently as December 2017 and
January 2018, but he actively dissuades students with views different from his own to continue to
study here at CGU.  I believe that they are using, indeed manipulating, the American qual exam
as a way to punish students whose views they disagree with and to dissuade students who have
voiced criticism of this regime from continuing graduate study.

Uhlmann's political views lie in the ultra-right region of the political spectrum and advisees
whom he has enlisted to harass me have all shared his ultra-right political views.  Some of his
advisees are ultra-right elements with no toleration for views different from their own.  From my
experience, Uhlmann disparages students for views different from his own in the class room,
refuses to advise students whose views are different from his own, promotes students whom he
considers to have the "right" political views, and those, like myself, whom he considers to be a

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

"dangerous thinker," he tries to destroy.  In my opinion, besides myself, my fellow graduate student, Kevin Feldman, is a case in point.

Instead of encouraging debate at a university, Uhlmann kills it.  Uhlmann strangles the soul of a university.  He shuts down debate in the classroom and visits vicious humiliation on students with viewpoints he disagrees with. .

Schroedel and Campbell not only know about this extreme unprofessional and unlawful conduct, which violates written university policies against discrimination, such as Title IX and analogous state laws, but have enabled it.  Indeed, Schroedel has gone so far as to participate in it actively, as my case shows.  As my advisor at the time, her statement to me that "they will destroy you," if I had chosen to do a PhD dissertation on same-sex marriage, is evidence for my claim.  When I apprised the Dept. Chair, Heather Campbell, on several occasions, of Schroedel's discriminatory conduct and threat toward me, Campbell did nothing about it.  When I apprised Campbell, on several occasions, of the discriminatory conduct toward me by Uhlmann and Schroedel, including the most recent in December 2017/January 2018, Campbell did nothing about it.  Instead of addressing these grave issues, Campbell has discouraged me, and continues to affirmatively discourage me, from apprising appropriate authorities of the faculty's inappropriate speech and conduct toward me.  The risk of apprising you as CGU President--prior to my earning the PhD degree in December 2018--was too great to bear in the circumstances, for, in my opinion, this regime would have sabotaged my obtaining a PhD degree from CGU.

I truthfully filled out an CGU Exit Questionaire/Interview for my M.A. degree in 2018 and this will be used as an Exhibit A in this matter.  I was not given an opportunity to fill out an Exit Questionaire for the PhD degree, which I note as remarkable.

I came to CGU in September 2010 with optimism, a very strong background, and had every expectation of a winning the Johnston Fellowship (tuition remission for entire graduate career), based on an explicit oral promise made to me by Sandra Seymour, Schroedel's assistant at the time.  After having been denied the Johnston Fellowship in 2009 as an applicant for admission to CGU, Seymour told me that I could re-apply for the Johnston Fellowship after my first CGU semester, but she impressed on me that it was imperative that I do well academically in the program.  She also said that based on my resume--which she had in front of her while talking to me--that my chances of obtaining the fellowship were "virtually certain."  In reliance upon her representation, I sold my real estate in Arlington, VA, and moved to Claremont to attend CGU, which a Holy Cross College professor friend of mine had described as the "Harvard of the West Coast."  Schaeffer described it as a little-known gem of a school where faculty were first-rate, especially as regards the US Constitution studies and political theory, and Schaeffer assured me that academic debate was robust and spirited among a gifted and competitive student body and gifted faculty.  It was about two years into the program that I realized that these representations

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

were not borne out by the reality of the situation here at CGU.  It was indeed incomprehensible to me that precious few grad students at CGU, if any, came from the other "Cs," Harvey Mudd, Pomona, Scripps, Pitzer, or CMC.   In my opinion, it is extremely telling that the very colleges that CGU uses to enhance its image to the world, send precious few, if any of their graduates to graduate school at CGU.

After arriving in September 2010 for my first semester, I told Uhmann, who offered to be my advisor at the time, that I intended to apply for the Johnston fellowship in the Spring semester 2011.  Uhlmann told me that, in his opinion, I was a strong candidate for the fellowship.  I also told Schroedel the same thing.  After working hard that semester, I distinguished myself as the top student in the CGU political science program at the time—always prepared for class, I participated the most in classroom discussion in all of my classes, was the most experienced in law and government, having attended a top ten law school and had been on its law review, and had worked in Washington, D.C. for over ten years as an attorney, had clerked for a federal appeals court judge, published two influential law review articles.

There exists a sharp contrast between Uhlmann's attitudes toward me prior to February 2011 and his attitudes toward me after February 2011.  My relationship to Uhlmann throughout the Fall Semester 2010 was absolutely positive and strong.  Indeed, it went beyond the professional into the personal throughout Fall 2010 and into the Spring 2011, as I became Uhlmann's chauffeur. Uhlmann gave me many personal gifts, including two winter coats and a Christmas manger, which I have kept as exhibits in this matter.  Uhlmann and I talked every day, daily smoking cigarettes together on the second floor of Harper and outside classrooms in McManus.  Uhlmann and Schroedel gave me special access to the lab on the second floor near their offices.  Having given me their phone numbers, I could call them to open the lab anytime I needed to work on the weekends.  I frequently worked on the weekends.  I drove Uhlmann several times a month to and from LAX and to Ontario airports and to his doctor's appointments.  During this time frame, Uhlmann often conveyed to me his opinion, based on my many class contributions, that I was a "natural teacher" of political science and the law.  He acknowledged my education at a top Ivy League university, both law school and undergraduate.  He said that I should be careful not to upstage Schroedel in her classes, since he realized that I knew more about American history, government, and political science than she did.  Uhlmann told me that I would make a fine professor of political science and that CGU would be very fortunate to get me as a professor. Uhlmann made me believe that that I had a future at CGU.   Objectively, my educational credentials parallel Uhlmann's, if they do not exceed his in certain respects.   I found it highly unusual that Uhlmann would frequently ask me personal questions, which I would often handle diplomatically.   I never asked Uhlmann personal questions, as it was of no concern to me.

In the middle of February 2011, after I had again reminded Uhlmann of my pending application for the Johnston Fellowship, Uhlmann asked me, with a sense of pressing urgency, what I was writing on in Schroedel's APD class in Spring 2011. I told him I was analyzing the same-sex marriage line of cases in light of a constitutional right to same-sex marriage.  He said oh I am

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

glad you told me that and walked away, which I found strange given what I saw as a developing
professional and personal relationship.  Not knowing how badly Uhlmann had damaged my
prospects for the scholarship, I continued to give Uhlmann rides to and from airports and to
doctor's appointments throughout that Spring semester 2011.

After February 2011 Uhlmann began for the first time to make invidious comments, with
troubling frequency, about my "gay cigarettes," my "filthy" car, and began for the first time to
mimic a gay man with a feminized voice in front of me.  Uhlmann told other students, i.e.,
Christopher Wolfe in front of me that it was now okay to wear a dress to school if he wanted to,
and numerous other similarly invidious comments that served to mock what he perceived as my
gay sexual orientation.  These comments became more frequent and persistent.

Uhlmann in the Harper 2d floor student lab made fun of me in late March for teaching ""Polish"
to fellow graduate student Sarah Mallams. I tutored Mallams in German, so apparently Uhlmann
is incapable of distinguishing German from Slavic languages.  Mallams was one of our most
gifted female students.  Mallams left the program because she considered the CGU American
Politics professors to be "unprofessional."  Mallams received a full scholarship, plus teaching
stipend, from the University of Houston and earned her PhD degree from there.  Mallams told
me that going to CGU was the worst mistake of her life.

I found out in April 2011 that the Johnston Fellowship (full tuition remission) was awarded to an
in-coming student from Assumption College in Worcester, MA, by the name of Melissa M.
Mahoney, whose credentials were demonstrably inferior to my own.  I complained about the
decision, which I considered to be arbitrary, to both Uhlmann and Schroedel, and later to
Campbell who was unable to shed any light on the decision.  Melissa Mahoney turns out to be a
student of Uhlmann's friend, Dr. Daniel Mahoney, a conservative political science professor
from Assumption College.  This was recently confirmed in a conversation I had with Chairman
Geoff Kavanaugh in his office at Assumption College in August 2018.  In May 2011, Schroedel
told me that Melissa Mahoney had a M.A. in Government from Harvard University and thus was
more qualified than I was for the scholarship.  This turns about to be inaccurate.  Uhlmann told
me that he was convinced that Mahoney was far more intelligent than I was and that justified her
getting the Johnston Fellowship.   In my opinion, the critical difference between Mahoney and
myself was that Melissa Mahoney, at the time of the Johnston Fellowship award in Spring 2011,
was perceived to be a good conservative and I was not.

In response to my complaint that giving him rides was getting to be too much, Uhlmann told me
in May 2011 that if things were getting to be too rough that "[I] could get the Vaseline out."

Uhlmann refused to return my handwritten bluebook final exam in his National Security class in
Spring 2011, after I repeatedly requested, indeed demanded, its return.  There were two reasons I
needed the exam book back: (1) I had written the basis of an article on US national security
institutions in that bluebook and (2) I intended to use the bluebook answer to prepare for the

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

American qual exam.  Uhlmann's refusal to return the exam meant that my thinking was forever lost.  When I complained to Schroedel about Uhlmann's breach of university regulations, Schroedel did nothing.  Uhlmann ignored my many requests to return my written final exam in this class.  I also reported Uhlmann's failure to return the final exam to Campbell, who characterized the issue as a "theft of intellectual property."  Despite her apparent sense of the gravity of the situation, Campbell did nothing to attempt to get my exam from Uhlmann.

On June 10, 2011, Uhlmann's advisee, Ashton Ellis, requested a copy of my paper on same-sex marriage, because he told me he was curious to see how I developed my argument and promised me he would give me his comments on the article.  At the time I thought nothing of it, but then began to realize that Ashton's request was likely in bad faith, given that Ellis never ever got back to me on the paper.  I have kept a copy of this email from Ellis.  In Spring 2017 Ellis later was awarded the job of teaching legal writing to grad students that should have gone to me based on my objectively superior credentials and based on a request I made to Campbell that she apprise me of an opening to teach this course.

Uhlmann often held me up for ridicule in the classroom, after I would point out something relevant in the reading assigned for that class.  In Modern Presidency, he, after having lost his temper, severely berated, in front of the whole class, fellow PhD grad student and lawyer Kevin Feldman for raising the question of whether some of the Framers were racist.  The effect of this outburst from Uhlmann was to chill the discussion of an important area of political science developed by the famous scholar named Rogers Smith, who now teaches at my alma mater, the University of Pennsylvania.  I recall that Uhlmann was required to write a letter of apology to Feldmann.  In my opinion, Uhlmann's abuse of Feldman in the classroom was a factor that contributed to Feldman's leaving the program, prior to receiving an M.A. degree.  Uhlmann should have written a letter of apology to the whole class.

In this same time period, J. Michael Hoffpauir, another Uhlmann advisee, called me a "Damn homey!" in the 2d floor lab in Harper, in a voice loud enough so that Uhlmann in his office could hear him down the hall.

Uhlmann told me toward the end of the Modern Presidency course that he was going to have to punish me in the Modern Presidency course for not having made a presentation all semester.  Uhlmann had to be reminded that he had stated to me in front of the entire class that I did not have to make a presentation in light of my extensive participation in every class of the Modern Presidency.  I had to remind him several times of what he had stated to me about mid-way through the semester.  I reported Uhlmann's abuse toward me to Schroedel who smiled at me but did nothing.

Uhlmann told the Modern Presidency class that the whole class should be punished with a 4-hour no break in-class Final exam—a killer of an exam, quite unprecedented.  I aced the 4-hour

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

exam and developed a novel theory about the administrative state bearing intrinsic limits on the
rhetorical presidency that the rhetorical presidency school failed to note.  It was groundbreaking.
My exam was the best exam.  I found this out through Schroedel, not Uhlmann.

I found out for the first time at the end of 2011 from Schroedel that Uhlmann dropped me as an
advisee without my knowledge sometime in 2011.  When I asked Schroedel when Uhlmann
specifically dropped me as an advisee, she would not answer the question.  When I asked
Schroedel who had placed my name as an advisee of hers, she would not answer the question.
To this day I still do not know who wrote my name in on official forms as Schroedel's advisee.
It is also remarkable that at no point in time did Schroedel ever meet with me as her advisee.

Uhlmann failed to inform me that there was a conference on the administrative state in Spring
2012.  Materials handed out for this conference were relevant to my American qual prep.  I
obtained the materials for this conference from another student.  When I showed up at the
conference in the Salvatori Center, Uhlmann forbade me from orally participating in the
conference on the administrative state.  I even knew some of the participants, for example, Judge
Doug Ginsburg, before whom I had argued appellate cases, and he asked me why I was not
participating in the conference.  I reported Uhlmann's conduct to Professor Jennifer Merolla and
she agreed with me that Uhlmann's conduct was outrageous and violative of my free speech
rights.  All emails to professional contacts I had made at the administrative state conference
curiously went unacknowledged.

In a Uhlmann course I audited on the 1st Amendment, religious freedom, church-state separation,
Uhlmann chastised me in the class as a 'smartass" for having raised as relevant to class
discussion the writings of John Stuart Mill on the "harm principle," which later became a
philosophical foundation of the line of cases, prior to *Obergefell* at the state level, holding that a
right to same-sex marriage existed under law.  I answered the take-home Final Exam question
and it was returned to me by Uhlmann in an envelope he addressed to "Chief Justice Jablonski."

It is remarkable that Schroedel failed to meet with me a single time as my advisor.  During my
entire time here at CGU, Schroedel never offered counsel to me on my career as a graduate
student or as a political science professor.  The only time she met with me was to go over the
courses I had taken to determine if I had met departmental requirements relative to the qualifying
exams for American and political theory.   When I asked whether I needed to do anything for the
M.A. degree, she said CGU automatically awards M.A. degrees to students who have finished 3
years of course work. This turned out to be misleading as I did not get an M.A. degree awarded
until May 2018, a circumstance which explains why I was never contacted to teach courses at
any community college.  I had to suffer through another departmental review of my eligibility for
the M.A. degree in April 2018, after I had been awarded a Dissertation Award and was 85%
done with my dissertation at that time.

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

Uhlmann's advisee Andrew Reinecke told me he was gay and was living with a boyfriend and that he was terrified that Uhlmann might find out about it, as Reinecke was aware of how Uhlmann had treated me. One day Reinecke suffered a seizure in Uhlmann's class. Recognizing immediately what was happening, I directed fellow student Trish Miller to call 911. Emergency help was called to the scene and Reinecke's life was saved. Miller, Uhlmann and myself attended to Reinecke while we waited for the help to arrive. Reinecke's condition worsened over the ensuing year and he eventually left the program.

In a conversation with fellow graduate student, Trish Miller, about what she thought Uhlmann and Schroedel would ask on the American qualifying exam in Fall 2013, she said, "Joe, they are out to get you, so do not expect them to ask a question on the American judiciary, since they know you are a lawyer and have expert knowledge of it." I mastered two more areas of the program, one of which I had not taken any classes in, than the recommended three areas, so as to ensure I would be able to answer three questions. A day prior to the American qualifying exam, Schroedel told me, "Joe, you will really enjoy taking the qual." When I read the American qual exam the morning of the exam in ACB, the thought immediately haunted me that they were, as Miller noted, indeed trying to get me. The omission of any large question on the American judiciary was too conspicuous to ignore and that together with other things, convinced me of manipulation. I was able to answer the administrative question only because I had mastered the material on my own time. During the exam, I gathered my wits about me, kept a sense of personal horror in check, and answered three questions to the best of my ability, despite my conviction the exam was written in less than good faith. In my opinion, Uhlmann intentionally omitted a question on the American judiciary, in the full knowledge that this was a major area of my political science interest. His post-qual exam comment to me, which bore all the hallmarks of his disappointment that I had passed the American qual, supports this inference. Uhlmann said to me, "It looks like you were over-prepared," and then walked away from me, without saying anything else.

With all due respect to you as CGU President, I would suggest interviewing the long list of students who have failed the American qual, whom this regime has consigned to the academic graveyard. Comments made to me by these unfortunate students suggest that the regime is manipulating the exam. Given the secrecy surrounding the exam together with exclusive control of the exam lying within the ambit of this regime, there would be ample opportunity for foul play here. The regime's campaign against Dr. Jacek Kugler, disparaging him as the "dark side" of the CGU political science program never made a bit of rational sense to me, from any perspective except an illicit one, and thus this was also a red flag to me regarding this regime. Indeed, it would appear that Kugler also smelled a rat and thus the regime was trying to put down, if not eliminate, someone who was beginning to be on to what this regime of professors is engaged in. The deep divisions in the political science faculty currently are disadvantaging past and current

8

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

CGU students substantially and complicating their efforts to putting together viable dissertation committees.  Moreover the secrecy surrounding the historically low pass rate for the American qual also constitutes, from my standpoint, supporting evidence allowing the inference that something "dark" is going on with this regime regarding the qualifying exams for American politics.

In the months after my successful American qual, I proposed writing a dissertation on same-sex marriage, using my paper in Schroedel's class as proposal, to Schroedel, who was my advisor at the time.  Schroedel told me in her office that if I do anything on same-sex marriage, "they will destroy you."  I suggested that I wanted to publish my article on same-sex marriage that I had written for her APD course, and she told me "you'd better not."  When I asked Schroedel who the "they" was that she referred to, she said nothing and stared at me.  I walked out of her office with a creepy feeling.

I reported Schroedel's implicit threats to Campbell, who listened but did nothing.  Campbell did say that I should be able to write on same-sex marriage if I wanted to do, either as an article or a dissertation.  Campbell told me that she did not know who the "they" was that Schroedel referred to, after I asked her if she knew who "they" was that Schroedel was referring to.

After Schroedel had failed to counsel me professionally as her advisee, I switched advisors from Schroedel to Campbell, who seemed at the time to be more sympathetic to my concerns than Schroedel.  I again brought up to Campbell that Schroedel had implicitly threatened me that "they would destroy me," if I either published the paper on same-sex marriage or wrote a dissertation proposal for an analysis of the same-sex marriage line of cases, both federal and state.   Campbell again said I ought to have the right to publish on same-sex marriage or write a dissertation proposal on an analysis of the same-sex line of cases.  She did nothing on my behalf, however.

I was about to file a grievance against Uhlmann and Schroedel, and Campbell begged me personally, on more than one occasion, not to file.   Fearing retaliation for filing a Title IX complaint/grievance against Uhlmann, I did not do it at that time.

Campbell never met with me once for an advisor-advisee session.  At my initiative, I met with her on issues related to Uhlmann and Schroedel.   As my advisor, Campbell has never met with me even once to discuss my academic record or my career as a political scientist.

After Schroedel's threat that "they will destroy [me]," if I did a dissertation on same-sex marriage or published an article on it, I decided to develop another proposal on the subject of Wilson's race-historicism.  This costed me substantial additional time.  I decided to get a committee of only CMC professors, Chairman Blitz, James Nichols, and Charles Kesler, to avoid the harassment and threats of Schroedel and Uhlmann and a dysfunctional Campbell at CGU.

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

After Ken Blickenstaff left the CGU faculty, I told Campbell that I would like to teach the CGU constitutional law courses and the legal writing course if they opened up.  Blickenstaff to the best of my knowledge only has a J.D. and no graduate degrees in political science.

Campbell gave the legal writing course job to Ashton Ellis, a Uhlmann advisee, in December 2016, without informing me of the opening.  Ellis is the same student who requested a copy of my paper on same-sex marriage back in 2011.  Ellis taught the course in January 2017.  When I asked Campbell why she did not contact me about teaching the course, she emailed me to say "I forgot."

After two prior unsuccessful applications for a Dissertation Award. I applied for a dissertation award in April 2017 and finally got one in May 2017.   The dissertation award was given to me by a committee that did not include either Uhlmann, or Schroedel or Campbell.  Neither Uhlmann nor Schroedel emailed me a congratulatory note.

In late Summer-Fall 2017 the department advertised for a full-time professor in political science without telling me of the opening, although Campbell knew of my interest in teaching at CGU and especially in the areas they were seeking to cover.

On November 21, 2017, my life was threatened by text message by CGU PhD student Kelan Farell-Smith, with the words "you welcome blood," preceded by other minatory text messages. It is my understanding that Kelan Farrell-Smith has been banned from CGU for threatening several CGU and CMC professors, including the chairman of my committee, Mark Blitz.

In early December 2017, Joseph Lake, a Uhlmann advisee, came up to me in the ACB lab, said in words to the effect that "we noticed" that you (Joe) have not participating in the job talks and it would be nice to have you participate in the job talks.  Then Lake invaded my personal space to look at what I had on my computer screen.  Not fully grasping the significance of the invasiojn of privacy at this point, I told him I had been busy writing my dissertation.  He implored me to come to a "meet the graduate students thing" for a woman named Christian the next day.  I said I would try and come to it.

I went to the event and Lake chose a seat next to me.  Christian asked students around the table what they were working on.  I told her what my dissertation was about and then discussed, at her behest, my findings on Wilson's fundamental racism--which had been adumbrated in Pestritto's book on Wilson.  When Christian challenged me that my thesis on Woodrow Wilson's racist progressivism was unfounded, (to the laughter of students in the classroom), I defended my thesis and my dissertation in a back and forth exchange with her.  I found it highly strange that Lake was nowhere to be found after the event, since it was he who had invited me to the event. The next day I saw him in the next job talk by a male candidate and he said absolutely nothing to me.

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

Days later I was summoned into Campbell's office on a charge of unprofessional conduct made by Lake against me. Lake I was told wrote something on the job evaluation form for the candidate to the effect: Joe Jablonski is the greatest embarrassment to CGU and the most obnoxious student ever at CGU. To the best of my information and belief, this evaluation with the slanderous remarks about me was seen and read by faculty members in the department and Uhlmann would have known that would happen. Campbell told me that Lake's was a serious charge that could warrant a dismissal from the university.

I immediately developed a defense to the charges. I told Campbell that she should contact a CGU graduate student from Turkey named Alp who witnessed the whole thing.

When I met with Campbell about the pending charges against me, I told her I was defending my thesis against an attack on its very viability. I also told Campbell that I had strong reason to believe that I was set up by Uhlmann through Lake. Lake's "We" was never specified. Lake also invaded my personal space to see what I was working on at the computer station in ACB. A month later Lake came to me in the ACB building purportedly seeking to clear the air and in that conversation said to me things that could only have come from Uhlmann, as Lake would have had no personal knowledge of my career, since I had never discussed it with him at any prior point in time. To my knowledge, Campbell never investigated the bad faith that surrounded this unfounded charge.

Joseph Lake is from what I can gather a far-right wing advisee of Uhlmann's. In my opinion, I was set up on false "unprofessional speech" charges, for which I had to expend an enormous amount of time and resources to defend myself in Campbell's office in December 2017 and January 2018. I lost two months of work on my dissertation as a result of this ruse, so much did this unfortunate set of circumstances upset me.

It suffices to say that these three professors and their advisees have caused me more harm than I am able to measure. This regime has damaged numerous graduate students other than myself. This regime has damaged CGU's reputation as an institution of higher learning teaching American political science. This problem continues to this very day. Schroedel recently exuded hostility toward me right before my dissertation defense on October 10, 2018, on the 2d floor in Harper and on October 14, 2018, on the second floor near Rm. 214 in the ACB building.

I succeeded here academically, in spite of this regime's waging a vicious campaign of psychological warfare against me, continuing to this day, to destroy my morale, to silence my voice, to undermine my will to continue here as a graduate student, to mar my reputation as an accomplished constitutional scholar and lawyer, to demean my professional and academic standing, to misrepresent willfully my academic record, to insult me personally, to dissuade me from publishing cutting edge research on same-sex marriage, and to intimidate me through threats of harm to my professional reputation, i.e., "they will destroy you." Their unprofessional conduct has caused me to lose scholarship aid, to lose adjunct teaching positions here that would

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

have given me current teaching experience, to take on excessive student debt, now in excess of $250,000, which no graduate student with my stellar academic record should have to bear. Schroedel's threat to me--levelled in the timeframe after my successful qualifying exams--that, if I chose a topic for my dissertation that related to the same-sex marriage line of cases, that "they will destroy you," has been borne out in the time following that threat.

Their discrimination against me because of my views on same-sex marriage dates, my age, my ethnicity, my 1st Amendment protected political view speech, my perceived sexual orientation, from February 2011, and continuing to the present, is unacceptable; hence the Complaint DFEH Matter Number: 201812-04416605.

The aforementioned conduct is in direct violation of federal, state and CGU Title IX policy and constitutes, in addition, a breach of contract, fraud, fraud in the inducement, and bad faith dealing. This behavior—the aforementioned and afore-described affirmative conduct, omissions, untoward remarks, and invidious attitudes toward me--has contributed to a hostile work environment continuing to the present, needless to say, unconducive to research and study at one of the nation's all-graduate student institutions of higher learning.

My stellar record as a graduate student here at CGU, with a perfect graduate record and a Dissertation Award 2017-18 and a successfully defended dissertation accepted without revisions on Oct. 10, 2018, with unanimous opinion of the committee that my dissertation is publishable and on the cutting edge of Wilson studies, should leave no doubt to a reasonable mind that these three professors have willfully discriminated against me, have retaliated against me for having raised civil rights concerns, and otherwise engaged in a pattern of harassment and hostility against one of CGU's top graduate students, because of his views on same-sex marriage and other political views, in violation of federal and state civil rights laws and the contractual representation by the university to the student that such discriminatory conduct and attitudes do not exist at CGU, and in breach of several representations CGU makes on its website. In my opinion, these three professors willfully defrauded me of an environment free from invidious discrimination based on perceived sexual orientation and caused a hostile work environment with repeated instances of harassment to instantiate. This hostility continues to this day.

Their discriminatory behavior toward me not only has substantially increased a student debt burden that otherwise should be modest given my academic record prior to CGU and my record here at CGU, see my CV attached, but has caused my mental and physical health to suffer. Further, their conduct has deprived me of teaching opportunities here at CGU that, absent this discrimination, would naturally have been open to me. Indeed, my CV (see attached CV) equals or exceeds the credentials of the three professors who are responsible for the discrimination against me that has been so costly professionally and financially and emotionally. In my opinion, they have also retaliated against me for having raised these discrimination issues with the appropriate authority, i.e., Dept. Chair Campbell. Campbell failed to write a letter of recommendation for me.

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

In the years 2013, 2014, and 2015, and Campbell begged me not to file a grievance with the university, implying that, had I pursued a grievance against Uhlmann and Schroedel for Title IX violations and breaches of contract, that untoward consequences would occur against me, in retaliation for having apprised appropriate authorities of the problematic conduct, and that, as a consequence of that retaliation, I would not be able to finish the program. I submit that those untoward consequences were nonetheless visited on me as described herein.

In December 2017/January 2018, I told Campbell that I believed on information and belief that I was intentionally set up on a false charge by extreme right-wing Uhlmann and his advisee, named Joseph Lake, in an attempt to destroy me by getting me dismissed from the university on trumped-up unprofessional speech misconduct charges. Given what I reasonably have perceived as a prior pattern of retaliation and intimidation against me, I therefore waited until I officially received the PhD degree, before apprising your office of this behavior. I fear presently further retaliation against me by these three professors for having reported these matters to you as CGU President. I have no doubt that they had tried to sabotage my PhD degree and to discourage the continuation of my graduate study here at CGU. They had certainly sabotaged my M.A. degree as I did not receive it until May 2018, when I should have had it 2 yrs. prior to that. Retaliation and intimidation would thus appear to me to be the *modus operandi* of Uhlmann, Schroedel and Campbell.

Given what I know about Uhlmann, Schroedel and Campbell, in my opinion, I believe that this latest episode of harassment in December 2017/January 2018 was motivated out of a fear that I would bring this matter to your attention as the new CGU president before they could orchestrate my dismissal from the university. In this sense, it would be clearly retaliatory within the meaning of governing statutes.

I conclude that CGU is not what it is represented to be on its website or in written brochures and departmental handbooks. My experience at this university, as articulated above, goes far to explaining both declining interest in the graduate program in political science and the utter absence of interest by the five C's in sending their students to grad school here.

As a settlement in this matter, I am asking that CGU fairly compensate me for the consequences of the discrimination, harassment and retaliation against me caused by these three professors. Based on my outstanding academic record here at CGU, and my extensive academic resume including a law degree from the prestigious Penn Law School, a top ten law school with extremely competitive admission, I lost a professorship at this university valued at $125k per year for 20 years, $2.5 million. I have suffered harassment, degradation, slander, defamation, unlawful restrictions on free speech, unlawful professional restraints on publication of articles deemed unacceptable by faculty, continuing threats to this day of "they will destroy [me]," regarding publication of articles "they" do not agree with. As I believe that the actions and

EXHIBIT A

Mr. Len Jessup
President, Claremont Graduate University
2/4/19

omissions of these three professors, either in whole or in part, are premeditated, and thus
calculated with an intent to harass me and therefore harm me, both professionally and personally,
I ask the additional sum of $500k. I have a student debt in excess of $250,000, but for their
discrimination against me, and thus I ask that CGU retire that debt.

I ask that the Johnston Fellowship be retroactively awarded to me on official letterhead of CGU.
In addition, I seek written apologies from all three professors and written promises, executed by
each of the foregoing professors, promising to cease and desist badmouthing me to other students
and professors here and elsewhere in the academic world. I also ask for a written promise that
any harm done to my reputation among CGU and CMC faculty be rectified appropriately and
that I shall be able to apply for future job openings, permanent and adjunct, in American politics,
at either CGU or CMC, without the animus of these three professors, and other unknown
professors, being a problem.

I look forward to resolving this matter as soon as possible.

Sincerely,

Joseph J. Jablonski, Jr.
559 N. Euclid Ave.
Upland CA 91786
jabljjj@cs.com
703-534-0992

Enclosures: Notice and Complaint; CV; Transcripts

EXHIBIT A

**EXHIBIT Q**

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

HEIT LAW GROUP
PROFESSIONAL CORPORATION

59

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

# Claremont Graduate University

**OFFICIAL ACADEMIC TRANSCRIPT**

Page 1 of 3

**Name:** Joseph Jablonski
**Student ID:** 110618

**Print Date:** Jan 7, 2019

## External Degrees

University Of Pennsylvania   Bachelor of Arts   May 15, 1981
University Of Pennsylvania   Doctor of Arts   May 15, 1987
University of Pittsburgh - Main Campus   Master of Arts   May 15, 1983

## Academic Program History

Program: 2010-08-05:   Politics and Policy   Active in Program
Doctor of Philosophy in Political Science (Major)

Program: 2010-09-27:   Politics and Policy   Active in Program
Doctor of Philosophy in Political Science (Major)
American Politics/Political Philosophy Concentration

Program: 2018-04-20:   Politics and Policy   Active in Program
Master of Arts in Politics (Major)

## Degrees Awarded

Degree: Master of Arts
Confer Date: May 12, 2018
Plan: Master of Arts in Politics

Degree: Doctor of Philosophy
Confer Date: Dec 22, 2018
Plan: Doctor of Philosophy in Political Science
Sub-Plan: American Politics/Political Philosophy

## Beginning of Graduate Record

### 2010 Fall

| Course | | Title | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| PP | 300 | Amer Politics & Institutions | 4.000 | 4.000 | A | 16.000 |
| PP | 305 | Exec Congressional Relations | 4.000 | 4.000 | A | 16.000 |
| PP | 450 | Major Works in Pol Philosophy | 4.000 | 4.000 | A | 16.000 |

Term GPA 4.000   Term Totals   Attempted 12.000   Earned 12.000   GPA Units 12.000   Points 48.000

### 2011 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 301 | American Political Development | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 319D | Spec Tops:Natl Secur/Desc Mkg | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 469A | Spec Tpc:In Pol Phil: Demo Tny | 4.000 | 4.000 | 4.000 | A | 16.000 |

Term GPA 4.000   Term Totals   Attempted 12.000   Earned 12.000   GPA Units 12.000   Points 48.000

### 2011 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 307 | The Modern Presidency | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 456 | Acnt Pol Pht: Tactlist/Roman Em | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 498 | Indep Research (PhD Students) | 4.000 | 4.000 | 4.000 | A | 16.000 |

Transcript Note: American Seperation of Powers Doctrine

Term GPA 4.000   Term Totals   Attempted 12.000   Earned 12.000   GPA Units 12.000   Points 48.000

### 2012 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| POST | 200PZ | Legislative Process & Policy | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 319B | Spec Tops:Perspec on Judcl Pwr | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 463 | Political Phil & History | 4.000 | 4.000 | 4.000 | A | 16.000 |

Term GPA 4.000   Term Totals   Attempted 12.000   Earned 12.000   GPA Units 12.000   Points 48.000

Lindsay Stadler, Director of Enrollment and Records Management

This officially sealed and signed transcript is printed on red SCRIP-SAFE security paper with the name of the university printed in white type across the face of the document. A raised seal is not required when the signature is in white type. When photocopied, the institution name will appear. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED.

The Family Educational Rights and Privacy Act (FERPA) prohibits disclosure of this information without the prior written consent of the individual identified by this document.

EXHIBIT A

TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE

# Claremont Graduate University

**OFFICIAL ACADEMIC TRANSCRIPT**

Page 2 of 3

Lindsay Stadler, Director of Enrollment and Records Management

This officially sealed and signed transcript is printed on red SCRIP-SAFE security paper with the name of the university printed in white type across the face of the document. A raised seal is not required. When photocopied a security statement combining the institution name will appear. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED.

**Name:** Joseph Jablonski
**Student ID:** 110518

### 2012 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 310 | Presidency & the Constitution | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 327 | Constitl Law II: Ntl Powers | 4.000 | 4.000 | 4.000 | A | 16.000 |
| PP | 462 | Contemp Political Theory | 4.000 | 4.000 | 4.000 | A | 16.000 |
| | | Term Totals | 12.000 | 12.000 | 12.000 | | 48.000 |

Term GPA 4.000

### 2013 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 341 | US Immigration Policy | 4.000 | 4.000 | 4.000 | A | 16.000 |

Transcript Note: Grade change from A- on 7/15/2013.

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 452 | The Thought of Leo Strauss | 0.000 | 0.000 | 0.000 | S | 0.000 |
| PP | 458 | Machiavelli's Discrses on Livy | 4.000 | 4.000 | 4.000 | A | 16.000 |
| TNDY | 4011 | The Nature of Inquiry | 4.000 | 4.000 | 4.000 | A+ | 16.000 |
| | | Term Totals | 12.000 | 12.000 | 12.000 | | 48.000 |

Term GPA 4.000

### 2013 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA 0.000

### 2014 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

### 2014 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

### 2015 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

### 2015 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

### 2016 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |
| | | Term Totals | 0.000 | 0.000 | 0.000 | | 0.000 |

The Family Educational Rights and Privacy Act (FERPA) prohibits disclosure of this information without the prior written consent of the individual identified by this document.

THE WORLD'S FINEST TRANSCRIPTS PRINTED ON SCRIP-SAFE

THE WORDS CLAREMONT GRADUATE UNIVERSITY AND 2009 EFCV APPEAR ON ALTERNATE LINES WHEN PHOTOCOPIED

EXHIBIT A

# Claremont Graduate University

**OFFICIAL ACADEMIC TRANSCRIPT**

Page 3 of 3

Lindsay Stadler, Director of Enrollment and Records Management

This officially sealed and signed transcript is printed on red SCRIP-SAFE security paper with the name of the university printed in white type across the face of the document. A raised seal is not required. When photocopied a security statement containing the institution name will appear. A BLACK OR WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED.

**Name:** Joseph Jablonski
**Student ID:** 110618

## 2016 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA   0.000   Term Totals   0.000   0.000   0.000   0.000

## 2017 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA   0.000   Term Totals   0.000   0.000   0.000   0.000

## 2017 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA   0.000   Term Totals   0.000   0.000   0.000   0.000

## 2018 Spring

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA   0.000   Term Totals   0.000   0.000   0.000   0.000

## 2018 Fall

| Course | | Title | Attempted | Earned | GPA Units | Grade | Points |
|---|---|---|---|---|---|---|---|
| PP | 499 | Doctoral Study (PhD Students) | 0.000 | 0.000 | 0.000 | | 0.000 |

Term GPA   0.000   Term Totals   0.000   0.000   0.000   0.000

---

Term GPA   0.000   Term Totals   0.000   72.000   72.000   288.000

### Graduate Career Totals

| | Attempted | Earned | GPA Units | | Points |
|---|---|---|---|---|---|
| Cum GPA: | 4.000 | Cum Totals | 72.000 | 72.000 | 288.000 |
| Transfer Cum GPA | | Transfer Totals | 0.000 | 0.000 | 0.000 |
| Combined Cum GPA | 4.000 | Comb Totals | 72.000 | 72.000 | 288.000 |

### Non-Course Milestones

Program: Politics and Policy

Tool One
Milestone Title: Nature of Inquiry/ Quantitative Research Methods (TNDY401/ PP481)
Date Completed: 2013-07-17

Tool Two
Milestone Title: Legal Research Methods (PP483)
Date Completed: 2013-07-17

Doctoral Qualifying Exam
Date Completed: 2014-04-03

Tool Three
Milestone Title: French
Date Completed: 2015-07-09

Advanced to Candidacy
Date Completed: 2015-09-08

Master's Degree Final Approval
Date Completed: 2018-04-12

Dissertation Defense
Date Completed: 2018-10-10

End of Official Transcript

The Family Educational Rights and Privacy Act (FERPA) prohibits disclosure of this information without the prior written consent of the individual identified by this document.

**EXHIBIT R**

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

HEIT LAW GROUP
PROFESSIONAL CORPORATION

60

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

## Christopher N. Krewson

| | |
|---|---|
| CONTACT INFORMATION | Department of Political Science<br>University of Wisconsin-Madison<br>110 North Hall, 1050 Bascom Mall<br>Madison, WI 53706<br>email: krewson@wisc.edu<br>phone: (559) 403-0062<br>web: christopherkrewson.com |
| EDUCATION | **University of Wisconsin, Madison, WI**<br><br>Ph.D. Candidate, Political Science (expected Spring 2018)<br><br>Major Field: American Politics (high pass)<br>Minor Fields: Political Methodology; Advanced Statistical Analysis<br>Research Interests: American Political Institutions; Judicial Politics<br><br>M.A., Political Science, May 2014<br><br>**Brigham Young University, Provo, UT**<br><br>B.A., American Studies, December 2012 |
| DISSERTATION | *How Justices Shape Public Perceptions of the Supreme Court On and Off the Bench*<br>Committee: Ryan J. Owens (Chair), Barry C. Burden, Eleanor Neff Powell, and Alexander M. Tahk<br><br>My three-essay dissertation explored the relationships between public perceptions of the United States Supreme Court and justices' activities on and off the bench. The first two essays focused on how justices influenced their personal reputations and public perceptions of the Court through public speeches. I demonstrated this with a randomized field experiment and a randomized survey experiment. In the field experiment, I assigned law students with reservations to a public speech by Justice Sotomayor to take a survey just before or just after the event. In a separate survey experiment using Amazon Mechanical Turk, I assigned individuals in a treatment group to read news coverage of the speech before responding to survey questions. Individuals who attended the speech and those indirectly exposed to the speech through a news article felt more favorable toward the justice, were more likely to perceive law as the primary determinant of judicial decisions, were less inclined to view justices as political, and expressed higher levels of institutional loyalty. In the third essay, I tested whether justices altered their opinion language in order to communicate with public audiences. The essay employed regression analysis, text analysis, and the development of a novel measure of opinion-level sensationalism (which captured the amount of emotional language in an opinion) to investigate this claim. In harmony with my expectations, I found pre-decision public interest in a case led justices to write opinions with language that was more emotional. |
| PUBLICATIONS AND MANUSCRIPTS UNDER REVIEW | Jack Edelson, Alexander Alduncin, Christopher Krewson, James A. Sieja, and Joseph Uscinski. 2017. "The Effect of Conspiratorial Thinking and Motivated Reasoning on Belief in Election Fraud." *Political Research Quarterly*. (equal contribution)<br><br>Christopher Krewson and Ryan J. Owens. 2017. "Historical Development of Supreme Court Research." In *The Routledge Handbook of Judicial Behavior*, eds. Robert Howard and Kirk Randazzo. Routledge.<br><br>Christopher Krewson and Ryan J. Owens. Forthcoming 2017. "The Concurring Behavior of Justice Scalia." In *The Conservative Revolution of Antonin Scalia*, eds. David A. Schultz and Howard Schweber. Lexington Press.<br><br>Christopher Krewson, Alexander M. Tahk, and Ryan J. Owens. "Federal Circuit Court Non-Compliance with Supreme Court Jurisprudential Regimes." *Journal of Law and Courts*. (revise and resubmit)<br><br>Christopher Krewson, David Lassen, and Ryan J. Owens. "Twitter and the Supreme Court: An Examination of Congressional Tweets about the Supreme Court." *Justice System Journal*. (revise and resubmit)<br><br>Christopher Krewson. "Save This Honorable Court: Shaping Public Perceptions of the Supreme Court Off the Bench." *Journal of Politics*. (under review) |

EXHIBIT A

WORKING
PAPERS

"Strategic Sensationalism: Understanding the Use of Emotional Appeals in Supreme Court Opinions."

"Politicized Confirmation Hearings and Public Views of the Court: Evidence from a Conjoint Experiment." (with Ryan J. Owens)

TEACHING
EXPERIENCE

Lecturer (University of Wisconsin-Madison):
Understanding Political Numbers, Spring 2018
Law, Politics, and Society, Spring 2017

Teaching Assistant (University of Wisconsin-Madison):
Introduction to Statistical Methods in Political Science (graduate level), Fall 2017
Maximum Likelihood Estimation for the Social Sciences (graduate level), Fall 2017
The Supreme Court as a Political Institution, Fall 2016
The Supreme Court as a Political Institution (grader), Fall 2015
Constitutional Law: Rights and Liberties, Spring 2015
Introduction to American Politics, Fall 2014

RESEARCH
EXPERIENCE

Project Assistant, Yaron Nili, University of Wisconsin Law School, 2017-present
Project Assistant, Eleanor Powell, University of Wisconsin-Madison, 2015-2016
Research Assistant, Ryan Owens, University of Wisconsin-Madison, 2014-2015
Research Assistant, Richard Davis, Brigham Young University, 2012

CONFERENCE
PRESENTATIONS

Christopher Krewson and Ryan J. Owens. 2018. "Politicized Confirmation Hearings and Public Views of the Court: Evidence from a Conjoint Experiment." To be presented at the 2018 annual meeting of the Southern Political Science Association (January 4-6, New Orleans, LA).

Christopher Krewson. 2017. "The Role of External Actors in the Development of Supreme Court Opinions." Presented at the 2017 annual meeting of the American Political Science Association (August 31-September 3, San Francisco, CA).

Christopher Krewson. 2017. "Substance and Perception: The Influence of Extra-Judicial Communications on Beliefs About the United States Supreme Court." Presented at the 2017 annual meeting of the Midwest Political Science Association (April 6-9, Chicago, IL).

Christopher Krewson. 2017. "Know Your Audience: How Judicial Opinions Are Influenced by External Actors." Presented at the 2017 annual meeting of the Southern Political Science Association (January 12-14, New Orleans, LA).

Christopher Krewson. 2016. "Bridging the Methodological Divide: Predictions and Legal Scholarship." Presented at the 2016 annual meeting of the American Political Science Association (September 1-4, Philadelphia, Pennsylvania).

Christopher Krewson. 2016. "Justices and Their Multiple Audiences: How Context and Audience Shape Judicial Behavior." Presented at the 2016 annual meeting of the Midwest Political Science Association (April 7-10, Chicago, Illinois).

Christopher Krewson. 2016. "A Rush to Judgement: The Politics and Timing of Presidential Nominations." Presented at the 2015 annual meeting of the Southern Political Science Association (January 6-9, San Juan, Puerto Rico).

Christopher Krewson, Ryan J. Owens, and Alexander M. Tahk. 2015. "Congruence Without Compliance: Measuring Lower Court (Non)Responsiveness to Jurisprudential Regime Changes." Presented at the 2015 annual meeting of the Midwest Political Science Association (April 16-19, Chicago, IL).

Christopher Krewson, Ryan J. Owens, and Alexander M. Tahk. 2015. "Compliance or Attrition? Re-evaluating Jurisprudential Regimes in the Courts of Appeals." Presented at the 2015 annual meeting of the Southern Political Science Association (January 15-17, New Orleans, LA).

Christopher Krewson, David S. Lassen, and Ryan J. Owens. 2014. "Interbranch Tweets: Examining How and Why Congress Tweets About the Supreme Court." Presented at the 2014 annual meeting of the Law and Society Association (May 29-June 1, Minneapolis, MN).

WORK
EXPERIENCE        Research Assistant/Contractor, Research Division, Federal Judicial Center, Washington, D.C., 2012-2014
                  English-Second-Language Instructor, Brigham Young University, 2008-2011

PROFESSIONAL
AFFILIATIONS      American Political Science Association (since 2016)
                  Midwest Political Science Association (since 2015)
                  Southern Political Science Association (since 2014)

AWARDS AND
FELLOWSHIP        Summer Initiative Competition, Political Science Department, University of Wisconsin-Madison, 2017
                  Conference Presentation Competition, Graduate Department, University of Wisconsin-Madison, 2016
                  Prestage-Cook Travel Award, Southern Political Science Association, 2015
                  Clara Penniman Fellowship, Department of Political Science, University of Wisconsin-Madison, 2013-2014

SERVICE           Managing Editor for *Constitutional Studies*, 2016-present
                  Graduate Student Coordinator for American Politics Workshop, 2015-present
                  Computer Services Graduate Student Representative, 2015-present

REFERENCES        **Ryan J. Owens (Chair)**
                  Professor of Political Science
                  Faculty Affiliate of the University of Wisconsin Law School
                  Honorary Fellow of the Institute for Legal Studies
                  University of Wisconsin-Madison

                      email: rjowens@wisc.edu
                      phone: (608) 263-2279

                  **Barry C. Burden**
                  Professor of Political Science
                  Director of the Elections Research Center
                  Lyons Family Chair in Electoral Politics
                  University of Wisconsin-Madison

                      email: bcburden@wisc.edu
                      phone: (608) 263-6351

                  **Eleanor Neff Powell**
                  Associate Professor of Political Science
                  Faculty Affiliate of the La Follette School of Public Affairs
                  Trice Faculty Scholar
                  University of Wisconsin-Madison

                      email: eleanor.powell@wisc.edu
                      phone: (608) 265-5798

                  **Alexander M. Tahk**
                  Assistant Professor of Political Science
                  University of Wisconsin-Madison

                      email: atahk@wisc.edu
                      phone: (608) 263-2297

EXHIBIT A

**EXHIBIT S**

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

61

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

Joseph J. Jablonski, Jr.
559 N. Euclid Ave.
Upland CA 91786
703-534-0992
jabljjj@cs.com

October 28, 2019

Hiring Committee
Department of Political Science
California State University, San Bernardino
5500 University Parkway
San Bernardino, California, 92407

**Re: Assistant Professor of Political Science 2020-AP243 Opening,**
https://www.schooljobs.com/careers/csusb/jobs/2495455-0/constitutional-law-and-american-politics-assistant-professor-tenure-track

Dear Hiring Committee:

Thank you for the opportunity to apply for the Assistant Professor of Political Science at California State University, San Bernardino, 2020-AP243. I welcome the opportunity to teach the undergraduates and M.A. degree students at Cal State and to become a member of the political science faculty. My recent Ph.D. in Political Science from Claremont Graduate University (CGU) and my law degree, together with my extensive experience practicing law in the federal courts, provide me with the necessary knowledge and skills to teach both Constitutional Law and American Politics courses for the department.

I taught PSCI203 American Government in the Spring Quarter and received a very favorable evaluation from the Chairman of this department and the students as well. In this Fall Quarter, I am currently teaching PSCI203 American Government and PSCI313 19th Century Political Thought and enjoying every moment of this experience. I am devoted to teaching students in the classroom and feel privileged to be able to do so here at San Bernardino.

As shown more fully in a separately submitted Diversity Statement, which also develops my teaching philosophy more fully, I am sincerely committed to Cal State San Bernardino's stated core mission values of "Inclusivity, innovation, integrity, respect, social justice and equity, sustainability, transparency, and wellness and safety." I am also passionately committed to Cal State San Bernardino's stated goals of "Student success, faculty and staff success, resource sustainability and expansion, community engagement and partnerships, and identity." I pride myself on being a colleague interested in what other faculty members are doing and assisting and supporting them in their scholarly publication work and in their teaching responsibilities wherever I can fill a need. I cite as an example, taking the teaching responsibility for PSCI313 on short notice.

1

EXHIBIT A

At Claremont Graduate University, I concentrated my graduate study in the subfields of American Politics and Political Theory. At CGU I mastered the material in courses dealing with the American judiciary and constitutional law. My dissertation deals with cutting edge research--in the field of American politics--on the question, now prominent in the news, as to whether America is a race or an idea.

My dissertation, "The Dark Side of President Woodrow Wilson's Progressivism: Its' Race-Historicism and Other Anti-Democratic Aspects," which attempts to spearhead a line of revisionist scholarship on Wilson's Progressivism will enable me to spawn new course offerings in the department of major interest to students relative to race and ethnicity. As you know, Wilson is widely regarded as the founder of Progressivism and a champion of social justice. There is, however, a dark side to his political thought that is being brought out now in the literature, of which my dissertation is a part. I build on Pestritto's insights in his book *Woodrow Wilson: The Roots of Modern Liberalism* (2005). As constructive criticism of Pestritto, I argue that the common image of Wilson as a social justice advocate needs to be reconsidered in light of Wilson's attitudes toward and thoughts on race in his published work as well as in his actual policies as the 28th President, i.e., his extending Jim Crow to D.C. and his support for nationalizing anti-miscegenation statutes in an amendment to the Constitution.

Based on the consensus among my dissertation committee members that my dissertation is publishable, I intend to publish it either as a series of articles in political science journals or as a book on Wilson's political thought in an academic press. I also intend to present papers at upcoming political science conferences on my research. I would welcome the opportunity to talk to the faculty about my research on Wilson.

In Law school at Penn I studied with Dean Robert Mundheim, Professor Frank Goodman, and Professor George D. Brown, under whose supervision I developed my law review comment dealing with cutting-edge federalism issues then before the Court. I was awarded a prestigious clerkship with Judge Boggs on the US Court of Appeals for the Sixth, where I drafted opinions for Judge Boggs, many of which involved constitutional law. In this time-frame, I developed a professional friendship with the late Justice Lewis F. Powell, Jr., whom I met for the first time at the statue of Chief Justice Marshall in the Supreme Court. Powell took a special interest in my work on the 11th Amendment and we collaborated on major constitutional law issues through personal correspondence now housed in the Washington & Lee Law School, Powell's alma mater. Under the guidance of Professor George D. Brown from Boston College Law School, I published, shortly after graduating from law school, two influential articles on the 10th and 11th amendments in DePaul and Richmond Law Reviews, which bore on the issues presented in the landmark 11th Amendment decision of *Seminole Tribe of Florida*, 517 U.S. 44 (1996).

I maintain a strong collegial relationship with one of the nation's top constitutional law professors, Larry Tribe of the Harvard Law School and with my whistleblower lawyer colleague Mark Zaid, who is currently representing the CIA whistleblower now at the center of the Impeachment Inquiry of President Trump. I also know the current White House Counsel, Pat Cipollone, who is one of my fellow law clerks who served Judge Boggs on the US Court of Appeals for the 6th Circuit. I have argued several cases before Justices Clarence Thomas and

2

EXHIBIT A

Ruth Bader Ginsburg, during the time that they were judges on the US Court of Appeals for the D.C. Circuit.

Along with my legal and Ph.D. studies, I bring other experiences from some of the top institutions in the United States. At Harvard, I took courses in ancient and modern political theory, taught by Dr. Clifford Orwin, and in the modernization of developing countries, taught by the late Dr. Samuel P. Huntington, whose book *Political Order in Changing Societies* was a central focus. I also audited a seminar given by Dr. Judith Shklar, in which we focused on Rousseau's work.

At the University of Pittsburgh where I was in a Ph.D. program in sociology on a full scholarship, I taught undergraduates in lab sections of two major undergraduate course offerings, Introduction to American Society and Culture and Introduction (Dr. Daniel Regan) to Statistical Methods for the Social Sciences (Dr. Patrick Doreian), I focused my study on classical sociological theory (late Dr. Burkart Holzner) and historical, political, and military sociology (Dr. Peter Karsten). Thus, I am familiar with Emile Durkheim, Max Weber, Karl Marx, Georg Simmel, and the Social Darwinist Herbert Spencer.

I am now preparing notes for an in-depth book-length political science critique of the current Trump Presidency, drawing from the constitutional lessons of the Nixon and Clinton cases. As I indicated in my CV, I recently published an Op-Ed in hillreporter.com, which contains the germ of a longer scholarly critique of the Trump presidency. I have a strong scholarly interest in "hyper-partisanship" and intend to write an article on that timely subject as it relates to a possible future trial on an impeachment bill against Trump.

I also believe that I can contribute effectively to any program, the department might have concerning pre-law political science majors and that I can become a valuable mentor for those students intending to go on to some sort of graduate-level study. I am prepared to teach courses on campus and online if offered.

I, therefore, believe that I am strongly qualified to teach many of the university course offerings in Constitutional Law and American politics, and political theory (when the department's needs dictate), at Cal State, San Bernardino, both at the undergraduate and graduate levels. Taken together, my legal experience, with membership in three bars, Virginia, D.C., and Massachusetts, and my inter-disciplinary scholarly background in political science, law, sociology, and foreign languages, make me uniquely qualified for this position 2020-AP243.

I hope you will contact me so that we can further discuss how I might meet your needs. Please feel free to contact me at 703-534-0992 or jabljjj@cs.com.

I look forward to hearing from you.

Sincerely,

Joseph J. Jablonski, Jr.

3

1                                     **EXHIBIT T**

EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA | 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

December 5, 2018

Joseph Jablonski
559 N. Euclid Ave
Upland, California 91786

RE:   **Notice to Complainant**
      DFEH Matter Number: 201812-04416605
      Right to Sue: Jablonski / Claremont Graduate University et al.

Dear Joseph Jablonski:

Attached is a copy of your complaint of discrimination filed with the Department of Fair Employment and Housing (DFEH) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents.  If you do not have an attorney, you must serve the complaint yourself. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing

-212-                                                           EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

December 5, 2018

RE:   **Notice of Filing of Discrimination Complaint**
      DFEH Matter Number: 201812-04416605
      Right to Sue: Jablonski / Claremont Graduate University et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Department of Fair Employment and Housing (DFEH) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. This case is not being investigated by DFEH and is being closed immediately. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing

EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                                         DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

December 5, 2018

Joseph Jablonski
559 N. Euclid Ave
Upland, California 91786

RE:     **Notice of Case Closure and Right to Sue**
        DFEH Matter Number: 201812-04416605
        Right to Sue: Jablonski / Claremont Graduate University et al.

Dear Joseph Jablonski,

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective December 5, 2018 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

EXHIBIT A

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Joseph Jablonski                                          DFEH No. 201812-04416605

                                    Complainant,

vs.

Claremont Graduate University
150 E. 10th Street
Claremont, California 91711

Michael Uhlmann
150 E. 10th Street
Claremont, California 91711

Jean Schroedel
150 E. Tenth Street
Claremont, California 91711

Heather Campbell
150 E. Tenth Street
Claremont, California 91711

                                    Respondents

_____

1. Respondent **Claremont Graduate University**  is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

2. Complainant **Joseph Jablonski**, resides in the City of **Upland** State of **California.**

3. Complainant alleges that on or about **January 15, 2018**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's sexual orientation, age (40 and over), association with a member of a protected class.

-1-
*Complaint – DFEH No. 201812-04416605*

Date Filed: December 5, 2018

EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Complainant was discriminated against** because of complainant's sexual orientation, age (40 and over), association with a member of a protected class and as a result of the discrimination was denied hire or promotion, reprimanded, asked impermissible non-job-related questions, denied a work environment free of discrimination and/or retaliation, denied any employment benefit or privilege, denied work opportunities or assignments.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was denied hire or promotion, reprimanded, asked impermissible non-job-related questions, denied a work environment free of discrimination and/or retaliation.

**Additional Complaint Details:** I began my studies at Claremont Graduate University ("CGU") in September, 2010 to obtain a PhD in Political Science.  I am a bisexual male of Polish origin and ethnicity.

   Initially my doctoral advisor was Dr. Michael Uhlmann ("Dr. Uhlmann"), professor of political science at CGU.  Under Dr. Uhlmann's guidance, I was a rising star at CGU with represented and promised scholarships and/or permanent and adjunct teaching position(s) at CGU were I to succeed academically. I became and remain one of the top students at CGU, but my promising career was thwarted, severely prejudiced, then derailed due to my protected status.

In February 2011 I wrote a paper in Dr. Schroedel's American Political Development class which was constitutional and sociological analysis of the various judicial opinions that supported same-sex marriage (over five years before the U.S. Supreme Court's landmark decision on June 6, 2015 in Obergefell v. Hodges, which ultimately held the constitution guaranteed the right to marry to same sex couples). In February 2011, Dr. Uhlmann inquired on the subject matter of the paper, and when I told him stated to the effect "I am glad you informed me" and walked away.

   From February, 2011, continuing to the present, Dr. Uhlmann, with the consent and support of Dr. Jean Schroedel ("Dr. Schroedel")and Dr. Heather Campbell ("Dr. Campbell"), and the actual knowledge and ratification by CGU's administration, have engaged in a pattern and practice of discriminating, retaliating, and harassing me based upon my age, and actual or perceived sexuality through various acts. omissions and intentional conduct, among other things: denial of scholarships and teaching positions, even though I was more qualified than the ultimate recipients; withholding information from or failing to advise me on open and available CGU teaching positions and assignments, faculty positions, or academic conferences, and refusing to provide advice or counsel on my career, even though at various times Drs. Uhlmann, Schroedel and Campbell were each my career advisors of record; statements by Dr. Uhlmann to faculty members and students which denigrated my qualifications and academic achievements and which willfully misrepresented my

-2-
*Complaint – DFEH No. 201812-04416605*

Date Filed: December 5, 2018

teaching ability, experience, and credentials ; statements by Dr. Uhlmann to me about my "gay cigarettes," "gay shorts," and "gay sandals";  statements by Dr. Uhlmann to me, and in front of the class, which mimicked a feminine gay voice; statements by Dr. Uhlmann to me, in front of other students, that it was now okay for a male to wear a dress to school,  statements by Dr. Uhlmann to me, in front of other students, that I should go to Catholic confession and confess my sins; Dr. Uhlmann at one point took my hand and rubbed it, softly stating "HIV, HIV, HIV";  Dr. Schroedel informed me that "they" will destroy me if I wrote a doctoral thesis or article on same-sex marriage; my advisors refused to provide letters of recommendation for me.

    Initially in 2012, 2013, 2014, and 2015 I complained about the conduct of Uhlmann and Schroedel to Dr. Campbell who each time dissuaded me from filing or bringing a discrimination or harassment complaint against Uhlmann and/or Schroedel and/or CGU.  I abandoned the same sex marriage subject matter, either in publishable article or dissertation form, due to fears that CGU professors would "destroy me," as Schroedel warned me in no uncertain terms, and instead wrote my doctoral dissertation on President Woodrow Wilson's racist progressivism (based upon which I was ultimately awarded my doctoral degree in October 2018).  However, I was cajoled by an advisee of Dr. Uhlmann to attend a December 7, 2017 "job talk" to consider a new graduate candidate, who proceeded to attack my doctoral thesis as unfounded, in response to which I made an intellectual and academic reply in front of the meeting.  I was then called into Dr. Campbell's office on charges of "unprofessional conduct" by the advisee, which could have resulted in my dismissal from CGU.  I defended against the false claim, which was denied.  I again complained to Dr. Campbell in December 2017 and January 2018 about Drs Uhlmann and Schroedel, and my complaints were ignored.  Dr. Uhlmann refused to be part of my dissertation committee in 2011, before I had even formally asked him to be on that committee.  On October 19, 2018 my dissertation was approved by a committee of professors from the CGU-associated Claremont McKenna College uninvolved in this matter to the best of my knowledge, and I was awarded a doctorate degree.  I have been severely damaged financially, professionally and emotionally by this aforementioned pattern of conduct of willful misrepresentation, intentional harassment, and discrimination, by Drs. Uhlmann, Schroedel and Campbell, because of my protected status.

Date Filed: December 5, 2018

VERIFICATION

I, **Joseph John Jablonski, Jr.**, am the **Complainant** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On December 5, 2018, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Upland, CA**

-4-
*Complaint – DFEH No. 201812-04416605*

Date Filed: December 5, 2018

EXHIBIT A

## **EXHIBIT U**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HEIT LAW GROUP
PROFESSIONAL CORPORATION
340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

63

FIRST COMPLAINT FOR DAMAGES

EXHIBIT A

# MELISSA MAHONEY SMITH

c: 508 335 7430 • e: mahoneymm@gmail.com

## EDUCATION

**Ph.D.**   **Political Science,** Claremont Graduate University                      Claremont, CA | **Dec. 2017**
  - Dissertation: *Civic Dignity and Meaningful Political Participation*

**M.A.**   **American Politics**, Claremont Graduate University                      Claremont, CA | **2013**

**B.A.**   **Political Science**, Assumption College                      Worcester, MA | **2007**
  - Graduated *Magna Cum Laude*

## PROFESSIONAL EXPERIENCE

**Policy Fellow** • *Charles Koch Institute*                      Arlington, VA | **Fall 2017**
- Co-authored report with *Freedom Foundation of Minnesota* about the health of the medical technology industry in Minnesota
- Identified Minnesota's self-imposed impediments to growth, the Twin Cities' competitive advantages over similarly-sized U.S. cities, and proposed policy prescriptions for Minnesota to consider without resorting to crony capitalism

**Graduate Researcher** • *Claremont Graduate University*                      Claremont, CA | **2015 – 2017**
- Evaluated community development projects in the Philippines using qualitative methods (Process Tracing) to determine whether citizen participation contributed to better outcomes
- Developed a new scale to measure civic dignity by conducting original survey research and using quantitative methods (Exploratory Factor Analysis, Poisson regression, and Spearman correlations) to analyze the data

**Case Study Writer** • *Claremont Graduate University*                      Claremont, CA | **2015 – 2016**
- Co-authored and published case study, "Reforming Mandaue City: The Struggle to Implement a Performance Governance System," with Prof. Robert Klitgaard
- Conducted extensive desk review of government records and other relevant research
- Prepared and conducted field interviews in the Philippines with city, business, and civil society representatives

**Adjunct Instructor** • *University of La Verne*                      La Verne, CA | **2013**
- Designed syllabi and taught undergraduate courses (30 students / course) on American Government and Classical Political Philosophy

**Project Manager** • *Carr Foundation / Gorongosa Restoration Project*                      Washington, DC | **2010**
- Managed the design phase of the Interpretive Center in Gorongosa National Park, working with experts in the exhibit design industry, USAID, and conservation and humanitarian leaders.  The design phase culminated in a workup of a proposed Interpretive Center
- Successfully entered National Geographic's film *Africa's Lost Eden* at 23 international and domestic film festivals, representing the film and the Gorongosa Restoration Project in Cannes and Los Angeles

EXHIBIT A

- Led teams on 2 book projects, later published at *Tales from Gorongosa* (2010) and *Miombo* (2010); also served as an editorial advisor for *Gorongosa: Through the Lens* (2010)
- Edited promotional tourism film using Final Cut Pro
- Executed system-wide email server migration

**Private English Language Tutor**                                    Garches, France | **2009**
- Conducted customized one-on-one ESL tutoring

**Assistant to the Dean of Global Studies** • *Worcester Polytechnic Institute*     Worcester, MA | **2007 – 2009**
- Developed and managed the budgets of 15+ study abroad programs
- Recruited, hired, and supervised 4 work-study students
- Co-authored the division's Annual Report submitted to the university president's office


## PUBLICATIONS

- Klitgaard, Robert and Melissa Mahoney Smith, "Reforming Mandaue City: The Struggle to Implement a Performance Governance System," Case Study, (Ann Arbor: WDI Publishing, 2017)


## SELECT PROFESSIONAL DEVELOPMENT AND ACTIVITIES

**Problem Driven Iterative Adaption** • *Harvard University Center for International Development*
- Completed Part I and Part II modules, earning online training series certificate in March 2016
- Case studies and assignments focused on deconstructing problems in a localized context, identifying and expanding change spaces, and designing iterations to address development problems

**Invited Panelist** • *Institute for Solidarity in Asia: Islands of Good Governance Forum*
- Served as a panelist at event in Manila, the Philippines in October 2015 to review government reform and anti-corruption efforts in city governments and federal agencies

**Quantitative Analysis** • *Inter-university Consortium for Political and Social Research (ICPSR)*
- Attended workshops on Regression at the University of Michigan during Summer 2014

**Grants, Fellowships, Seminar Invitations**
- Recipient of several grants from the Institute for Humane Studies, the Charles Koch Foundation, and the Lynde and Harry Bradley Foundation for research support and professional development
- Attended 6 invited seminars on select political theory and public policy topics from 2012-2017, hosted by the Institute for Humane Studies, the Jack Miller Center, and the Texas Public Policy Foundation

**Academic Conference Presentations**
- Presented research on political theory topics at 4 Political Science conferences from 2012-2015


## CURRENT VOLUNTEER SERVICE

- Foster family (dogs) • *Animal Ark Rescue* in Columbus, GA
- Family Readiness Group Steering Committee Member • *199th Infantry Brigade* at Fort Benning, GA

EXHIBIT A

# **EXHIBT V**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

340 South Lemon Avenue, Suite 8933, Walnut, CA 91789

HEIT LAW GROUP
PROFESSIONAL CORPORATION

**FIRST COMPLAINT FOR DAMAGES**

EXHIBIT A

7/19/20, 3:48 PM

Fwd: My dissertation is right on point with the debate in the country today!

-----Original Message-----
From: Joe Jablonski <jabljjj@cs.com>
To: Heather.Campbell@cgu.edu
Sent: Tue, Jan 23, 2018 4:39 pm
Subject: Re: My dissertation is right on point with the debate in the country today!

Dear Heather,

It is not that I feel unsafe in any physical sense, but I do get the distinct impression that Lake is being used as a pawn in a campaign by Uhlmann, whom I know to be homophobic--quite contrary to the stated policy of CGU--to "destroy" me professionally and to discourage any employment as a professor here at CGU.   All of the facts point to Uhlmann being behind whatever happened in the candidate-student meeting a month ago.   I had no prior connection to Lake, other than being a fellow student acquaintance, before he invited me to attend the candidate-student meeting.  Lake used the "royal" "we," which I believe refers to Uhlmann.

Uhlmann, you may recall, after befriending me as a top student and fellow D.C. lawyer in the year you came on board, dropped me as an advisee promptly upon learning that I had written a sociological and legal analysis of same-sex marriage for Schroedel's APD course, for which she had given me an A, and an A in her course.  Uhlmann also failed to return a final exam of mine in his National Security course, which I now read as a form of harassment.   I never pursued a grievance against Uhlmann because you advised me I could not win no matter how meritorious the grievance may have been.

In addition, when I initially thought I might write a dissertation on same-sex marriage, Schroedel discouraged it because "they will destroy you."   Who "they" was was never made clear.   Lake's "we" in "we noticed that you have not been participating in the candidates' talks," conjures in my mind Schroedel's prior use of "they."

Uhlmann knows too well how my resume parallels his own, if it does not exceed it.   I have an advanced degree in sociology which he does not have and I have a proficiency in several foreign languages he does not have.  In addition, I have an interest in higher mathematics that he most certainly does not have.

If Uhlmann thinks otherwise, he is being dishonest.   In short, what I am trying to say is that he is, as Schroedel told me two years ago, trying to "destroy me," if only in the sense that he is failing to inform you of how my qualifications for teaching here at CGU match or exceed his own.

Uhlmann's prejudice against me boils down to his disappointment in learning that I do not share his homophobia and that I support CGU's policy of non-discrimination based on sexual orientation.  He knows how gifted I am as a teacher and writer and so does Schroedel for that matter.   That's wherein the tension between him and me originates.

I believe that no student should be treated differently because a professor perceives his or her sexual orientation to be different from his or her own.   The extent of Uhlmann's homophobia can be gauged from the fact that he had never even read the paper I produced, it was simply because I chose to write on same-sex marriage that he dropped me as an advisee.

Best,

-223-                                                          EXHIBIT A

7/19/20, 3:48 PM

Joe


-----Original Message-----
From: Heather Campbell <Heather.Campbell@cgu.edu>
To: Joe Jablonski <jabljjj@cs.com>
Sent: Tue, Jan 23, 2018 1:07 pm
Subject: Re: My dissertation is right on point with the debate in the country today!

Dear Joe,

I have read your message but don't see there's anything for me to do. I will retain this, though. You are under no obligation to interact with any student you feel is untrustworthy.

From what you wrote, I do not get the sense that you feel unsafe. But, if you do feel unsafe, you should contact the Dean of Students.

Best,
Heather

Heather  E. Campbell, PhD
Chair and Professor
Politics and Government
Claremont Graduate University
McManus 242
heather.campbell@cgu.edu
909-621-8689

*Rethinking Environmental Justice in Sustainable Cities: Insights from Agent-Based Modeling*, Campbell, Kim and Eckerd (2015).
http://www.tandfebooks.com/doi/book/10.4324/9780203076941

*Urban Environmental Policy Analysis*. Campbell & Corley (2012).
https://www.amazon.com/Environmental-Policy-Analysis-Heather-Campbell/dp/0765624303
"…the book is perhaps best described as a Rosetta Stone for those working in the environmental policy arena." (Caruthers, 2016)


On Jan 22, 2018, at 1:52 PM, Joe Jablonski <jabljjj@cs.com> wrote:

Hi Heather,

Joe Lake approached me at my study station at ACB  "to clear the air for himself."   I was a little surprised he did that, but, in the interest of diplomacy, I did go out to talk to him.

He mentioned Uhlmann several times.

He wanted to know whether I was interested in Uhlmann's job since Uhlmann he alleged was retiring.  I did not say anything to him about my interest in teaching here on prudential considerations.  I also did not go into any past issues with Uhlmann.  He seemed to fishing for that.  Lake also contrived to be concerned about my job prospects and said he wanted to help.   He did not want to see me always "passed over."

I had not talked to Lake since the meeting with the female candidate.   He came up to me this morning just like he did when he invited me to candidate/student meeting.

What I did learn is that Uhlmann picked the candidate from UVa and views him as his successor.

EXHIBIT A

7/19/20, 3:48 PM

Uhlmann, in my opinion, is using Lake to pry info from me.  Uhlmann is also continuing to pretend I
don't exist.

As you know, when I first got here Uhlmann and I talked several times per day, including on the
phone.  I drove Uhlmann to and from the airport all the time and to doctors' appointments.  That
continued for almost a year.  His demeanor toward me abruptly changed, however.   Uhlmann
knows I clerked for Judge Boggs, someone he and others in Reagan Admin nominated to be on the
6th Circuit.   Uhlmann knows also that Boggs was on the long list for the US Supreme Court, during
the time Bork got "borked," and Ginsburg was asked by Nancy Reagan to withdraw due to pot
smoking with his students.   Uhlmann picked Scalia over Boggs and Boggs remained on the 6th
Circuit and Scalia went up.   He also knows that Justice Powell, whom I met at the statue of Ch. J.
John Marshall, befriended me.  I was to be Powell's clerk that year 1988, but Powell suddenly took ill
and could not continue as a sitting justice.   Powell and I continued a correspondence which is now
housed in the Washington & Lee Law School Library.   Powell took a great interest in my published
writings on the 10th and the 11th Amendments.   They have been cited numerous times by scholars
studying in this area.

Best,

Joe

-----Original Message-----
From: Heather Campbell <Heather.Campbell@cgu.edu>
To: Joe Jablonski <jabljjj@cs.com>
Sent: Tue, Jan 16, 2018 9:57 am
Subject: Re: My dissertation is right on point with the debate in the country today!

Joe,

That is good. Even academics like things that speak to the times!

Heather

Heather  E. Campbell, PhD
Chair and Professor
Politics and Government
Claremont Graduate University
McManus 242
heather.campbell@cgu.edu
909-621-8689

*Rethinking Environmental Justice in Sustainable Cities: Insights from Agent-Based
Modeling*, Campbell, Kim and Eckerd (2015).
http://www.tandfebooks.com/doi/book/10.4324/9780203076941

*Urban Environmental Policy Analysis*. Campbell & Corley (2012).
https://www.amazon.com/Environmental-Policy-Analysis-Heather-Campbell/dp/0765624303
"…the book is perhaps best described as a Rosetta Stone for those working in the environmental
policy arena." (Caruthers, 2016)

On Jan 13, 2018, at 11:33 AM, Joe Jablonski <jabljjj@cs.com> wrote:

EXHIBIT A

7/19/20, 3:48 PM

Hi Heather,

Just to let you know that my dissertation is right on point in today's political maelstrom.

Warm regards,

Joe


https://www.nytimes.com/2018/01/12/us/politics/trump-immigration-congress.html?emc=edit_th_180113&nl=todaysheadlines&nlid=80585461

EXHIBIT A